UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X          Case No. 17–CV–3706

People of the State of New York, by ERIC T.
SCHNEIDERMAN, Attorney General of the State of New
York,

                              Plaintiff,

            -against-

Kenneth Griepp, Ronald George, Patricia Musco, Randall Doe,
Osayinwense N. Okuonghae, Anne Kaminsky, Brian George,
Sharon Doe, Deborah M. Ryan, Angela Braxton, Jasmine
LaLande, Dorothy Rothar, Prisca Joseph, and Scott Fitchett, Jr.
                              Defendants.

---------------------------------------------------------------------------X


## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION


**ERIC T. SCHNEIDERMAN**
New York State Attorney General
120 Broadway
New York, New York 10271
(212) 416-8250
<u>Plaintiff</u>

By:      _/s/ Sandra Pullman_____
            Sandra Pullman
            Assistant Attorney General
            Civil Rights Bureau

            Nancy Trasande
            Assistant Attorney General
            Nancy.Trasande@ag.ny.gov

            Lourdes M. Rosado
            Bureau Chief
            Lourdes.Rosado@ag.ny.gov

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ................................................................ 1

**FEDERAL, STATE, AND CITY CLINIC ACCESS LAWS** ........................... 4

A.      Federal and State Law ...................................................... 4

B.      City Law ........................................................................ 5

**FACTUAL BACKGROUND** .................................................................... 5

A.      The OAG's Investigation ................................................ 8

B.      Defendants' Unlawful Conduct ....................................... 8

      1.    Church at the Rock Defendants ................................ 10

      2.    Grace Baptist Church Defendants ............................. 14

      3.    Other Defendants ................................................... 16

**ARGUMENT** ...................................................................................... 17

**I.**      **PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF THE CLAIMS** .................................................................. 18

A.      Defendants' Actions Violate Federal and State Clinic-Access Laws ................. 18

    1.    Defendants Engage in Force, Threats of Force, and Physical Obstruction ......... 19

      a.    Defendants Engage in Force ................................. 19

      b.    Defendants Deliver Threats of Force ...................... 20

      c.    Defendants Engage in Physical Obstruction ............ 23

    2.    Defendants Possess the Requisite Intent and Motives Under Federal and State Law ............ 26

B.      Defendants' Actions Violate the NYC Clinic Access Act .................... 28

    1.    Defendants' Conduct is Prohibited by the City Law ................... 28

      a.    Defendants obstruct Patients, Escorts and Clinic Staff from Accessing the Clinic .. 28

      b.    Defendants Routinely Follow and Harass People Within 15 Feet of the Clinic ... 29

      c.    Defendants Engage in Conduct That Places People in Reasonable Fear of Physical Harm ........... 29

      d.    Defendants Interfere with the Operation of the Clinic in General ...................... 30

    2.    There Is No Intent Requirement Under the City Law ............................. 30

**II.**      **PLAINTIFF DEMONSTRATES IRREPARABLE HARM** ......................... 31

A.      Irreparable Harm Is Presumed for FACE and the NY Clinic Access Act ........... 31

i

B.        Defendants Are Causing Irreparable Harm...........................................................32

**III.**     **PLAINTIFF DEMONSTRATES THAT INJUNCTIVE RELIEF WOULD NOT HARM THE PUBLIC INTEREST** ..........................................34

**IV.**    **THE REQUESTED RELIEF IS NARROWLY TAILORED TO REMEDY DEFENDANTS' ONGOING VIOLATIONS OF LAW**.................................36

# TABLE OF AUTHORITIES

**Cases**

*Am. Freedom Def. Initiative v. Metro. Transp. Auth.*,
815 F.3d 105 (2d Cir. 2016) ................................................................................................18, 19

*Cheffer v. Reno*,
55 F.3d 1517 (11th Cir. 1995) .....................................................................................................20

*City of New York v. Golden Feather Smoke Shop, Inc.*,
597 F.3d 115 (2d Cir. 2010)..........................................................................................................31

*Cnty. of Los Angeles v. Davis*,
440 U.S. 625 (1979)......................................................................................................................19

*Daly v. Amberg*,
126 N.Y. 490 (N.Y. 1869) .............................................................................................................4

*Defario v. City of Syracuse*,
193 F. Supp. 3d 119 (N.D.N.Y. 2016)..........................................................................................34

*Devos, Ltd. v. Record*,
No. 15-cv-6916, 2015 U.S. Dist. LEXIS 172929 (E.D.N.Y. Dec. 24, 2015)...............................18

*Dickson v. Ashcroft*,
346 F.3d 44 (2d Cir. 2003)...........................................................................................................19

*Hill v. Colorado*,
530 U.S. 703 (2000).....................................................................................................................37

*Knox v. Serv. Emps. Int'l Union, Local 1000*,
132 S. Ct. 2277 (2012).................................................................................................................18

*Masden v. Women's Health Ctr.*,
512 U.S. 753 (1994)...............................................................................................35, 36, 37, 38

*McCullen v. Coakley*,
134 S. Ct. 2518 (2014).................................................................................................................38

*Murray v. Lawson*,
138 N.J. 206 (1994) .....................................................................................................................38

*New York v. Actavis PLC*,
787 F.3d 638 (2d Cir. 2015) .........................................................................................................18

*New York v. Cain*,
418 F. Supp. 2d 457 (S.D.N.Y. 2006) ............................................................................... *passim*

*New York v. Kraeger*,
160 F. Supp. 2d 360 (N.D.N.Y. 2001) .............................................................. *passim*

*New York v. Operation Rescue Nat'l*,
273 F.3d 184 (2d Cir. 2001) ("New York v. ORN") aff'd,
240 F. App'x 430 (2d Cir. 2007) ..................................................................... *passim*

*New York State NOW v. Terry*,
886 F.2d 1339 (2d Cir. 1989)................................................................................33, 36

*NM v. Hebrew Acad. Long Beach*,
155 F. Supp. 3d 247 (E.D.N.Y. 2016) ...........................................................................18

*Oliva v. Brookwood Coram I, LLC*,
No. CV 14-cv-2513, 2015 U.S. Dist. LEXIS 179084 (E.D.N.Y. Nov. 30, 2015).........18

*Oneida Nation of New York v. Cuomo*,
645 F.3d 154 (2d Cir. 2011)..................................................................................18, 34

*People ex rel. Stearns v. Marr*,
181 N.Y. 463 (N.Y. 1905) ..............................................................................................4

*Planned Parenthood of Shasta-Diablo, Inc. v. Williams*,
10 Cal. 4th 1009 (1995) .................................................................................................38

*Power Auth. of New York v. Moeller*,
57 A.D.2d 380 (N.Y. App. Div. 1977), appeal denied, 42 N.Y.2d 806 (1977)..............4

*Ricatto v. Ricatto*,
4 A.D.3d 514 (N.Y. App. Div. 2004) .............................................................................4

*Rigas v. Livingston*,
178 N.Y. 20 (N.Y. 1905) ................................................................................................4

*Schenck v. Pro-Choice Network of Western N.Y.*,
519 U.S. 357 (1997)........................................................................................37, 38, 39

*State of New York ex rel. Spitzer v. Operation Rescue*,
273 F.3d 184 (2nd Cir. 2001) aff'd, 240 F. App'x 430 (2d Cir. 2007)..........................4

*SymQuest Grp., Inc. v. Canon U.S.A., Inc.*,
No. 15-cv-4200, 2015 U.S. Dist. LEXIS 114898 (E.D.N.Y. Aug. 7, 2015) ................18

*Tutor Time Learning Ctrs., LLC v. KOG Indus.*,
No. 1:12-CV-4129, 2012 U.S. Dist. LEXIS 162124 (E.D.N.Y. Nov. 13, 2012).........34

*United States v. Burke*,
15 F. Supp. 2d 1090 (D. Kan. 1998)..................................................................33, 35

iv

*United States v. Davila*,
461 F.3d 298 (2d Cir. 2006).............................................................................................20

*United States v. Dinwiddie*,
76 F.3d 913 (8th Cir. 1996) ......................................................................20, 21, 22, 38

*United States v. Dugan*,
450 F. App'x 20 (2d Cir. 2011) .....................................................................................27

*United States v. Gregg*,
32 F. Supp. 2d 151 (D.N.J. 1998), aff'd, 226 F.3d 253 (3d Cir. 2000) .......................24

*United States v. Hill*,
893 F. Supp. 1034 (N.D. Fla. 1994)...............................................................................5

*United States v. Lindgren*,
883 F. Supp. 1321 (D.N.D. 1995)......................................................................24, 33, 35

*United States v. McMillan*,
946 F. Supp. 1254 (S.D. Miss. 1995) ("McMillan I") .......................................... *passim*

*United States v. McMillian*,
53 F. Supp. 2d 895 (S.D. Miss. 1999) ("McMillan II") ...............................................22

*United States v. Narco Freedom, Inc.*,
95 F. Supp. 3d 747 (S.D.N.Y. 2015)..............................................................................31

*United States v. Roach*,
947 F. Supp. 872 (E.D. Pa. 1996) ................................................................... *passim*

*United States v. Scott*,
958 F. Supp. 761 (D. Conn. 1997)......................................................22, 24, 25, 36

*United States v. Scott*,
No. 3:95-CV-1216, 1998 U.S. Dist. LEXIS 6716 (D. Conn. Mar. 16, 1998), aff'd,
187 F.3d 282 (2d Cir. 1999)..........................................................................................37

*United States v. Turner*,
720 F.3d 411 (2d Cir. 2013)...................................................................................20, 21

*United States v. Weslin*,
156 F.3d 292 (2d Cir. 1999).........................................................................................27

*United States v. White*,
893 F. Supp. 1423 (C.D. Cal. 1995) ...................................................................18, 24, 37

*United States v. William Savran & Assoc.*,
755 F. Supp. 1165 (E.D.N.Y. 1991) ............................................................................32

*Vringo, Inc. v. ZTE Corp.*,
No. 14-cv-4988, 2015 U.S. Dist. LEXIS 71919 (S.D.N.Y. June 3, 2015) ...................................18

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989)......................................................................................................37

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008)..............................................................................................18, 34, 35


**Statutes**

18 U.S.C. § 248(a)(l)....................................................................................... *passim*

18 U.S.C. § 248(c)(3)...........................................................................................31

18 U.S.C. § 248(e) ..........................................................................................20, 23

N.Y. Civ. Rights Law § 79-m ............................................................. *passim*

N.Y. Penal Law § 240.70 .................................................................... *passim*

N.Y. Penal Law § 240.71 ...................................................................32, 34

N.Y.C. Admin. Code § 8-801 .............................................................34

N.Y.C. Admin. Code § 8-802 .............................................................29

N.Y.C. Admin. Code § 8-803 ............................................................ *passim*


**Other Authorities**

H.R. Rep. No. 103-306 (1993), reprinted in 1994 U.S.C.C.A.N. 699..........................................32

Plaintiff, the People of the State of New York, by Eric T. Schneiderman, Attorney General of the State of New York ("OAG"), respectfully submits this Memorandum of Law and accompanying declarations and attached exhibits in support of Plaintiff's motion for a preliminary injunction. Plaintiff brings this motion to enjoin Defendants' threatening, obstructive, and violent conduct at Choices Women's Medical Center ("Choices"), located at 147-32 Jamaica Avenue, Jamaica, New York. Defendants' conduct violates the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248(a)(l), the New York State Clinic Access Act ("NY Clinic Access Act"), N.Y. Civ. Rights Law § 79-m, and the New York City Access to Reproductive Health Care Facilities Act 9 ("NYC Clinic Access Act"), N.Y.C. Admin. Code § 8-803.

## PRELIMINARY STATEMENT

Every Saturday morning to date, an aggressive group of anti-choice protesters shows up at Choices with one purpose: to impede access to reproductive health-care services. The protesters subject incoming patients to a barrage of unwanted physical contact, as well as verbal abuse, threats of harm, and lies about the clinic's hours and its services. They descend on approaching patients, sometimes walking patients into the clinic's exterior wall and pinning them against it. The protesters also crowd patients arriving by car, using their bodies to block the passenger-side doors and thrusting their heads and hands through open windows. Protesters deliberately collide into the volunteer escorts, at times pushing and shoving them, as the escorts try to shield patients from this unwanted physical contact and vitriol. The protesters also make violent threats against both the escorts and patients, referring to terrorist attacks and murderous assaults on abortion clinics and warning that the same fate may befall them. These obstructive tactics routinely deter or delay patients who are attempting to access medically necessary care.

1

Choices is an outpatient surgery center that provides, in addition to abortion care, a full array of medical services for women, including routine gynecological care, prenatal care, reproductive surgical services, and counseling. Many patients visit Choices for annual gynecological exams or wellness visits. Yet the reason for a visit makes no difference to the protesters, who badger and crowd all patients and accuse them of supporting murder.

The volunteer escorts who arrive at dawn each Saturday attempt to protect the patients, clear a path to the clinic's entrance, and reduce the trauma of navigating the hostile environment. Often, this is not enough. Patients regularly arrive at the clinic shaken and scared. Some need to delay their appointments because they are crying, trembling, and in need of counseling. Others are deterred from returning to the clinic on a later date for follow-up services or other medically necessary care. Still others believe the lies about the clinic's services or opening hours and simply leave before even entering Choices.

Some protesters video-record the individuals entering Choices, threatening to post images of patients and staff online to make them targets of militant anti-choice groups. On at least one occasion, a protester at Choices announced where a staff member lived, implying that he would harm her and her family after she left work.

2

Patients and escorts know that these are not idle threats. There is a long history of violence against abortion providers,[1] including in New York State.[2] Worse yet, anti-abortion violence is on the rise. The year 2015 saw a dramatic increase in violent attacks against abortion providers, attributed by many to a spike in inflammatory rhetoric in public discourse.[3]

Mirroring the national trend, the protest activity at Choices has become increasingly aggressive in the past year, prompting clinic staff to call the police on several occasions. Police officers have indicated to Choices staff that the officers are constrained from stopping this aggressive conduct unless they personally witness the commission of a crime. The anti-abortion protesters at Choices are accordingly emboldened by the perception that no laws restrict their campaign to prevent women from accessing legal health-care services.

Fortunately, their perception is inaccurate. Federal, state, and local law prohibit anti-choice protesters from interfering with patients, staff, and volunteers at reproductive health clinics. Courts

---

[1] Since 1977, nearly 7,000 reported acts of violence have been directed against abortion providers, including bombings, arsons, death threats, bioterrorism threats, and assaults, as well as nearly 200,000 reported acts of disruption, such as hate mail and harassing calls. Eleven people, including doctors, clinic employees, a clinic escort, a security guard, and a police officer, have been murdered. *Anti-Choice Violence and Intimidation*, NARAL Pro-Choice America (Jan. 1, 2017), https://www.prochoiceamerica.org/wp-content/uploads/2017/01/1.-Anti-Choice-Violence-and-Intimidation.pdf; *see also* Liam Stack, *A Brief History of Deadly Attacks on Abortion Providers*, N.Y. Times (Nov. 29, 2015), https://www.nytimes.com/interactive/2015/11/29/us/30abortion-clinic-violence.html?_r=0. In addition, there have been at least twenty-six attempted murders by anti-abortion protesters, including by a man who, in 2011, explained to the police that he was carrying a gun in order to "lay out abortionists because they are killing babies." Greg Toppo, *Threat of Violence Ever-Persistent at Abortion Cinics, Advocates Say*, USA Today (Dec. 1. 2015), https://www.usatoday.com/story/news/2015/12/01/planned-parenthood-attack-clinic-dangers/76613822/; *Violence Statistics & History* Nat'l Abortion Fed'n, https://prochoice.org/education-and-advocacy/violence/violence-statistics-and-history/ (last visited June 1, 2017).

[2] The death toll includes the 1998 murder of Dr. Barnett Slepian, a 51-year-old New York physician who had been the target of anti-abortion protesters since the 1980s. Kimberly Hutcherson, *A Brief History of Anti-Abortion Violence*, CNN (Dec. 1, 2015), http://www.cnn.com/2015/11/30/us/anti-abortion-violence/.

[3] For example, following the release that year of a series of misleading anti-abortion videos purporting to show that Planned Parenthood was staffed by "butchers" who "sell baby parts"—fraudulent claims that were then repeated and amplified by elected officials and lawmakers—violent threats against abortion providers skyrocketed, and the number of clinic blockades nearly doubled from the prior year. Threats at abortion clinics also have risen since the 2016 presidential election; online threats against abortion providers jumped nearly fifty percent in the thirty days after the election, as compared to the thirty days prior. Aneri Pattani, *Threats at abortion clinics rise since Trump's election*, CNBC (Dec. 15 2016), http://www.cnbc.com/2016/12/15/abortion-providers-see-increased-threat-since-trumps-election.html.

3

around the country—including in the Eastern District of New York—have found that the types of actions taken by the protesters here violate these statutes.

The OAG is committed to enforcing these laws, which protect women's basic right to access health care free of harassment, abuse, and violence. Further, Congress specifically authorized state Attorneys General to bring suit under FACE to enjoin protest activity that impedes access to clinics, and the NY Clinic Access Act similarly authorizes the OAG to prosecute violators. The OAG respectfully requests that this Court enjoin Defendants, as well as all those acting in concert with them,[4] from obstructing and harassing patients and staff at Choices, and order the creation of a sixteen-foot buffer zone outside the clinic.

## FEDERAL, STATE, AND CITY CLINIC ACCESS LAWS

### A.      Federal and State Law

FACE and the NY Clinic Access Act are identical in their wording, and thus are analyzed by courts together. Courts' analyses and holdings regarding FACE are equally applicable to the NY Clinic Access Act.

In order to demonstrate a violation of FACE and the NY Clinic Access Act, Plaintiff must show that: (1) Defendants engaged in acts of "force," "threat of force," or "physical obstruction," (2) with the intent to "injure," "intimidate," or "interfere" with (or attempt to injure, intimidate, or interfere with) a person, (3) because that person has sought or provided, or is seeking to obtain or provide, reproductive health services or in order to discourage or intimidate such a person from

---

[4] New York courts have used the "acting in concert" language to enjoin unnamed parties from engaging in the prohibited or enjoined activity. *See, e.g. State of New York ex rel. Spitzer v. Operation Rescue*, 273 F.3d 184, 205 (2nd Cir. 2001) *aff'd*, 240 F. App'x 430 (2d Cir. 2007). Courts in New York also have held that, even without such language, injunctions cover not only named defendants but also those who "act[] either as the agents or servants of the defendants or in combination or collusion with them or in assertion of their rights or claims." *Rigas v. Livingston*, 178 N.Y. 20, 24-25 (N.Y. 1905); *see also Daly v. Amberg*, 126 N.Y. 490, 496 (N.Y. 1869); *People ex rel. Stearns v. Marr*, 181 N.Y. 463, 468-70 (N.Y. 1905); *Ricatto v. Ricatto*, 4 A.D.3d 514, 516 (N.Y. App. Div. 2004); *Power Auth. of New York v. Moeller*, 57 A.D.2d 380, 382 (N.Y. App. Div. 1977), *appeal denied*, 42 N.Y.2d 806 (1977).

obtaining or providing reproductive health services. 18 U.S.C. § 248(a)(l); N.Y. Penal Law §

240.70(l)(a) and (b). Such conduct is actionable when directed against not only patients and staff,

but escorts as well. *United States v. Hill*, 893 F. Supp. 1034, 1038-39 (N.D. Fla. 1994) (finding

that "Congress was concerned not only with the safety of doctors and nurses, but also with the

safety of others who are essential to the provision of clinic services . . . [E]scorts are considered

an integral part of the functioning of clinics," and thus FACE prohibits threats or violence against

escorts and other volunteers).

**B.    City Law**

The NYC Clinic Access Act makes it unlawful to, among other things, (1) "knowingly

physically obstruct or block" a clinic in order to impede access, or attempt to do so (by way of

physical contact or otherwise), (2) "follow and harass another person within fifteen feet of the

premises of a reproductive health care facility," (3) engage in conduct within fifteen feet of the

clinic that "places another person in reasonable fear of physical harm," or attempt to do so, or (4)

"knowingly interfere with the operation of a reproductive health care facility," or attempt to do so.

N.Y.C. Admin. Code 8-803.

**FACTUAL BACKGROUND**

On Saturday mornings, Defendants turn the sidewalk along Choices into an obstacle

course. They block the path to the door with massive, gory posters, and they follow and harass

patients and staff all the way to the entrance, making violent threats and spewing lies. Surgical

abortions are performed at Choices on a set schedule that includes Saturday mornings. The

protesters know this, and they do their best to impede patients' access to these lawful health-care

services. The protesters' rhetoric and signs leave no doubt about their purpose, as they say things

such as, "Babies are murdered here;" "They are killing babies above your head," and "You have

5

the blood of dead babies on your hands," while displaying images that purport to show mangled, bloodied fetuses.

The width of the sidewalk in front of the Choices patient entrance is approximately sixteen feet. (Ventola Decl. ¶ 5.) Nearly all of Defendants' harassing conduct takes place in the middle of this sidewalk, which is eight feet from the premises. Specifically, the protesters position themselves and their gory posters along the side of the building from the street corner up to the clinic's entrance in order to carve up the sidewalk into a narrow, jagged walkway. (Brady Decl. ¶ 17 and Ex. 1 at 1-4; White Decl. ¶ 12; Garnick Decl. ¶ 10; Howell Decl. ¶ 4; Asmus Decl. ¶¶ 6, 12; Lee Decl. ¶ 10.) Protesters descend on all approaching patients, yelling that they are murderers, forcing unwanted anti-abortion literature on them, and occasionally grabbing their arms to get their attention. (Brady Decl. ¶¶ 17-22; White Decl. ¶ 13; Garnick Decl. ¶ 11; Greenberg Decl. ¶¶ 7, 18 and Ex. 1 at 1-2; Lee Decl. ¶¶ 11-12, 14-15; Howell Decl. ¶¶ 5, 8; Asmus Decl. ¶¶ 10-11.) In the process, protesters also collide with, shove or step on patients and escorts. (Brady Decl. ¶¶ 19, 25-28; White Decl. ¶ 14; Garnick Decl. ¶ 11; Greenberg Decl. ¶¶ 16-18 and Exs. 1 at 5-8; Asmus Decl. ¶ 7; Lee Decl. ¶ 11; Trasande Decl. Ex. 1 at 38-42.) At times, the protesters even walk patients into the clinic's exterior wall, pinning them against it, or into the street. (Brady Decl. ¶ 28; White Decl. ¶ 14; Garnick Decl. ¶ 20; Greenberg Decl. ¶ 18; Howell Decl. ¶ 6.) They also descend on patients arriving by car, using their bodies to block the passenger-side doors and thrusting their heads and hands through open windows. (Brady Decl. ¶ 18; White Decl. ¶ 15; Garnick Decl. ¶ 12; Lee Decl. ¶ 11.)

The protesters make threats of violence, referring to terrorist attacks and telling escorts and patients that they, too, may get shot or killed. (Brady Decl. ¶ 24; White Decl. ¶ 25; Garnick Decl. ¶ 27 and Ex. 3; Greenberg Decl. ¶¶ 22-23.) As a result, passersby are often provoked to respond

6

violently. (Garnick Decl. ¶¶ 24-27.) The protesters routinely ignore the pleas of those who ask to be left in peace. (White Decl. ¶ 18). Instead, anyone who seeks to enter Choices—or simply walk by the clinic—is followed, harassed, and threatened with violence. (Greenberg Decl. ¶ 21; Brady Decl. ¶ 24.) The protesters persist in forcing anti-choice literature on all passers-by, no matter how many times people refuse to accept the materials. (Brady Decl. ¶¶ 21, 19; White Decl. ¶ 13; Garnick Decl. ¶ 11; Lee Decl. ¶ 11.) They also lie about the clinic's hours and services, (Priegue Decl. ¶¶ 6, 9; Greenberg Decl. ¶ 19; Asmus Decl. ¶ 9), and make false claims about the dangers of abortion care (Greenberg Decl. ¶¶ 18-19 and Ex. 2; Riccio Decl. Exs. 1-2).

Defendants have caused some patients to turn away from the Choices entrance and forego their medical visits. (Priegue Decl. ¶¶ 10, 14; Din Decl. ¶ 5; Small Decl. ¶ 7; Greenberg Decl. ¶ 24; Howell Decl. ¶ 12; Asmus Decl. ¶ 14.) Other patients enter the clinic visibly upset and anxious—some shaking and crying—after encountering protesters. (Priegue Decl. ¶¶ 12-14; Hoffman Decl. ¶ 10; Carbone Decl. ¶ 17; Din Decl. ¶ 3; Small Decl. ¶ 6; Garnick Decl. ¶¶ 19, 23; Brady Decl. ¶ 38; White Decl. ¶ 30). Defendants also provoke patients, escorts, and staff to respond physically; some unfortunately succumb. (Howell Decl. ¶¶ 7, 9-10; Greenberg Decl. ¶¶ 24-25; Garnick Decl. ¶ 19; Asmus Decl. ¶ 13; White Decl. ¶ 26; Brady Decl. ¶¶ 39-43.) Many patients are worried about their safety and are scared to leave the facility. (Brady Decl. ¶ 38; Garnick Decl. ¶ 22; Priegue Decl. ¶ 12; White Decl. ¶ 26; Howell Decl. ¶ 12.) Patients also fear for their privacy and safety given that certain Defendants capture video of patients entering and exiting the clinic. (Priegue Decl. ¶ 16; Greenberg Decl. ¶ 28; Lee Decl. ¶ 13.) Many patients are concerned that Defendants will post information about their visits on social media networks and that their relatives or colleagues will learn that they had an abortion. (*See* Priegue Decl. ¶ 16; Greenberg Decl. ¶ 28; Garnick Decl. ¶¶ 14-15; Lee Decl. ¶ 13.)

Defendants' lies about the services provided at Choices also inhibit patients' ability to access care. One patient, after encountering Defendants on the sidewalk, told Choices staff, "The people outside told me I could die and now I'm scared of being put to sleep." (Priegue Decl. ¶ 12.) Many patients are traumatized by their encounters with Defendants and require additional time and counseling by staff, who must calm and reassure the patients before addressing the reason for their visit. (Priegue Decl. ¶ 13; Hoffman Decl. ¶ 10; Barbone Decl. ¶¶ 13, 17; Greenberg Decl. ¶ 24.)

## A.      The OAG's Investigation

Uncontroverted video and audio evidence compiled during the OAG's investigation to corroborate staff, escort, and patient eyewitness accounts, all of which establish that each named Defendant has violated FACE, the NY Clinic Access Act, and the NYC Clinic Access Act. Collectively, the evidence shows that Defendants use unlawful threats, force, physical obstruction, and harassment to impede access to the clinic and its service.

Below is a summary of the unlawful actions of individual Defendants and supporting evidence, distilled from a variety of OAG investigative sources. OAG video surveillance of Choices has been in place since June 21, 2016. (Sherer Decl. ¶ 4.) Undercover OAG investigator visits to Choices took place on October 8, 2016, October 29, 2016, November 4, 2016, and December 3, 2016. (Ricco Decl. ¶ 3.) Further, the OAG has interviewed Choices staff, escorts, local residents, and patients and examined supporting audio, video, and contemporaneous documentation about protest activity that continues to this day, prior to commencing this action.

## B.      Defendants' Unlawful Conduct

Defendants are a loose alliance of individuals associated with Church at the Rock in Brooklyn, New York; Grace Baptist Church in Woodhaven, New York; Helpers of God's Precious

Infants in Brooklyn, New York; Bright Dawn Ministries in Brooklyn, New York; and protesters with no apparent group affiliation. Defendants act alone and in concert with a consortium of anti-choice protesters whose total membership numbers have fluctuated between twenty-five to sixty-five individuals over the past four years.[5] Together they intimidate, threaten, harass, and interfere with patients and staff who seek to enter Choices, with the objective of obstructing the delivery of, and access to, legal reproductive health-care services.

A review of the available evidence demonstrates that Defendants' unlawful actions have persisted over the last several years and that their collective activity around the clinic appears to incite passersby to threaten and harass clinic patients, staff, and escorts.[6] (*See* Trasande Decl. (annexing video surveillance stills and supporting declarations and annexed exhibits.) Defendants

---

[5] The OAG has identified approximately twenty-three protesters acting in concert with Defendants associated with Church at the Rock. These individuals include: Lois Griepp, Daniel Griepp, Steven Griepp, Esther Griepp Kotze, Eugene Kotze, Terrance Collier, John Noel (together with his three minor sons), Bernice Davis Boothe-Alcindor, Terresia Atkinson, Paul Atkinson, Andrea Atkinson, Marie Doe, Charlene Doe, Evelyn Doe, Natalie Doe, and Jane Doe Protesters 1 through 5. The OAG also has identified two additional protesters, Peter Nicotra and Jane Doe Protester 6, acting in concert with Defendants associated with Grace Baptist Church. Defendants collectively act in concert with protesters associated with Grace Reformed Baptist Church of Long Island and Syosset Gospel Church. To date, the OAG has identified five protesters associated with Grace Reformed Baptist Church of Long Island, who include: Marc Grimaldi, Jonathan Devito, James Evak, Michael Arash Artan, and Donya Lovell, and four protesters associated with Syosset Gospel Church, who include: Michael Stephens, Anthony Peccia, Gary Rosenblatt, and Erika Steffens Peccia. The OAG has identified twenty protesters with no discernable affiliation who act in concert with all named Defendants, collectively. They include: John Doe Protesters 1 through 7, Daniel Courney, Jose L. Abreu, Alex Solis, Marilyn Nevarez, Andy Martinez, Benito Contreras, Robert Parker, Matthew Tringali, Phil Sessa, Daniel Ramirez, Jah-Døn A. Hart, Lauren Delapenha, and Kelvin Candelario.

[6] For example, on March 25, 2017, an unknown man wearing a construction worker vest lingered outside the clinic for approximately one hour and directed the following comments at escorts: "I'm going to burn this place down"; "You should all be shot"; "You should all die"; You can't get rid of me; I'll always be around, and if not me, somebody else"; "You're a murderer"; "You're a nasty troll"; "You're an agent of the devil"; and "I'm surprised nobody has firebombed this place". (Garnick Decl. ¶ 27 and Ex. 3.) In addition, on or about September 10, 2016, a disturbed individual approached the clinic entrance with a box full of old phones and electronic devices. (Garnick Decl. ¶ 26.) He took the protesters' pamphlets and threw them on top of the box. (Garnick Decl. ¶ 26 and Ex. 2 at 1.) He instructed the people around him not to touch the box. When the Choices security guard on duty approached him to see what was going on, the man responded by threatening the security guard and saying "I can kill you." (Garnick Decl. ¶ 26 and Ex. 2 at 2.) He added, "I have bi-polar . . . I'm off my meds and could kill any of you and not go to jail." (Garnick Decl. ¶ 26.) He then cut into the box with a pair of scissors and abandoned the box and cart. (Garnick Decl. ¶ 26.) Before leaving the box, he said "don't fucking touch my shit, you don't know what's in there." (Garnick Decl. ¶ 26.)

are identified and discussed individually below, in the order in which they appear in the case caption.

### 1.    Church at the Rock Defendants

*Defendant Kenneth Griepp*, Senior Pastor of Church at the Rock in Brooklyn:

- Procures and distributes three-by-five foot posters to fellow church members, and directs them to assume positions narrowing the approximately sixteen-foot sidewalk surrounding Choices to just five feet (Brady Decl. ¶¶ 17, 22-23; Garnick Decl. ¶ 10; White Decl. ¶ 12 );[7]

- Physically blocks the path of individuals attempting to enter Choices by holding said posters (Brady Decl. ¶ 17; Garnick Decl. ¶ 10; Trasande Decl. Ex. 1 at 1; White Decl. ¶ 14);

- Chases and crowds patients as they approach the building, in an attempt to disseminate anti-choice literature, and ignores patient pleas to be left alone (Trasande Decl. Ex. 1 at 2-3);

- Films patients and escorts outside of the Choices facility (Brady Decl. ¶ 36); and

- Follows and harasses clinic escorts and patients within fifteen feet of the facility (Trasande Decl. Ex. 1 at 2-3).

*Defendant Ronald George*, member and Pastor at Church at the Rock:

- Makes death threats, referring to the September 11, 2001 terrorist attacks, and tells escorts, "you never know when you wake up in the morning that you might die" (Brady Decl. ¶ 24);

- Deliberately collides with, forcefully shoves, and steps on the feet of clinic escorts in an effort to get close to patients as they approach the clinic (Greenberg Decl. ¶¶ 16-17; Brady Decl. ¶ 25-27; Asmus Decl. ¶ 7);

- Stations himself immediately next to the passenger side of arriving vehicles so as to obstruct the passenger's egress (Brady Decl. ¶ 18; White Decl. ¶ 15; Garnick Decl. ¶ 12);

---

[7] Defendant Griepp also provides transportation to other Church at the Rock Defendants to get to Choices on Saturday mornings. (*See* Rivera Decl. ¶ 3 (three vehicles registered to Defendant Griepp have been observed at Choices during protests on Saturday mornings.)

- Physically leans into the window of arriving vehicles and forces unwanted anti-choice literature into the occupants' hands (Brady Decl. ¶ 18; Garnick Decl. ¶ 12; White Decl. ¶ 15);

- Blocks patient access to the clinic entrance (Greenberg Decl. ¶ 16);

- Films patients, escorts, and staff (Brady Decl. ¶ 36 and Ex. 1 at 8); and

- Follows and harasses patients, clinic escorts, and staff within fifteen feet of the premises (Brady Decl. ¶ 16).

*Defendant Patricia Musco*, Director of Counseling at Church at the Rock:

- Purposely collides into volunteer escorts who are attempting to shield patients from unwanted contact (Brady Decl. ¶ 19; Garnick Decl. ¶ 11; Trasande Decl. Ex. 1 at 4; White Decl. ¶ 13);

- Stations herself immediately next to the passenger side of vehicles pulling up to the clinic entrance so as to block the passenger's exit from the car (Brady Decl. ¶¶ 18-19; Garnick Decl. ¶ 12; Trasande Decl. Ex. 1 at 5; White Decl. ¶ 15);

- Physically leans into vehicles arriving or picking-up patients so as to force anti-choice literature inside (Brady Decl. ¶¶ 18-19; White Decl. ¶ 15; Garnick Decl. ¶ 12);

- Chases patients as they approach the clinic in an effort to present anti-choice materials and impede their entrance into the clinic (Brady Decl. ¶ 19; Garnick Decl. ¶ 11; Lee Decl. ¶ 12; Trasande Decl. Ex. 1 at 6; White Decl. ¶ 13);

- Films patients and escorts outside of the Choices facility (Brady Decl. ¶ 36 and Ex. 1 at 9);

- Impedes patient access to the clinic entrance by holding three-by-five foot posters that narrow the path to the Choices entrance (Brady Decl. ¶ 17 and Ex. 1 at 1-4);

- Positions herself within four feet of the clinic entrance and follows entering patients in order to shout into the clinic's interior (Brady Decl. ¶ 34); and

- Follows and harasses patients, minor children, and volunteer escorts within fifteen feet of the facility, (Trasande Decl. Ex. 1 at 7-10), yelling that they are murderers (Brady Decl. ¶ 20; White Decl. ¶ 13; Garnick Decl. ¶ 11).

*Defendant Randall Doe*,[8] member of Church at the Rock:

- Makes death threats to escorts, stating "You can die at any moment," (Brady Decl. ¶ 24); references mass shootings and terrorist attacks, telling escorts, "You never know when you're going to die," (White Decl. ¶ 25); and refers to the November 2015 shooting at a Planned Parenthood in Colorado, warning the escorts, "You don't know when you might get shot" (Greenberg Decl. ¶ 22);

- Follows, harasses, (Garnick Decl. ¶ 17) and deliberately collides with clinic escorts who are attempting to shield patients from unwanted contact by shoving them, body-checking them, and stomping on their feet (White Decl. ¶ 13; Brady Decl. ¶¶ 19, 26; Garnick Decl. ¶ 11; Asmus Decl. ¶ 7);

- Pins arriving patients and their companions against the outer wall of the Choices facility so as to disseminate anti-choice literature and rhetoric (Trasande Decl. Ex. 1 at 11);

- Stations himself immediately next to the passenger side of vehicles pulling up to the clinic entrance so as to block the passenger's exit from the car (Brady Decl. ¶ 18; White Decl. ¶ 15; Garnick Decl. ¶ 12);

- Physically leans into the windows of arriving vehicles and forces unwanted anti-choice literature into the occupants' hands (Brady Decl. ¶ 18; White Decl. ¶ 15; Garnick Decl. ¶ 12);

- Follows and harasses patients departing the clinic (White Decl. ¶ 24);

- Films patients, escorts, and staff (Trasande Decl. Ex. 1 at 12);

- Closely follows and harasses patients who are attempting to enter the clinic, within five feet of the entrance, while shouting and banging on massive posters (Brady Decl. ¶¶ 22-23; Trasande Decl. Ex. 1 at 13-16; White Decl. ¶ 20);

- Follows and harasses children who are accompanying patients entering the clinic by telling them, "don't let your mother go in there; they kill children in there" (Brady Decl. at ¶ 22; Garnick Decl. ¶ 18), and yelling that "People who support abortion also support that a woman can be a whore" (Brady Decl. ¶ 22); and

- Disseminates false information about the connection between suicide and various forms of cancer and abortion (Riccio Decl. Exs. 1-2).

---

[8] Plaintiff has been able to identify various Defendants through social media and license plate searches but was unable to ascertain a last name for this Defendant, who is referred to by other protesters as Randall.

*Defendant Osayinwense N. Okuonghae*, member of Church at the Rock:

- Intentionally collides with clinic escorts so as to get close to patients approaching the clinic entrance (Trasande Decl. Ex. 1 at 17-18);

- Stations himself next to the passenger side of arriving cars so as to obstruct the passenger's exit (Brady Decl. ¶ 18; Garnick Decl. ¶ 12; Metz Decl. Ex. 1; Trasande Decl. Ex. 1 at 19-20; White Decl. ¶ 15);

- Physically leans into the window of arriving vehicles and forces unwanted anti-choice literature into the occupants' hands (Brady Decl. ¶ 18; White Decl. ¶ 15; Garnick Decl. ¶ 12);

- Blocks patient access to the clinic entrance (Brady Decl. ¶¶ 17, 28, 32); and

- Follows and harasses patients, clinic escorts, and staff within fifteen feet of the premises (Brady Decl. ¶ 32; Trasande Decl. Ex. 1 at 21-23).

*Defendant Anne Kaminsky*, member of Church at the Rock:

- Menaces clinic staff members by informing them their names are on a website devoted to anti-abortion activity, and that she can remove their names from the website—but only if they cease working at Choices (Priegue Decl. ¶ 18);

- Stations herself immediately next to the passenger side of arriving vehicles so as to impede passengers' exit from the car (Brady Decl. ¶ 18; White Decl. ¶ 15; Garnick Decl. ¶ 12);

- Physically leans into the window of arriving vehicles and forces unwanted anti-choice literature into the occupants' hands (Brady Decl. ¶ 18; White Decl. ¶ 15; Garnick Decl. ¶ 12);

- Chases and harasses patients within fifteen feet of the premises (Trasande Decl. Ex. 1 at 24-25); and

- Obstructs the path of individuals wishing to enter the clinic by using three-by-five foot placards (White Decl. ¶ 20; Garnick Decl. ¶ 10).

*Defendant Brian George*, member of Church at the Rock:

- Intentionally collides with clinic escorts so as to get close to patients approaching the clinic entrance (Trasande Decl. Ex. 1 at 26);

- Chases, harasses, and crowds patients within fifteen feet of the premises and forces unwanted anti-choice literature on them (Brady Decl. ¶¶ 19-20; White Decl. ¶ 20; Garnick Decl. ¶ 11; Trasande Decl. Ex. 1 at 26);

13

- Blocks patient access to the clinic entrance (Brady Decl. ¶¶ 17, 19-20; White Decl. ¶ 14; Garnick Decl. ¶ 9); and

- Follows and harasses patients, clinic escorts, and staff within fifteen feet of the premises (Brady Decl. ¶¶ 19, 22).

*Defendant Sharon Doe*, member of Church at the Rock:

- Intentionally collides with clinic escorts to reach arriving patients causing damage to patient personal property (White Decl. ¶ 30);

- Closely follows and crowds patients as they approach the clinic's entrance, causing them to dart into the street or collide with the exterior wall of the Choices building (Garnick Decl. ¶ 20; Trasande Decl. Ex. 1 at 27-30); and

- Follows and harasses patients, clinic escorts, and staff within fifteen feet of the premises (Trasande Decl. Ex. 1 at 27-30).

*Defendant Deborah M. Ryan*, member of Church at the Rock:

- Intentionally collides with clinic escorts in order to reach arriving patients (Brady Decl. ¶ 25);

- Follows and harasses patients as they approach the clinic's entrance (Trasande Decl. Ex. 1 at 31-32; Brady Decl. ¶ 29); and

- Persistently follows and harasses patients, clinic escorts, and staff within fifteen feet of the premises (Brady Decl. ¶ 29; Trasande Decl. Ex. 1 at 31-32).

The Defendants from Church at the Rock regularly organize and incite other individuals from both their church and other religious groups as well as passersby to physically obstruct the clinic entrance and threaten and harass clinic patients and staff within fifteen feet of the facility.

### 2.    Grace Baptist Church Defendants

*Defendant Angela Braxton*, former member of Church at the Rock and current member of Grace Baptist Church in Woodhaven, New York:

- Intentionally collides with clinic escorts who are attempting to protect patients from unwanted contact (Brady Decl. ¶ 19);

14

- Touches and chases patients for 100 feet or more as they walk up to the clinic's entrance, causing them to dart into the street or collide with the exterior wall of the premises in their efforts to escape her (Asmus Decl. ¶ 10; Brady Decl. ¶ 19; Garnick Decl. ¶ 20; White Decl. ¶ 14);

- Stations herself immediately next to the passenger side of vehicles arriving at the clinic entrance so as to impede patients' exit from the car (Brady Decl. ¶ 18; Garnick Decl. ¶ 12; Trasande Decl. Ex. 1 at 35; White Decl. ¶ 15);

- Leans into the window of arriving vehicles and forces materials into the occupants' hands (Brady Decl. ¶ 18; White Decl. ¶ 15; Garnick Decl. ¶ 12);

- Films patients and clinic escorts walking into the clinic (Brady Decl. ¶ 36; Trasande Decl. Ex. 1 at 36);

- Holds open the clinic's doors after entering patients to scream inside about murder (Trasande Decl. Ex. 1 at 37);

- Follows and harasses patients, minor children, and volunteer escorts within fifteen feet of the facility, often handing children anti-choice literature and instructing them to "give this to your Mommy to read". (Brady Decl. ¶ 19; Trasande Decl. Ex. 1 at 33-34; White Decl. ¶ 23);

- Verbally provokes violent emotional reactions in patients (Brady Decl. ¶¶ 39, 40, 42; Greenberg Decl. ¶ 25); and

- Organizes and recruits others to physically obstruct the clinic entrance and follow, threaten, and harass clinic patients and staff within fifteen feet of the premises (Brady Decl. ¶ 15 and Ex. 2-3).[9]

*Defendant Jasmine LaLande*, a member of Grace Baptist Church:

- Intentionally collides into volunteer escorts who are attempting to shield patients from unwanted contact (Trasande Decl. Ex. 1 at 38-42);

---

[9] Defendant Angela Braxton regularly organizes and incites other protesters at Choices who physically obstruct the clinic entrance and threaten and harass clinic patients and staff within fifteen feet of the clinic. These individuals include Defendant Jasmine LaLande and individual protesters named, Peter Nicotra, Jah-Døn A. Hart, Kelvin Candelario, Matthew Tringali, Alex Solis, Phil Sessa, Robert Parker, Jonathan Devito, Lauren Delapenha, and Dan Courney, as well as protesters associated with Syosset Gospel Church, including Michael Steffens, Anthony Peccia, Gary Rosenblatt, and Erika Steffens Peccia, and Grace Reformed Baptist Church of Long Island, including Marc Grimaldi, Jonathan Devito, James Evak, Michael Arash Artan, and Donya Lovell. (Brady Decl. ¶ 15.) On two occasions, protesters affiliated with Defendant Angela Braxton, who routinely invites and recruits additional protesters, made threatening statements. Specifically, on February 27, 2016, Daniel Courney, a protester and acquaintance of Defendant Angela Braxton, warned, "You don't know the day of death. If you are wise you will number your days. You apply your heart to wisdom. You don't know the day of death." (Brady Decl. ¶ 24 and Ex. 2.) On June 18, 2016, Alex Solis, a protester and acquaintance of Angela Braxton, informed clinic escorts and patients, "So you don't know the day of your death. Calamity might strike any moment." (Brady Decl. ¶ 24 and Ex. 3.)

- Closely follows patients for 100 feet or more as they approach the clinic's entrance; causing patients to dart into the street or collide with the wall of the Choices building in their efforts to escape her (Trasande Decl. Ex. 1 at 43-45);

- Physically blocks the passenger side of arriving vehicles so as to obstruct passenger exit from the car (Brady Decl. ¶¶ 18-19; Garnick Decl. ¶ 16; White Decl. ¶ 15);

- Leans into the window of arriving cars and forces unwanted anti-choice literature into the patients' hands (Brady Decl. ¶ 19; White Decl. ¶ 15; Garnick Decl. ¶ 12); and

- Organizes others to physically obstruct the clinic entrance and follow, threaten and harass clinic patients and staff within fifteen feet of the premises (Brady Decl. ¶ 15).

The Defendants from Grace Baptist Church regularly organize and incite other individuals from both their church and other religious groups as well as passersby to physically obstruct the clinic entrance and follow, threaten, and harass clinic patients and staff within fifteen feet of the facility.

### 3. Other Defendants

*Defendant Dorothy Rothar*, founder of Bright Dawn Ministries and a member of Helpers of God's Precious Infants, a religious anti-choice group in Brooklyn:

- Touches, grabs, and closely follows patients for 100 feet or more as they approach the clinic's entrance (Greenberg Decl. ¶ 18 and Ex. 1 at 1-2);

- Causes patients to dart into the street or collide with the wall or be pinned against the wall of the Choices building as they attempt to escape her (Greenberg Decl. ¶ 18 and Ex. 1 at 3-6); and

- Intentionally disseminates false information concerning the safety risks of an abortion in an effort to deter patients from going through with the procedure (Greenberg Decl. ¶ 18 and Ex. 2).

*Defendant Prisca Joseph*,

- Deliberately collides with clinic escorts in an effort to get close to patients as they approach the clinic (Brady Decl. ¶ 19);

16

- Closely follows patients and crowds them as they approach the clinic's entrance, causing them to dart into the street or collide with the exterior wall of the Choices building in order to avoid her (Brady Decl. ¶ 28);

- Positions herself immediately next to the doors of arriving cars so as to block the passenger's exit (Brady Decl. ¶ 18; Garnick Decl. ¶ 12; Trasande Decl. Ex. 1 at 46-47; White Decl. ¶ 15);

- Reaches into the windows of vehicles and forces unwanted anti-choice literature into the occupants' hands (Brady Decl. ¶¶ 18-19; Garnick Decl. ¶ 12; Trasande Decl. Ex. 1 at 48; White Decl. ¶ 15);

- Records the license plate numbers of Choices' staff's cars (Priegue Decl. ¶ 19; White Decl. ¶ 22 and Ex. 1 at 1);

- Impedes patient access to the clinic entrance (Trasande Decl. Ex. 1 at 51-52); and

- Follows and harasses patients, clinic escorts, and staff within fifteen feet of the premises (Trasande Decl. Ex. 1 at 49-53).

*Defendant Scott Fitchett, Jr.*

- Films patients and clinic escorts walking to the clinic entrance (Brady Decl. ¶ 36); and

- Follows and harasses patients and their minor children within fifteen feet of the facility, as well as clinic escorts, and staff, while yelling at them about murder (Greenberg Decl. ¶ 25); (Brady Decl. ¶ 20).

These Defendants regularly organize and incite other individuals as well as passersby to physically obstruct the clinic entrance and threaten and harass clinic patients and staff within fifteen feet of the facility.

## ARGUMENT

A party requesting a preliminary injunction must show "(1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party; and (3) that a preliminary injunction is in the public interest." *New York*

*v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quoting *Oneida Nation of New York v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011) (internal quotation marks omitted)).[10] As fully set forth below, the OAG clearly meets the three parts of this test for their claims under federal, state, and local law. Furthermore, the injunctive relief requested is narrowly tailored so that it will impose no greater burden than necessary on Defendants' First Amendment rights.

## I.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS OF THE CLAIMS

Plaintiff has presented substantial evidence that Defendants have violated federal, state, and local clinic access laws and is, therefore, likely to succeed on the merits of its claims.

### A.   Defendants' Actions Violate Federal and State Clinic-Access Laws

As demonstrated below, Defendants have violated FACE and the NY Clinic Access Act on many occasions and will continue to do so unless enjoined by this Court.[11]

---

[10] This standard was set forth by the U.S. Supreme Court in *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008), yet it has not been uniformly applied in this jurisdiction. Courts in the Eastern District of New York have continued to use the pre-*Winter* ("traditional") standard, which does not include the third prong addressing public interest. *See NM v. Hebrew Acad. Long Beach*, 155 F. Supp. 3d 247, 256 (E.D.N.Y. 2016); *Devos, Ltd. v. Record*, No. 15-cv-6916, 2015 U.S. Dist. LEXIS 172929, at *20 (E.D.N.Y. Dec. 24, 2015); *Oliva v. Brookwood Coram I, LLC*, No. CV 14-cv-2513, 2015 U.S. Dist. LEXIS 179084, at *12-13 (E.D.N.Y. Nov. 30, 2015); *SymQuest Grp., Inc. v. Canon U.S.A., Inc.*, No. 15-cv-4200, 2015 U.S. Dist. LEXIS 114898, at *12 (E.D.N.Y. Aug. 7, 2015). The district court in *Vringo, Inc. v. ZTE Corp.*, clarified that in the Second Circuit a litigant seeking a preliminary injunction can either use the traditional/pre-*Winter* standard or the standard set forth in *Winter*. *Vringo, Inc. v. ZTE Corp.*, No. 14-cv-4988, 2015 U.S. Dist. LEXIS 71919, at *12 (S.D.N.Y. June 3, 2015). Here, we address the public interest prong, yet note that such a showing may not be necessary.

[11] The OAG has documented unlawful conduct by Defendants as recently as June 17, 2017. (White Decl. ¶ 33; Brady Decl. ¶ 47; Garnick Decl. ¶ 29.) This is well within the time frame for ongoing violations; moreover, there is a presumption of future violations once a plaintiff has shown that defendants have violated FACE. *See United States v. Roach*, 947 F. Supp. 872, 877 (E.D. Pa. 1996) (issuing FACE injunction despite the fact that defendants had not attempted a blockade in ten months because "based on the history of these Defendants, there is no assurance that it will not happen again"); *United States v. White*, 893 F. Supp. 1423, 1438 (C.D. Cal. 1995) (issuing FACE injunction and noting that the "mere fact that the weekly protests have been less disruptive since the police began monitoring the demonstrations does not obviate the need for an injunction"); *United States v. McMillan*, 946 F. Supp. 1254, 1268 (S.D. Miss. 1995) ("McMillan I") ("Once the plaintiff has established that a violation of [FACE] has been committed, it is the defendant's burden to show that it is unreasonable to expect that the wrong will be repeated."). These decisions rely on the more general principle that a defendant's voluntary cessation of unlawful conduct will not render a case moot against the defendant because "a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 815 F.3d 105, 109 (2d Cir. 2016) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012)). Accordingly, courts will find a case moot after a defendant's voluntary cessation of unlawful conduct only if the defendant can demonstrate

Defendants routinely engage in prohibited behavior in an effort to interfere with access to the clinic and intimidate the clinic's staff and patients. As noted above, the elements of FACE and the NY Clinic Access are that: (1) Defendants engaged in (a) acts of "force," (b) "threat of force," or (c) "physical obstruction"; (2) with the intent to "injure," "intimidate," or "interfere" with (or attempt to injure, intimidate, or interfere with) a person; (3) because that person has sought or provided or is seeking to obtain or provide, reproductive health services or in order to discourage or intimidate such a person from obtaining or providing reproductive health services. 18 U.S.C. § 248(a)(l); N.Y. Penal Law § 240.70(l)(a) and (b). The OAG easily meets all three prongs.

### 1. Defendants Engage in Force, Threats of Force, and Physical Obstruction

#### a. *Defendants Engage in Force*

FACE does not include a definition of "force," but federal courts have found that it is "broadly defined as 'power, violence or pressure directed against a person or thing.'" *New York v. Cain*, 418 F. Supp. 2d 457, 473 (S.D.N.Y. 2006) (citing *Dickson v. Ashcroft*, 346 F.3d 44, 50 (2d Cir. 2003)). Accordingly, courts considering FACE claims have interpreted the term "force" to include acts of physical aggression and contact, such as hitting, pushing, shoving, or knocking into patients as well as escorts and staff. *See id*. at 474 (describing defendant's actions of pressing his body into an escort as well as pushing the escort…as "the clearest example of a use of force in violation of FACE"); *New York v. Kraeger*, 160 F. Supp. 2d 360, 375 (N.D.N.Y. 2001) (noting that defendant used force when "[s]he accosted, yelled at, pushed and bumped into [a patient] . . .

---

that: (1) "there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id*. (quoting *Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (alteration omitted). Defendants can make no such showing here.

." and finding that intentionally stepping on staff member's heels while escorting a patient constitutes force).

Defendants have used precisely the same tactics that courts have held to be uses of force under federal and state laws. Like the defendants *Cain* and *Kraeger*, Defendants have repeatedly pushed and shoved clinic escorts and patients, intentionally stepped on their feet, and used their bodies to press up against the escorts and body-check them. (Asmus Decl. ¶ 7; Brady Decl. ¶¶ 19, 25-27, 28; Garnick Decl. ¶ 11; Greenberg Decl. ¶¶ 16-17; Lee Decl. ¶ 11; Trasande Decl. Ex. 1 at 38-42; White Decl. ¶¶ 13, 14.) Defendants also have crowded and bumped into patients, placed their hands on patients, grabbed their arms, and walked them into walls, pinning them there. (Brady Decl. ¶¶ 19, 28; White Decl. ¶ 14; Garnick Decl. ¶¶ 11, 20; Greenberg Decl. ¶ 18 and Ex. 1 at 1-6; Howell Decl. ¶ 6; Trasande Decl. Ex. 1 at 4, 17.)

Thus, Defendants meet the first element of FACE and the NY Clinic Access Act by engaging in unlawful uses of force in their attempts to interfere with access to the clinic.

### b.    *Defendants Deliver Threats of Force*

FACE and the NY Clinic Access Act further prohibit threats of force that create a reasonable apprehension in the recipient of bodily harm to herself or to another person. 18 U.S.C. § 248(e)(3); N.Y. Penal Law § 240.70(3)(c); *Kraeger*, 160 F. Supp. 2d at 373 (citing *United States v. Dinwiddie*, 76 F.3d 913, 925 (8th Cir. 1996); *Cheffer v. Reno*, 55 F.3d 1517, 1521 (11th Cir. 1995)). In the Second Circuit, the test of whether certain conduct is an actionable "true threat" "is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (quoting *United States v. Davila*, 461 F.3d 298, 305 (2d Cir. 2006) (explaining that true threats may be prohibited without implicating First Amendment rights).

20

In applying this test, the effect of the alleged threat on the recipient is relevant, while the intent of the maker to actually carry out the alleged threat is not. *See Cain*, 418 F. Supp. 2d at 475.

Courts have considered a variety of factors in determining whether a threat is a "true threat" under FACE, rather than protected speech, including: whether the threat is unequivocal and specific as to the person threatened, *New York v. Operation Rescue Nat'l*, 273 F.3d 184, 196 (2d Cir. 2001) ("*New York v. ORN*") *aff'd*, 240 F. App'x 430 (2d Cir. 2007); whether the threat is unconditional, *id.*; whether the threat is communicated directly to the victim; what the recipient's and other listeners' reactions are to the threats; and whether similar statements were made to the victim in the past. *Kraeger*, 160 F. Supp. 2d at 373 (citing *Dinwiddie*, 76 F.3d at 925). Nonetheless, the Second Circuit has affirmed convictions for threats that described and encouraged unlawful conduct from third parties, and not directly from the speaker. *See, e.g., Turner*, 720 F.3d at 413-14 (upholding a conviction for threatening three judges where the defendant wrote that they "deserve to be killed," referred to the murder of the family of another federal judge, and posted their photographs, work addresses, and locations of chambers online).

Here, Defendants continually make direct threats of violence against patients, escorts, and staff. (Brady Decl. ¶ 24; Garnick Decl. ¶¶ 22, 26-27; White Decl. ¶ 25; Greenberg Decl. ¶ 22.) They warn their victims that they are likely to be killed and that they are murderers who will be punished with death, causing patients to cry, tremble, and occasionally lash out in response. (Brady Decl. ¶¶ 20, 24, 39-43; White Decl. ¶ 28, 30; Garnick Decl. ¶¶ 19, 23and Ex. 3; Greenberg Decl. ¶¶ 22-25; Howell Decl. ¶ 7, 9-10.)

In determining the reasonableness of a recipient's reaction, courts have taken into account the local and national climate of violence at clinics, and assaults on physicians and clinic staff in the area or elsewhere in the nation. *See, e.g.*, *Kraeger*, 160 F. Supp. 2d at 373 (citing *United States*

21

*v. McMillian*, 53 F. Supp. 2d 895, 898 (S.D. Miss. 1999)) ("McMillan II"); *United States v. Scott*, 958 F. Supp. 761, 774 (D. Conn. 1997). Thus, courts must "analyze an alleged threat in light of its entire factual context, and decide whether the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future." *Kraeger*, 160 F. Supp. 2d at 373 (quoting *Dinwiddie*, 76 F.3d at 925). (internal citations omitted); *see also Cain*, 418 F. Supp. 2d at 476 (in finding defendant's actions to constitute true threats, it did not matter to the court that defendant did not tell a threatened escort precisely how he would harm her).

Furthermore, a reasonable recipient would consider, as part of the context, the manner in which the threats are delivered. *See Cain,* 418 F. Supp. 2d at 476 ("When [defendant] told an escort 'this is your last warning,' he was extremely close to her, screaming, and pointing a finger in his face. Any reasonable person on a sidewalk in Manhattan would . . . interpret such a statement as a threat."). Indeed, nonverbal conduct may communicate a true threat. *Id.* at 477. For example, in *Cain*, where the defendant inspected the license plate of an escort's car, the court held that the car owner could "reasonably interpret the gesture as intended to communicate an intent to track the owner down and harm her." *Id*.

In this case, Defendants' threats share the characteristics of threats found by courts to constitute violations of FACE and the NY Clinic Access Act. Defendants shove, body-check, and step on escorts as they deliver their threats. (Asmus Decl. ¶ 7; Brady Decl. ¶¶ 19, 25-27, 28; Garnick Decl. ¶ 11; Greenberg Decl. ¶¶ 16-17; Lee Decl. ¶ 11; Trasande Decl. Ex. 1 at 38-42, 54; White Decl. ¶ 13.) They crowd escorts, patients, and staff, and yell and scream at them in close proximity. (Brady Decl. ¶¶ 19-20, 24, 28, 29, 31; White Decl. ¶¶ 14, 19, 23; Garnick Decl. ¶¶ 11, 20, 21; Greenberg Decl. ¶¶ 15, 17; Trasande Decl. Ex. 1 at 4, 7-9, 17.) Defendants also refer to

mass shootings and terrorism, invoking the history of violence against abortion providers and acts of violence by armed individuals. (Brady Decl. ¶ 24; White Decl. ¶ 25; Greenberg Decl. ¶¶ 22, 23.) Defendants Kenneth Griepp, Patricia Musco, Ronald George, Randall Doe, Angela Braxton, and Scott Fitchett, Jr. openly film patients, clinic escorts, and staff outside the clinic using their smartphones or GoPro cameras. (Brady Decl. ¶ 36; Garnick Decl. ¶ 14; Greenberg Decl. ¶ 28; Priegue Decl. ¶ 16; Trasande Decl. Ex. 1 at 12, 36.) Defendant Prisca Joseph routinely takes down license plate numbers of patients and staff. (Priegue Decl. ¶ 19). This conduct is particularly threatening given the history of anti-abortion websites and their role in inciting violence against individuals targeted on their sites.[12]

All of these documented instances of threats violate federal and state law.

### c.    *Defendants Engage in Physical Obstruction*

FACE and the NY Clinic Access Act define physical obstruction as either "rendering impassable" ingress to or egress from a facility or "rendering passage to or from such a facility...unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d). A plaintiff need not show that a clinic was shut down, that people could not enter for

---

[12] For example, Operation Rescue, a "pro-life Christian activist organization," operates a website dedicated to posting information on doctors and other clinic personnel. This includes information on where they work, professional licenses that includes their home address, photos, and more. *Who We Are*, Operation Rescue, http://www.operationrescue.org/about-us/who-we-are/ (last visited May 31, 2017); ABORTIONDOCS, http://abortiondocs.org/ (last visited June 19, 2017). Operation Rescue posted regularly on the late Dr. George Tiller, and maintained pages dedicated to tracking and disrupting his work. *See Tiller Watch*, OperationRescue.org (archived Sept. 15, 2008), http://www.operationrescue.org/category/tiller-watch/ [http://web.archive.org/web/20080915084930/http://www.operationrescue.org/category/tiller-watch/]; *About Us*, ChargeTiller.com (archived Aug. 29, 2008) http://www.chargetiller.com/about.html [https://web-beta.archive.org/web/20080829165149/http://www.chargetiller.com/about.html]. Dr. Tiller was subsequently murdered by a reader and commenter of Operation Rescue's websites. Laura Fitzpatrick, *Scott Roeder: The Tiller Murder Suspect*, TIME (June 2, 2009), http://content.time.com/time/nation/article/0,8599,1902189,00.html. Other anti-abortion websites and blogs have gone so far as to provide information and tactics on how to disrupt clinic operations, including bomb threats and arson. *See* Margaret Sanger and Faye Wattleton, *99 Covert Ways to Stop Abortion –Part 3*, The Army of God (archived Feb. 17, 2005) http://www.armyofgod.com:80/AOGsel5B.html [https://web.archive.org/web/20050217225555/http://www.armyofgod.com:80/AOGsel5B.html] (This website, however, has since been taken down).

a period of time, or that anyone actually was denied medical services in order to establish a violation of FACE or the NY Clinic Access Act. *See Kraeger*, 160 F. Supp. 2d at 373 (citing *United States v. Gregg*, 32 F. Supp. 2d 151, 156 (D.N.J. 1998) (citations omitted), *aff'd*, 226 F.3d 253 (3d Cir. 2000)); *United States v. Roach*, 947 F. Supp. 872, 876 (E.D. Pa. 1996) ("Neither physical injury to patients or staff nor actual entry into the clinic by the protesters is required for conduct to fall within the definition of 'physical obstruction.'"). Courts have held that encountering interference and harassment while attempting to enter or leave a clinic meets the "unreasonably difficult or hazardous" standard. *See Kraeger*, 160 F. Supp. 2d at 373; *Gregg*, 32 F. Supp. 2d at 156; *Scott*, 958 F. Supp. at 775-76; *United States v. White*, 893 F. Supp. 1423, 1431-32 (C.D. Cal. 1995); *United States v. Lindgren*, 883 F. Supp. 1321, 1330-31 (D.N.D. 1995).

Defendants' conduct is remarkably similar to behavior that other courts have found to constitute unlawful physical obstruction in violation of FACE. For example, in *Cain*, the district court found that individuals "standing near car doors so that patients cannot leave their cars," "standing directly in front of a patient and preventing her from approaching the clinic while [defendants] attempt to give her literature," and "standing in front of the [clinic] door and refusing to move" are examples of physical obstruction that violate FACE. 418 F. Supp. 2d at 480; *see also Lindgren*, 883 F. Supp. at 1329-31 (individual engages in unlawful physical obstruction when she signals the driver to roll down the window and then "sticks her head and arm into the car, and hands literature to the occupant.").

Likewise, the *Kraeger* court held that the protesters' crowding, walking very closely to patients, and stepping in patients' way violated FACE and the NY Clinic Access Act. 160 F. Supp. 2d at 376. The court also found that the defendants' acts of pacing in front of the clinic walkway with large signs, standing directly in front of the walkway with large signs, and pacing the entire

24

length of the sidewalk while holding their large signs interfered with the ingress and egress of patients and staff to the clinic. *Id.* Further, in *New York v. ORN*, the district court held that defendants' interference with pedestrians "as they approach the building, shouting at them and standing in front of them as the pedestrians tried to enter the building" violated FACE. 273 F.3d at 194; *see also Scott*, 958 F. Supp. at 768-69, 775-76 (finding a FACE violation where a protester stepped in front of escorts and patients, waved signs in front of escorts and patients, ran up to and after patients, and continued to yell at and push literature on them despite requests to be left alone).

Defendants have engaged in precisely the same behavior here. Defendants hold their large posters and position themselves so as to constructively narrow the width of the approximately sixteen-foot sidewalk to five feet or less and make it unreasonably difficult or hazardous for individuals to enter. (Asmus Decl. ¶ 6, 12; Brady Decl. ¶ 17 and Ex. 1 at 1-4; Garnick Decl. ¶ 10; Howell Decl. ¶ 4; Lee Decl. ¶ 10; Trasande Decl. Ex. 1 at 26, 55; White Decl. ¶¶ 12, 20; Greenberg Decl. ¶ 7, 14, 15.)

Defendants pace the sidewalk next to the clinic and stand in front of the entrance while yelling at patients. (Brady Decl. ¶¶ 31, 34; White Decl. ¶ 16.) They also crowd patients and shove escorts out of the way in an attempt to force anti-abortion literature on patients, despite repeated requests to be left alone. (Brady Decl. ¶¶ 18, 19, 21; White Decl. ¶ 13; Garnick Decl. ¶ 11.) They stand next to car doors to block patients from exiting, and even physically lean into the windows of arriving vehicles and shove materials into the occupants' hands. (Brady Decl. ¶ 18; Garnick Decl. ¶ 12; Greenberg Decl. ¶ 18 and Ex. 1 at 3; Metz Decl. Ex. 1; Trasande Decl. Ex. 1 at 5, 20, 46-48, 56-57; White Decl. ¶ 15.)

Accordingly, the OAG has met the first element of FACE and the NY Clinic Access Act by documenting Defendants' acts of force, threats of force, and physical obstruction by

Defendants, all of which make access to Choices unreasonably difficult or dangerous, in violation of the law.

### 2.    Defendants Possess the Requisite Intent and Motives Under Federal and State Law

The second and third elements of FACE and the NY Clinic Access Act, which address a defendant's intent and motives, can be considered together: whether Defendants' obstruction, use of force, and threats of force are intentional, and whether Defendants engage in this conduct "because" the persons to whom it is directed are obtaining and providing reproductive health services or in order to discourage or intimidate such a person from obtaining or providing reproductive health services. *See* 18 U.S.C. § 248(a)(l); N.Y. Penal Law § 240.70(l)(a)-(b).

To begin, Defendants' unlawful conduct is certainly intentional—that is, their use of force, threats of force, and physical obstruction that impede access to the clinic were not the result of mistake or coincidence. They have repeatedly pushed and shoved escorts, cornered and grabbed patients, threatened violence, and used their signs and their bodies to make it unreasonably difficult to walk down the street to enter the clinic. Next, they are undeniably motivated to commit these acts because the clinic offers abortions.

Defendants' highly targeted activities, along with their rhetoric specifically directed at stopping abortions, precludes any interpretation of their actions at the clinic as accidental or directed at preventing something other than reproductive health services. Defendants repeatedly implore patients and staff to not patronize or work at Choices as doing so would be tantamount to murder. (Brady Decl. ¶ 31; Lee Decl. ¶ 14; Asmus Decl. ¶ 11; Garnick Decl. ¶ 18; Priegue Decl. ¶ 18.) Defendants Ronald George, Randall Doe, Anne Kaminsky, and Jasmine LaLande purposely disseminate false medical information to arriving patients in order to deter them from seeking care, alleging that abortion results in suicide, breast and ovarian cancer, and schizophrenia. (Greenberg

26

Decl. ¶¶ 18-19; Brady Decl. ¶ 37; Riccio Decl. Exs. 1-2.) Dorothy Rothar, in turn, has sought to impede second trimester abortions by circulating pamphlets that contain false medical information, indicating that it is possible to reverse an abortion without any adverse consequences to the health of the mother or fetus by simply removing the laminaria used to dilate the cervix and initiate the abortion. (Greenberg Decl. ¶ 18 and Ex. 2.) Defendants thus have acted with the requisite intent "because" they target persons that seek to or have obtained or provided reproductive health services or wish to discourage individuals from obtaining or providing reproductive health services.

As the Second Circuit held in *United States v. Dugan*, 450 F. App'x 20 (2d Cir. 2011), these elements do not refer to the defendants' ultimate purpose, *id*. at 22; thus, if defendants mean to engage in the acts they commit and the logical and natural intended result of those acts is to physically obstruct patients and staff, or to threaten them, then the intent element of the statute is satisfied. *See also United States v. Weslin*, 156 F.3d 292, 298 (2d Cir. 1999) ("No matter what their ultimate purpose in blockading the clinic may have been, the defendants do not deny—nor could they plausibly deny—that they meant to block the entrances to the . . . clinic . . . and that they did so because they wished to prevent the clinic from performing abortions.").

Defendants act with the express purpose of discouraging the rendering or receipt of any reproductive health-care service: they interfere with patients because they seek reproductive health care; and they interfere with providers—Choices staff and volunteer escorts—because they seek to provide such care. The language that Defendants use to harass patients leaves no question about this motive. Accordingly, the OAG meets the second and third prongs of FACE and the NY Clinic Access Act.

**B.     Defendants' Actions Violate the NYC Clinic Access Act**[13]

Defendants engage in conduct that violates the city law in a number of ways. Like the federal and state clinic-access laws, the NYC Clinic Access Act also bans the use of force, threats of force, and physical obstruction. In addition, the city law prohibits Defendants from following and harassing people in close proximity to the clinic and generally interfering with the clinic's operation. Because Defendants continuously and routinely engage in these types of unlawful conduct, Plaintiff demonstrates a likelihood of success on the merits of this claim.

### 1.     Defendants' Conduct is Prohibited by the City Law

All of the previously described ongoing conduct, which violates federal and state law, also violates the NYC Clinic Access Act and is referred to, but not repeated at length, here. Additional acts, made unlawful by the more expansive city law, are noted below.

#### a.     *Defendants obstruct Patients, Escorts and Clinic Staff from Accessing the Clinic*

As discussed above, Defendants routinely obstruct access to the clinic by pacing the sidewalk and standing directly in front of the entrance with large placards; chasing patients down the block while yelling at them and walking them into the clinic's exterior wall; and shoving and assaulting escorts who are trying to assist the patients. (Asmus Decl. ¶¶ 5-7; Brady Decl. ¶ 17, 19, 26, 27, 28; Garnick Decl. ¶ 11; Greenberg Decl. ¶ 18 and Ex. 1 at 3-6; Howell Decl. ¶¶ 4-6; Lee Decl. ¶¶ 9-11; Trasande Decl. Ex. 1 at 4, 11, 16, 38-42, 62; White Decl. ¶¶ 13-14.)

---

[13] To date, there are no reported or unpublished decisions about the NYC Clinic Access Act.

                **b.**       ***Defendants Routinely Follow and Harass People Within 15 Feet of the Clinic***

The city law prohibits following and harassing anyone within fifteen feet of the "premises of a reproductive health care facility," which is defined as "the driveway, entrance, entryway, or exit of a reproductive health care facility, the building in which such facility is located and any parking lot in which the facility has an ownership or leasehold interest." N.Y.C. Admin. Code § 8-802(c).

Defendants regularly position themselves at various points along the sidewalk next to the clinic. The sidewalk itself is approximately sixteen-feet wide, so any protester present on the sidewalk is by definition within fifteen feet of the premises. While there, Defendants routinely follow patients, escorts and staff—indeed, anyone who appears to be headed toward the clinic— and harass all passers-by with a steady stream of threats and insults, no matter how many times they are asked to stop. Defendants engage in this conduct within fifteen feet of the premises, in violation of the city law. (Brady Decl. ¶¶ 16, 20, 21, 30-33, 34; Lee Decl. ¶¶ 11-12; Trasande Decl. Ex. 1 at 2-4, 6-10, 13, 22-30, 33, 51-53, 55, 58-73; White Decl. ¶ 20.)

                **c.**       ***Defendants Engage in Conduct That Places People in Reasonable Fear of Physical Harm***

As discussed above, Defendants' verbal and nonverbal conduct places people in reasonable fear of physical harm. Defendants' ongoing unlawful conduct—including their screamed threats and physical aggression, filming of patients entering the clinic, and their invocation of real-world violence against abortion providers—puts patients, staff, and escorts in reasonable fear for their safety. (Brady Decl. ¶¶ 24, 31, 36, 38-43 and Ex. 1 at 5-10; Garnick Decl. ¶ 14, 17, 22; Greenberg Decl. ¶¶ 22, 28; Priegue Decl. ¶¶ 16, 19; Trasande Decl. Ex. 1 at 12, 36; White Decl. ¶ 22, 24, 25 and Ex. 1.)

### d.   *Defendants Interfere with the Operation of the Clinic in General*

Above and beyond their prohibited use of force and threats of force, Defendants interfere with the clinic's operation in numerous ways. They lie about the clinic's hours and services and disseminate misinformation about ailments associated with abortion care, physically obstruct of the entrance, and regularly harass patients, all in an effort to delay or deter the provision of health care and interfere with the clinic's operations in violation of the city law. (Brady Decl. ¶ 19; Greenberg Decl. ¶¶ 7, 18-19 and Ex. 2; Lee Decl. ¶¶ 14-15; Priegue Decl. ¶¶ 6, 9, 12; Riccio Decl. Exs. 1-2; White Decl. ¶¶ 16, 17.) Further, Defendants' conduct provokes violent responses from patients and others (Brady Decl. ¶¶ 38-42; White Decl. ¶¶ 26-28; Greenberg Decl. ¶¶ 24-25; Asmus Decl. ¶ 13) and incites passersby to join the fray, by making their own violent threats against the clinic (Garnick Decl. ¶¶ 24-27 (and attached exhibits referenced therein)).

The plain language of the city law prohibits *any* interference – physical or otherwise – with the operation of the clinic. Defendants' lies about the clinic's services and hours of operation, for example, interfere with the operation of the clinic. Defendants also propagate false information about connections between various illnesses, such as infertility, suicidal tendencies, and abortion. By purposely distributing misinformation about the clinic and the nonexistent links between abortion and a variety of physical and emotional ailments, Defendants seek to obstruct patients' access to the wide range of health care that Choices provides.

### 2.   **There Is No Intent Requirement Under the City Law**

The city law has no intent requirement for certain covered conduct, such as following, harassing, and placing persons in reasonable fear of physical harm. Nonetheless, Defendants have knowingly engaged in other conduct, such as obstructing, blocking, and interfering with the clinic, in violation of the city law.

## II.      PLAINTIFF DEMONSTRATES IRREPARABLE HARM

Plaintiff has established that, absent injunctive relief, the People of New York will suffer irreparable harm. The standard for meeting this requirement differs slightly for the federal and state clinic-access laws, as compared to the local ordinance. First, FACE and the NY Clinic Access Act expressly authorize the OAG to seek injunctive relief; in such cases, irreparable harm is presumed. Next, although the city law does not include such express authorization, it is well-established that acts of force, obstruction, and threats, such as those documented at Choices, cause irreparable injury to patients seeking reproductive health care, the staff providing such services, and the public in general, as discussed in § II(B), *infra*. The OAG easily meets the applicable standard for all of its claims.

### A.      Irreparable Harm Is Presumed for FACE and the NY Clinic Access Act

It is well-established that "when a statute authorizes the government to seek preliminary injunctive relief but does not specifically require proof of irreparable harm," irreparable harm is presumed and need not be proven. *See City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 115, 121 (2d Cir. 2010) ("[T]he City [of New York] was not required to make a showing of irreparable harm to obtain an injunction under [the statutes at issue because] [b]oth statutes authorize injunctive relief for violations . . . of their provisions."); *United States v. Narco Freedom, Inc.*, 95 F. Supp. 3d 747, 754 (S.D.N.Y. 2015) ("when, as here, a statute authorizes the government to seek preliminary injunctive relief but does not specifically require proof of irreparable harm, no such showing is required.")

FACE and the NY Clinic Access Act expressly authorize the Attorney General to seek an injunction to prevent violations of the statutes. 18 U.S.C. § 248(c)(3); N.Y. Civ. Rights Law § 79-

m.[14] Indeed, FACE's legislative history reveals that Congress believed that the conduct that FACE was designed to eradicate was *per se* causing irreparable harm. H.R. Rep. No. 103-306, at 6 (1993), reprinted in 1994 U.S.C.C.A.N. 699, 703 (FACE was enacted to "put a stop to the violence and disorder and to restore access to constitutionally protected rights"). Given this Congressional mandate, courts have held that once plaintiffs demonstrate a likelihood that FACE violations have occurred, irreparable harm is presumed. *See United States v. William Savran & Assoc.*, 755 F. Supp. 1165, 1179 (E.D.N.Y. 1991) ("[W]here Congress has provided for Governmental enforcement of a statute by way of an injunction . . . irreparable harm need not be demonstrated . . . so long as the statutory conditions are met, irreparable harm . . . is presumed."); *Roach*, 947 F. Supp. at 877 (holding that once government demonstrated likelihood of success on FACE claim, irreparable injury would be presumed).

Plaintiff has shown that Defendants have violated, and will continue to violate, FACE and the NY Clinic Access Act. Irreparable harm is thus presumed and Plaintiff meets the first part of the test for a preliminary injunction for its state and federal claims.

## B.    Defendants Are Causing Irreparable Harm

Even without the presumption of harm conferred by the state and federal statutes, there is ample evidence that Defendants' ongoing conduct has caused actual irreparable harm to patients seeking reproductive health care, the staff providing it, and the public in general. Courts repeatedly have held that irreparable harm is caused by the aggressive and unlawful activity in which Defendants are engaged. Here, Defendants have engaged in persistent and blatant unlawful

---

[14] The NY Clinic Access Act is codified in two parts of New York law: the Penal Law defines the prohibited conduct, N.Y. Penal Law §§ 240.70-240.71, and the Civil Rights Law authorizes the Attorney General to seek an injunction against that conduct, N.Y. Civ. Rights Law§ 79-m.

conduct at least weekly for five years and continue unabated to date. (White Decl. ¶ 33; Brady Decl. ¶ 47; Garnick Decl. ¶ 29.)

For example, in *Cain*, the court found that conduct similar to the behavior at issue here caused irreparable harm by impeding access to health-care facilities: "Women denied access [to medical facilities] cannot be compensated by money damages; injunctive relief alone can assure them the clinics' availability. . . . The irreparable harm flowing from defendants' activities – including the medical risks and the denial of constitutionally guaranteed rights – is real and threatens to continue." 418 F. Supp. 2d at 473 (quoting *New York State NOW v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989) (internal citations omitted)).

Numerous other courts have reached the same conclusion, finding irreparable harm where anti-choice protesters have engaged in the types of obstruction and threats alleged here. *See, e.g.*, *United States v. Burke*, 15 F. Supp. 2d 1090, 1095 n.6 (D. Kan. 1998) (aggressive acts have adverse impact on the emotional state of women seeking clinic services and the physical well-being of employees at the Center); *United States v. McMillan*, 946 F. Supp. 1254, 1268 (S.D. Miss. 1995) ("McMillan I") (finding irreparable harm in threats of force against clinic patients and workers that inhibit their exercise of their constitutional rights to obtain and provide reproductive health services); *Lindgren*, 883 F. Supp. at 1331-32 (finding threat of irreparable harm where defendants' conduct physically obstructed patients' access to legal abortion services).

Defendants' unlawful conduct — including their physical obstruction of the clinic entrance, acts of force and threats of force, as well as their pattern of harassment against patients, staff, and escorts — has interfered with individual patient care (*see* Argument § I(B)(1)(d), *supra*) and thus harmed women seeking legal reproductive health services. Defendants' illegal activities also cause severe emotional distress to patients, escorts, and staff; instill fear in those individuals

who are the subject of such threats; deter some women and delay others from obtaining medical care; and impede the ability of clinic staff to provide health care.

Thus, unless enjoined, Defendants' conduct will continue to inflict irreparable harm on patients, staff, and the public at large.

## III.   PLAINTIFF DEMONSTRATES THAT INJUNCTIVE RELIEF WOULD NOT HARM THE PUBLIC INTEREST

In deciding whether to grant a preliminary injunction, courts must consider the public consequences of the requested injunctive relief. *Winter v. NRDC, Inc*., 555 U.S. 7, 24, 129 S. Ct. 365, 376-77 (2008). Thus, the moving party must demonstrate that a preliminary injunction would not harm the public interest. *See Oneida Nation of N.Y.*, 645 F.3d at 164; *Tutor Time Learning Ctrs., LLC v. KOG Indus*., No. 1:12-CV-4129, 2012 U.S. Dist. LEXIS 162124, at *20 (E.D.N.Y. Nov. 13, 2012); *see also Defario v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) ("The Court generally assumes that the acts of a governmental entity are aligned with the interests of the public it serves.").

Injunctive relief would not harm the public interest in this case because Congress determined that FACE serves the public interest "by ensuring that individuals who seek to provide or obtain reproductive health services can do so free from unlawful interference." *Roach*, 947 F. Supp. at 877. Further, Congress specifically authorized state Attorneys General to bring a civil action "when he or she has reasonable cause to believe that any person or group of persons may be injured by the conduct prohibited by FACE."[15] *McMillian I*, 946 F. Supp. at 1269.

---

[15] The New York State legislature enacted the NY Clinic Access Act to protect access to reproductive health services. N.Y. Penal Law §§ 240.70-240.71. The New York State Attorney General is authorized to seek injunctive relief for violations of the Clinic Access Act. N.Y. Civ. Rights Law § 79-m. Similarly, the NYC Clinic Access Act was enacted to protect the public health, safety and welfare by prohibiting interference with access to reproductive health care services. NYC Administrative Code § 8-801. Since FACE serves the public interest, the state and city laws – which were enacted to protect access to reproductive health-care services – demonstrably serve the public interest as well.

Courts have found that granting injunctive relief to prevent FACE violations does not harm the public interest.[16] *See Burke*, 15 F. Supp. 2d at 1095 (finding no harm to the public if the court orders an injunction); *Roach*, 947 F. Supp. at 877-78 ("Congress determined that FACE serves the public interest by ensuring that individuals who seek to provide or obtain reproductive health services can do so free from unlawful interference."); *McMillian I*, 946 F. Supp. at 1269 ("[A]n injunction will promote and serve the public interest by protecting the interests that FACE was designed to protect," and because "it will help to keep clinic workers safe from harm by affording protection from the defendant's threats or any irrational impulses to act upon the threats. Consequently, women's access to safe and vital reproductive health care will be ensured."); *Lindgren*, 883 F. Supp. at 1327-28, 1332 (finding that while the public has an interest in preserving the right of all individuals to speak freely, including the right to speak freely on abortion, the public also has an interest in seeing that FACE is upheld as well as having the legal rights of citizens upheld, and not having those rights frustrated by unlawful acts).

In addition to violating FACE, Defendants' actions interfere with the public's rights in general. First, Defendants' physical obstruction of the clinic and their campaign of harassment interfere with the public's right to obtain medical services. Courts have found it significant if women who obtain medical procedures are emotionally upset prior to or during the medical procedure, because it prevents them from receiving optimal care. *See Masden v. Women's Health Ctr.*, 512 U.S. 753, 758 (1994) ("[P]atients manifested a higher level of anxiety causing those patients to need a higher level of sedation to undergo the surgical procedures, thereby increasing the risk associated with such procedures."); *Kraeger*, 160 F. Supp. 2d at 369 ("[P]atients arrive

---

[16] Because the public-interest prong of the preliminary injunction standard emerged in the Second Circuit after *Winter*, there are no Second Circuit FACE cases analyzing whether a preliminary injunction would serve the public interest. However, as discussed below, other circuits have considered the public interest in the clinic-access context.

nervous and upset. Staff members have to spend time calming patients down before the purpose

of their visit can be addressed."); *Scott*, 958 F. Supp. at 767 ("[I]nterfering with a patient's access

to [the clinic] can increase the patient's stress level, and thereby increase the risks of a subsequent

abortion procedure" including post-operative risks). Since the right to obtain medical services is a

right common to all New York residents, injunctive relief would not harm the public interest. *See*

*Cain*, 418 F. Supp. 2d at 483; *Terry*, 886 F.2d at 1362.

Second, Defendants' conduct interferes with the public's right to freely move about the

public streets and sidewalks outside of the clinic. Courts have granted injunctive relief in order to

promote "free flow of traffic on streets and sidewalks." *See Madsen*, 512 U.S. at 768 ("The State

also has a strong interest in ensuring the public safety and order, in promoting the free flow of

traffic on public streets and sidewalks, and in protecting the property rights of all of its citizens.");

*Cain*, 418 F. Supp. 2d at 484 (issuing an injunction to promote the free flow of traffic on streets

and sidewalks serves the significant governmental interest of ensuring safety and public order);

*Kraeger*, 160 F. Supp. 2d at 370 (issuing an injunction in part because defendants "pace the entire

length of the narrow clinic sidewalk while holding large signs, making it difficult for people to

walk on the sidewalk. . . . [D]efendants do not yield space on the sidewalk to anyone.").

Given Defendants' repeated violations of federal, state, and local clinic-access laws, their

disruption of the clinic's ability to provide reproductive health services, as well as their ongoing

interference with the public's ability to move freely along the sidewalk by the clinic, Plaintiff

respectfully submits that an injunction would be in the public interest.

## IV.    THE REQUESTED RELIEF IS NARROWLY TAILORED TO REMEDY DEFENDANTS' ONGOING VIOLATIONS OF LAW

In light of Defendants' continuing record of harassing and obstructive conduct, Plaintiff

has submitted a proposed preliminary injunction ("Proposed Order") that would create a 16-foot

"buffer zone" around the entrance to Choices; the Proposed Order would prohibit Defendants and those acting in concert with Defendants, from congregating, picketing, demonstrating or entering the buffer zone. Buffer zones are common FACE remedies, and have been found to burden no more speech than necessary to serve the significant government interests at stake here.

The U.S. Supreme Court has approved the use of buffer zones to protect reproductive health facilities and their patients and staff. *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 380-85 (1997); *Madsen*, 512 U.S. at 768-71. Likewise, the Second Circuit and federal district courts in New York and around the country have found buffer zones to be both necessary and constitutional. *See New York v. ORN*, 273 F.3d at 208; *Cain*, 418 F. Supp. 2d at 486-87; *Kraeger*, 160 F. Supp. 2d at 379; *United States v. Scott*, No. 3:95-CV-1216, 1998 U.S. Dist. LEXIS 6716, at *6 (D. Conn. Mar. 16, 1998), *aff'd*, 187 F.3d 282 (2d Cir. 1999); *McMillan I*, 946 F. Supp. at 1270; *White*, 893 F. Supp. at 1439-40.

In order for an injunctive buffer zone to avoid imposing unlawful limits on a protester's First Amendment rights, it must be: (1) content neutral, and (2) narrowly tailored so as to "burden no more speech than necessary to serve a significant government interest." *Madsen*, 512 U.S. at 765. Here, the proposed buffer zone is content neutral because it is not a regulation of speech, but "rather, it is a regulation of the places where some speech may occur," *Hill v. Colorado*, 530 U.S. 703, 719 (2000), and because its restrictions are justified '"without reference to the content of the regulated speech,'" *Madsen*, 512 U.S. at 763 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see Schenck*, 519 U.S. at 374 n.6 (rejecting argument the injunction is an unlawful prior restraint because it leaves alternative channels of communication open; granting injunction not because of content of expression but because of prior unlawful conduct). Further, the proposed buffer zone burdens no more speech than necessary because it restricts Defendants'

access to only that portion of the sidewalk as is needed to promote the government's significant interests in protecting a women's freedom to seek pregnancy-related services, ensuring public safety and order, and protecting the medical privacy of patients whose psychological and physical well-being are threatened. *Madsen*, 512 U.S. at 767-68 ("We think a standard requiring that an injunction "burden no more speech than necessary" exemplifies "precision of regulation."); *see also McCullen v. Coakley,* 134 S. Ct. 2518, 2535 (2014) (finding that unlike content-based restrictions, such injunctions need not be the least restrictive or intrusive means of serving the governmental interest, but cannot regulate speech that does not advance its goals); *Schenck*, 519 U.S. at 376 (ensuring public safety is a significant governmental interest). The Supreme Court has held "that the combination of these governmental interests is quite sufficient to justify an appropriately tailored injunction to protect them." *Madsen*, 512 U.S. at 768.

There is no formulaic size for a buffer zone; rather, courts exercise their discretion to craft a zone that eliminates the threat to governmental interests posed by the defendants' conduct while protecting defendants' First Amendment rights. *See Schenck*, 519 U.S. at 381 (deferring to district court's assessment of number of feet necessary to keep clinic entrances clear); *Madsen*, 512 U.S. at 769-70 (same). Thus, courts have upheld, over First Amendment challenges, buffer zones ranging from ten feet to 500 feet. *See Dinwiddie*, 76 F.3d at 928-29 (500 feet); *Murray v. Lawson*, 138 N.J. 206, 234 (1994) (100 feet); *Planned Parenthood of Shasta-Diablo, Inc. v. Williams*, 10 Cal. 4th 1009, 1021 (1995) (sixty feet); *Schenck*, 519 U.S. at 380-81 (fifteen feet); *New York v. ORN*, 273 F.3d at 190 (fifteen feet); *Cain*, 418 F. Supp. 2d at 486-87 (ten feet).

In *Schenck*, the Supreme Court approved a fifteen-foot buffer zone, because it was necessary to ensure access; without a buffer zone, defendants "would not merely engage in stationary, non-obstructive demonstrations but would continue to do what they had done before:

38

aggressively follow and crowd individuals right up to the clinic door and then refuse to move, or purposefully mill around parking lot entrances in an effort to impede or block the progress of cars." 519 U.S. at 381-82 (describing conduct similar to Defendants' conduct here and, *id*. at 383, characterizing such conduct as "extraordinary" lawlessness that warranted keeping defendants away from the entrances in order to ensure access). Likewise*, in New York v. ORN*, the Second Circuit relied on a record similar to the facts Plaintiff has set forth here to uphold a fifteen-foot buffer zone. 273 F.3d at 195 (finding that the defendant had, among other things, obstructed driveway access, confronted patients at close range and blocked patients inside their cars by standing close to car doors and, *id*. at 203, concluding that such "picketing activity at the sites has interfered with clinic access, thus meriting the continuation and modification of buffer zones.") More recently, in *Cain*, the Southern District of New York upheld a ten-foot buffer zone in order to prohibit protesters (peaceful and non-peaceful) from gathering near the entrance of the clinic, noting that the protesters could continue their activities outside the buffer zone which was directly opposite the clinic. *Cain*, 418 F. Supp. 2d at 486-487.

Here, the city law already restricts following and harassing people within fifteen feet of the premises, a restriction that Defendants have openly and repeatedly flouted. The proposed sixteen-foot buffer zone would do little more than enforce the existing law as the width of the sidewalk outside the Choices clinic entrance is approximately sixteen feet. Doing so would ensure that the Defendants are given clear notice of the limits on their activities, as it would prohibit them from positioning themselves anywhere on the sidewalk in front of the building. Further, the proposed buffer zone is significantly smaller than those that have been approved elsewhere, and it provides Defendants with ample alternative avenues of communication. They may continue to communicate their message verbally, with signs, and with literature from the sidewalk across the street from

39

Choices—as other lawful protesters already do. From this location, Defendants can be seen and heard by persons arriving at and leaving the clinic, as well as passing pedestrians and motorists.

In sum, the proposed buffer zone is no more burdensome than necessary to protect the significant governmental interests in protecting access to reproductive health services, ensuring public safety, and protecting patients' medical privacy.

## CONCLUSION

In order to put an end to Defendants' unlawful uses of force, threats, physical obstruction, and harassment to obstruct access to reproductive health care at Choices, Plaintiff respectfully requests that its motion for a preliminary injunction be granted.

Dated: New York, New York
June 20, 2017

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York

By:      /s/ Sandra Pullman
Sandra Pullman
Assistant Attorney General
Sandra.Pullman@ag.ny.gov

Nancy Trasande
Assistant Attorney General
Nancy.Trasande@ag.ny.gov

Lourdes M. Rosado
Bureau Chief
Lourdes.Rosado@ag.ny.gov

40

Office of the New York State Attorney General
Civil Rights Bureau
120 Broadway, 23rd Floor
New York, New York 10271
(212) 416-8250