UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
PEOPLE OF THE STATE OF NEW YORK,                    MEMORANDUM
                              Plaintiff,            AND ORDER
        - against -
KENNETH GRIEPP, et al.,                             17-CV-3706 (CBA) (JO)
                              Defendants.
----------------------------------------------------------X

James Orenstein, Magistrate Judge:

     In two separately filed motions, all of the defendants seek to disqualify me based on

assertions that I am biased and that my continued participation in the case creates an appearance of

impropriety. *See* Docket Entry ("DE") 139; DE 146; 28 U.S.C. §§ 144, 455. For the reasons set forth

below, I deny the motions pursuant to Section 455. Briefly stated, the motions are predicated on a

mix of false statements, distortions of fact, and truthful assertions presented out of context in a

misleading fashion. Because I continue to be impartial, and because an accurate account of the

pertinent facts does not support either an inference that I am actually biased or a conclusion by a

fully informed neutral observer that my continued participation in the action would be improper,

there is no basis for my disqualification. I take no action on the motions pursuant to Section 144,

which must be resolved by the assigned district judge.

I.     Background

     The plaintiff has accused several individual defendants of interfering with the rights of

women to seek and receive reproductive health-care services offered at Choices Women's Medical

Center in Queens, New York (the "Clinic"); and, as a remedy, seeks declaratory and injunctive relief,

an award of damages, and the imposition of civil penalties. *See* DE 1 (Complaint); 18 U.S.C. § 248

(the federal Freedom of Access to Clinic Entrances Act); New York Clinic Access Act, N.Y. Civ.

Rights Law § 79-m (the portion of the New York Clinic Access Act authorizing the New York

Attorney General to seek an injunction); N.Y.C. Admin. Code §§ 8-803 and 8-804 (the New York

City Access to Reproductive Health Care Facilities Act). The case was randomly assigned to me for the oversight of non-dispositive pretrial matters pursuant to Local Civil Rule 72.2. *See* Docket Entry dated June 20, 2017.

After the Complaint was filed, the parties did not begin a formal exchange of discovery, but instead proceeded to litigate motions for dismissal and preliminary injunctive relief. As a result, I took no part in the action during its initial stages aside from ministerial functions relating to the admission and withdrawal of counsel and the approval of a stipulated protective order. *See* Order dated December 6, 2017. My first (and thus far only) substantive role in the case began when the court *sua sponte* directed me to convene a settlement conference, which I did on December 11, 2017. *See* Minute Entry & Order dated December 7, 2017; DE 136.[1] Because the motion to disqualify me is predicated on the movants' description of the unrecorded events of that conference, I summarize below details of the colloquy to the extent necessary to assess the motion's merits.

At the outset of the conference, I met in the courtroom with all counsel as well as all of the attending defendants: Kenneth Griepp (who was joined by his wife, non-party Lois Griepp), Ronald George, Patricia Musco, Anne Kaminsky, Sharon Richards (the true name of defendant Sharon Doe, *see* DE 35), Prisca Joseph, Angela Braxton, and Scott Fitchett, Jr.[2] After making introductions, I explained to all present that the conversation would be an informal and off-record discussion and

---

[1] My lack of substantive involvement does not mean that the parties had no pretrial disputes relating to discovery and other non-dispositive matters. Instead, because almost all of the proceedings to date have related to requests for preliminary injunctive relief, the assigned district judge has resolved such disputes. More recently, the court combined the hearing on the motion for preliminary injunctive relief with a trial on the merits to begin soon. *See* Minute Entry & Order dated Dec. 7, 2017 (setting trial date). As a result of that procedural history, as well as of the fact that I cannot resolve any of the pending, time-sensitive discovery disputes before the court resolves the Section 144 motions, it appears likely that I will have no remaining duties to discharge in this case regardless of the outcome of the latter. Accordingly, the Section 144 motions may well prove to be moot.

[2] Defendant Brian George arrived later and joined the other appearing defendants in the jury box.

that nothing anybody said during the conference could be used in any way for purposes of litigation. Consistent with my usual practice at settlement conferences, I also explained that I would find it useful to hold separate conversations with each side, but that I would only do so if all parties and counsel present consented to such *ex parte* contact and agreed that it would not form a basis for seeking my disqualification should the case not settle. All of the defendants stated that they understood, and that they consented to my participation in *ex parte* discussions, as well as to my law clerk's presence for all such talks.[3]

Similarly consistent with my usual practice in settlement conferences (at least, in those cases where the record or the parties' pre-conference statements of settlement position suggest a low likelihood of agreement), I advised the attendants that I would stop the conference if it appeared to have no hope of producing an agreement. In particular, I made clear that if and when either side took a position that I concluded would make settlement impossible, such as identifying a non-negotiable position that the other side could not accept, I would immediately conclude the conference. All present expressed their understanding of that advice.

I then separated the two sides to begin the *ex parte* discussions. Because of the large number of people on the defendants' side, I invited them to remain in the courtroom while I conferred with the plaintiff's counsel in the jury room adjacent thereto. I held a lengthy discussion with the plaintiff's counsel to understand their perspective on the factual and legal disputes of the case, their litigation goals, and the contours of a consensual resolution that they thought would be acceptable

---

[3] I do not suggest that the defendants have improperly predicated the instant motions on the fact that I held *ex parte* discussions with the plaintiff's counsel. The motions are clearly based on other, albeit incorrect, factual assertions.

to both sides. At the end of that discussion, which I believe lasted the better part of an hour, I asked them to remain in the jury room while I spoke with the defendants.

I returned to the courtroom and started to convey the plaintiff's proposal, but the defendants' counsel asked me to defer doing so until each of the individual defendants had an opportunity to tell me about themselves. Counsel suggested, and I readily agreed, that it would be useful for me to have an understanding of each defendant's background and, in particular, the personal experiences that motivated each to spend time attempting to provide sidewalk counseling to the women who approached the Clinic's entrance.

I then heard from each of the attending defendants (as well as non-party Lois Griepp) in turn. Some spoke for only a few minutes, others took longer, and one of the defendants spoke at great length. All spoke sincerely, and at times emotionally, about deeply held beliefs, and all made a deep impression on me. Although I had hoped to proceed more quickly to a discussion of settlement proposals (I did not watch the clock, but estimate that it took about an hour to hear from all of the attending defendants), I considered the time well spent because it gave me a much better understanding of how the defendants perceived the stakes of the litigation and their needs with respect to settlement.

Because the litigation centers on the interactions between the defendants and those they seek to counsel, and in particular because the plaintiff seeks to enjoin certain conduct if the offer of counseling is rejected, I specifically asked each speaker to address how he or she would respond to a person who expressed an unwillingness to receive the proffered counsel. In addition, I spent several minutes in colloquy with one defendant who told me he is a teacher. Because he must sometimes, in the interest of maintaining classroom order and discharging his teaching duties, silence students who may think they have important things to say, I thought it important to have an understanding of

how he believes such interactions should proceed when he is the person who seeks to defer speech, rather than the person whose speech the listener may prefer to avoid. As with all of my discussions with the defendants, my discussion with the teacher was wholly cordial.

During the defendants' individual presentations, I sat at one end of the counsel table, the defendants sat in the jury box, and their attorneys sat between us, at one side of the counsel table. Because of that positioning, when two of the defendants' attorneys were whispering to each other, their visible and audible conversation distracted me from their clients' statements. I therefore reminded counsel that I was listening to their clients at their suggestion and said that I was eager to hear what their clients had to say. I made clear that it might be important for counsel to confer with one another during the presentation, but that such conversation should occur outside the courtroom while their co-counsel remained inside. The two attorneys stopped talking and remained in their seats. Soon, however, they began exchanging notes – and again, because of their positions between me and their clients in the jury box (albeit not in my direct line of sight to the speakers), their conduct distracted my attention from the defendant who was then telling me about herself. With apologies to that defendant for interrupting her, I again asked counsel either to stop passing notes, or to leave the courtroom to hold their discussion. Both attorneys stayed in their seats and stopped passing notes.

As the defendants completed their presentations, I understood all of them to be asserting an interest in offering counseling to those seeking to enter the Choices Clinic and a willingness to disengage if and when a person to whom they offered such counseling declined to speak. However, while I had a better understanding of what the defendants wanted to say, and why they wanted to say it, I did not yet have a sense of the manner in which they sought to engage the people they encountered or how their preferences in that regard might or might not be compatible with the

plaintiff's settlement proposal (which involved demarcation of the sidewalk adjacent to the Clinic to ensure that patients uninterested in receiving counseling would have an unobstructed path to enter). Some of the defendants had referred to their use of posters, but I did not yet understand how they sought to place themselves and their signs in relation to pedestrians outside the Clinic. I therefore asked the defendants to demonstrate to me exactly what they wanted to be able to do. Neither the defendants nor their counsel objected to the proposal. I therefore stood at the courtroom's public entrance while the defendants arranged themselves in the courtroom to begin the demonstration.

As they were about to begin, counsel asked to participate in the demonstration by pretending to be non-party Clinic escorts. I did not think such participation would be useful for two reasons. First, I had no reason to assume that the attorneys, all of whom maintain offices outside of New York State, had sufficient first-hand experience of the sidewalk encounters at issue in the case to offer an accurate portrayal of the escorts, even if they were committed to doing so in an objective fashion. Second, and more important, the escorts' actions were not the subject of my inquiry at that stage of the discussion: rather, I was trying to understand the defendants' settlement goals by gaining a better understanding of how they wished to be able to offer counseling in the first instance, not how they might respond to perceived interference from escorts after they made an offer of counseling. I therefore asked counsel not to participate in the demonstration.

Following the demonstration, I had further colloquy with the defendants and their counsel. During that discussion, defendant Griepp demonstrated how he would sometimes display a large poster of a fetus to someone trying to enter the Clinic and (in a raised voice) implore the woman not to kill a child. At that point, I paused a few moments while deciding whether to share with the

defendants and their counsel the fact that my family had suffered a miscarriage.[4] That painful and intensely personal experience is of course a matter that should normally remain private, as I acknowledged when I decided to share it with those present. But that experience also gave me an insight into how this aspect of the defendants' sidewalk counseling efforts could impede rather than promote the kind of discourse they sought to have with Clinic patients, and I concluded that sharing the information might promote settlement. I therefore did so and discussed how, in my view, insisting on that particular form of expression might be very hurtful to the listener and therefore undermine the defendants' efforts to forge a connection with those they sought to counsel.

The defendants' characterization of this portion of the conference is markedly different, and wholly incorrect. They contend that after revealing my family's miscarriage experience, I "said, unequivocally, to all Defendants and counsel present, that [I] could not be impartial on this issue because of [my] prior experience." DE 139-1 ¶ 8 (counsel's declaration). I did not say that, nor would I have had any reason to say such a thing because it is untrue in several important respects. First, if I believed either that I was biased or that a disinterested observer would think me so, I would simply recuse myself. Second, I am wholly impartial as to all factual and legal disputes in this case: I have no basis for believing one side's factual description of the events outside the Clinic over the other's, and that precludes any ability to predict how the legal claims before the court should be decided. Third, the propriety of displaying the image of a fetus while describing the termination of a pregnancy as the killing of a child is not at issue in this litigation – what is in dispute is whether the defendants are unlawfully impeding the Clinic's patients from gaining access to the Clinic's services;

---

[4] The movants have omitted details of the personal experience I described, citing a commendable concern for my privacy. However, because the opacity of their description contributes to the distortion in their account of what occurred, I provide greater detail here.

as a result, any personal feelings I might have upon seeing and hearing such a message have no bearing on any decision I would be called upon to make in overseeing pretrial discovery or other non-dispositive matters.

Fourth, the defendants have both misreported and misunderstood my statement about the message in the context of people who have suffered miscarriages. I have no reason to think that, however offensive some might find the defendants' words and their display of the poster, that it is outside the very wide bounds of permissible discourse under settled law. To the contrary, I firmly believe that the importance of defending our society's commitment to free speech is at its acme where the speech at issue may be offensive to the listener. Fifth, and relatedly, I did not find the message offensive; nor do I believe that there is anything inherently wrong with the defendants' use of it. The fact that their use of the image prompted me, and might prompt others, to recall a painful experience does not mean that I fault the defendants for their expression; it means only that I have a reason to believe their method of communication will undermine rather than enhance their efforts to engage Clinic patients in meaningful counseling.

Another portion of the settlement conference that the movants and their counsel have inaccurately described was my discussion with defendant Griepp, who is the pastor of the church that he and several of the defendants attend. During his colloquy with me, Pastor Griepp discussed in part the religious views that inform his interest in offering sidewalk counseling to the Clinic's patients. As I started to engage in discussion with him about the matter, I noted, in the interest of transparency, that I do not share either his faith or his views about abortion, but that such differences would not prevent me from trying to understand his views on settlement or trying to help the parties forge an agreement they would all find acceptable. My disclaimer in that regard is consistent with my usual practice in settlement discussions with a litigant whose position is based

more on moral or religious beliefs than on an evaluation of a claim's monetary value: I believe that such disclosures allow the litigant to make informed choices about how best to proceed with negotiations.

After listening, at counsel's request, to the defendants' extensive presentations and observing their demonstration of how they wished to engage those seeking to enter the Clinic, I conveyed to the defendants and their counsel the plaintiff's proposal for settling the case. Contrary to the defendants' current assertion that I did not wish to hear from their counsel, I did discuss with counsel, at some length, both the plaintiff's proposal and the counterproposal they offered. After several minutes of discussion, during which counsel explained terms that they would and would not find acceptable, it became apparent to me that the parties had a fundamental disagreement that would prevent them from settling the case. I continued to explore options with counsel when defendant Fitchett's counsel interjected to point out his client's position, which seemed to me to place the prospect of settlement firmly out of reach. I therefore thanked counsel for the clarification and, consistent with the instructions I had given at the outset, informed the defendants that I did not believe an agreement was achievable. I then left the room, invited the plaintiff's counsel back into the courtroom, explained to all my conclusion that the parties had irreconcilable settlement goals, and adjourned the conference.

Throughout the proceedings, which I believe lasted about three hours, the discussions were consistently cordial on all sides. On December 19, 2017, five days after the conference concluded, several defendants filed the instant motion for disqualification. DE 139. The remaining defendants sought similar relief on December 29, 2017. DE 146.

II.    Discussion

Where a party moves to disqualify a judge under Section 455, the judge whose removal is sought must address the request in the first instance. *See, e.g.*, *In re Certain Underwriter*, 294 F.3d 297, 302 (2d Cir. 2002) (citing *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988)); *see also LoCascio v. United States*, 473 F.3d 493, 498 (2d Cir. 2007) (stating that "a judge has an affirmative duty to inquire into the legal sufficiency of ... an affidavit" asserting a basis for his disqualification) (internal citations omitted); *Alfano v. Nat'l Geographic Channel*, 2007 WL 2982762, at *7 n.10 (E.D.N.Y. Oct. 5, 2007). On the other hand, a motion for disqualification under Section 144 must be determined by "another judge[.]" 28 U.S.C. § 144. I therefore address here only the motion for disqualification under Section 455.[5]

That inquiry on a motion for disqualification is "whether an objective, disinterested observer fully informed of the underlying facts, [would] entertain significant doubt that justice would be done absent recusal, or alternatively, whether a reasonable person, knowing all the facts, would question the judge's impartiality." *United States v. Yousef*, 327 F.3d 56, 169 (2d Cir. 2003) (alteration in original) (internal quotation marks and citation omitted); *Dekom v. New York*, 2013 WL 3095010, at *6 (E.D.N.Y. June 18, 2013) (quoting same), *aff'd*, 583 F. App'x 15 (2d Cir. 2014). Stated differently, the facts set forth in the papers supporting the motion "'must give fair support to the charge of a bent of mind that may prevent or impede impartiality of judgment.'" *LoCascio*, 473 F.3d at 498 (quoting *Wolfson v. Palmieri*, 396 F.2d 121, 124 (2d Cir. 1968)) (internal quotation marks omitted).

---

[5] I do not mean to suggest that the foregoing standard applies uniquely to motions under Section 455. To the contrary, while the two statutes specify different grounds for disqualification and prescribe differing procedures, the same substantive standards apply to each. *See Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir. 1987) (citing *United States v. Pugliese*, 805 F.2d 1117, 1125 (2d Cir. 1986)). However, because I may not resolve the motion under Section 144, I need only consider the applicable standard under Section 455.

Where a disqualification motion is predicated on a judge's subjectively perceived hostility, applicable precedent requires the movant to show more than mere dissatisfaction with the judge's words or apparent attitude:

> [J]udicial remarks … that are disapproving of, or even hostile to, counsel, the parties, or their cases do not support a claim of bias or partiality unless they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible … expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been [appointed] as federal judges, sometimes display do *not* establish bias or partiality.

*Francolino v. Kuhlman*, 365 F.3d 137, 143-44 (2d Cir. 2004) (emphasis in original, quotation marks and footnote omitted, citing *Liteky v. United States*, 510 U.S. 540, 555-56 (1994)); *see Fox Indus., Inc. v. Gurovich*, 323 F. Supp. 2d 386, 387 (E.D.N.Y. 2004) (quoting same).

Finally, a judge may not disqualify himself simply to accommodate a party's sincerely held belief that he cannot be impartial, or merely to put to rest a motion the denial of which an unreasonable movant is likely to appeal. To the contrary, "'[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is.'" *In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136, 140 (2d Cir. 2007) (quoting *In re Drexel Burnham Lambert Inc.*, 861 F.2d at 1312).

Applying that standard requires me to deny the motion under Section 455. An accurately informed observer could not infer that I am actually biased because, contrary to the movants' assertions, I did not say that I am. To be sure, that is my account, and it differs from that of the movants. But for the following reasons, I conclude that under the circumstances of this case, the existence of that discrepancy does not compel a different result.

As noted above, the applicable standard for deciding a motion for disqualification interprets the relevant circumstances from the viewpoint of the "objective, disinterested observer fully informed of the underlying facts." *Yousef*, 327 F.2d at 169. But where those circumstances include

differing accounts by the movant and the judge who must decide the motion, that standard requires the court to decide a subsidiary question. Specifically, does the standard refer to a first-hand observer, who would be in a position to know which of two conflicting accounts is correct, or does it instead refer to a fact-finder who would resolve such a conflict by taking into account all relevant circumstances but who would lack personal knowledge of the disputed events? I need not decide that issue, because both possibilities lead to the same result.

If the standard assumes a first-hand witness, then I can only conclude that such an impartial observer would know that I did not, in fact, profess an inability to be impartial. I recognize that the defendants disagree, but the motion under Section 455 is to be decided in the first instance by the judge whose disqualification is sought. *See In re Certain Underwriter*, 294 F.3d at 302 (citing *In re Drexel Burnham Lambert Inc.*, 861 F.2d at 1312); *Williams v. NYS Office of Mental Health*, 2015 WL 4624226, at *3 (E.D.N.Y. Aug. 3, 2015). As a result, to the extent such a motion is predicated on factual matters within the judge's knowledge, and to the extent the "disinterested observer" standard assumes a first-hand witness, that judge must base the decision on the facts as the judge knows them.

If the disinterested observer is a neutral *post hoc* fact-finder, I conclude the result would be the same for two reasons. First, in seeking a judge's disqualification, the "[m]ovants must overcome a presumption of impartiality, and the burden for doing so is 'substantial.'" *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 332 F. Supp. 2d 667, 670 (S.D.N.Y. 2004) (quoting *Giladi v. Strauch*, 1996 WL 18840, at *1 (S.D.N.Y. Jan. 18, 1996) (citing *Farkas v. Ellis*, 768 F. Supp. 476, 478 (S.D.N.Y.1991))). Absent any other information than the movants' assertion that I said that I cannot be impartial and my assertion that I did not, that presumption – applied by me or any other judge – would appear to compel the denial of the motion to disqualify me.

Second, there is information available to contextualize the difference between the movants' account and my own: namely, the difference between my history with respect to matters implicating a judge's qualification to serve impartially and that of the movants' counsel. Neither I nor any other judge has ever had occasion to disqualify me from participation in a case. In those cases where I lacked either actual or apparent impartiality, I have voluntarily recused myself. In those cases where I was aware of information that I concluded did not require disqualification but that might support a colorable argument to the contrary, I have disclosed that information and given an explanation for my decision to remain in the case so that any party would have the opportunity to seek reconsideration. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2008 WL 2039541 (E.D.N.Y. May 12, 2008); *In re Holocaust Victim Assets Litig.*, 2007 WL 805768, at *9 (E.D.N.Y. Mar. 15, 2007), *report and recommendation adopted*, 528 F. Supp. 2d 109 (E.D.N.Y. 2007). In the handful of cases in which a litigant has moved to disqualify me, the motions have been denied, and in each such case the movant either did not seek or did not secure relief upon review. *See Holcombe v. US Airways Grp., Inc.*, 2017 WL 1184104, at *2-3 (E.D.N.Y. Mar. 29, 2017);[6] *Williams*, 2015 WL 4624226, at *3-5; *Goodwine v. Nat'l R.R. Passenger Corp.*, 2014 WL 37850 (E.D.N.Y. Jan. 6, 2014); *Haley v. F.B.I.*, 2010 WL 3282634, at *1 (E.D.N.Y. Aug. 18, 2010); *Alfano*, 2007 WL 2982762; *Riola v. Long Island Cycle & Marine, Inc.*, 352 F. Supp. 2d 365 (E.D.N.Y. 2005).

---

[6] In *Holcombe*, the motion for recusal was made (twice) by the plaintiff's former counsel in the course of litigating a motion to determine whether the client had discharged him for cause and was therefore not liable to pay his fee. Counsel did not seek direct review of the decisions denying those motions, but did seek district court review of the order finding he had been terminated for cause, and in the course of doing so asserted that I should have been disqualified. The district court affirmed my ruling on review in an unpublished decision. *Holcombe v. US Airways Grp., Inc.*, docket no. 08-CV-1593 (SLT) (JO), DE 221 (E.D.N.Y. Aug. 4, 2017). The latter ruling is pending appellate review. *See id.* DE 222 (E.D.N.Y. Sept. 3, 2017) (notice of appeal).

In contrast, the attorneys litigating the instant motion on behalf of most of the defendants have repeatedly demonstrated in prior cases a fundamental misunderstanding of the standards for disqualification and a willingness to seek such relief by relying on baseless accusations of bias. *See Marcavage v. Bd. of Trustees of Temple Univ. of Commonwealth Sys. of Higher Educ.*, 232 F. App'x 79, 82-83 (3d Cir. 2007) (affirming district court's denial of "race-based" recusal motion filed by same counsel predicated on "innuendo" and noting that the plaintiff had previously filed a petition for mandamus on the same issue, which the court summarily denied); *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,* 2017 WL 4641940 (N.D. Cal. Oct. 17, 2017) (denying Section 144 disqualification motion filed by same counsel, which the court found "border[ed] on the frivolous," relied on speculation, lacked "any facts even remotely indicating" a basis for disqualification, and "mischaracter[ized]" case law); *Moore v. Judicial Inquiry Comm'n of the State of Alabama*, 200 F. Supp. 3d 1328, 1339 (M.D. Ala. 2016) (rejecting argument made by same counsel that Supreme Court of Alabama was biased where former state Chief Justice offered "no citation to any rule or precedent that supports his speculation"); *Proffitt v. Cornuke*, 2006 WL 650688 (D. Colo. Mar. 13, 2006) (denying disqualification motion filed by same counsel based in part on mischaracterization of magistrate judge's participation in settlement conference, in part on counsel's claim to have been "taken aback" by magistrate judge's allegedly "cold" and "hostile" attitude, in part on false attribution of biased comments to magistrate judge, and in part on "[r]umor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters which do not satisfy the requirements for disqualification") (internal quotation omitted).[7]

---

[7] *See also Perry v. Brown*, 671 F.3d 1052, 1095-96 (9th Cir. 2012) (affirming district court's rejection of argument that the trial judge could not be impartial because he was gay; same counsel represented *amici curiae* but not litigating parties), *vacated and remanded on other grounds*, 133 S. Ct. 2652 (2013). I have found no reported decision on a motion for disqualification by defendant Fitchett's counsel.

Thus, a fully informed, disinterested observer seeking to assess the conflicting accounts of what happened at the settlement conference in this case would take into account the fact that I have always correctly understood and discharged my duty to disqualify myself from a case in which I could not properly serve. Such an observer would also take into account the fact than in every reported instance in which the movants' counsel sought a judge's disqualification, the resulting ruling found the motion to be baseless. In such circumstances, a disinterested observer would likely conclude that the movants had not overcome the presumption that I am impartial.

The remainder of the motion for disqualification is plainly insufficient. A reasonable person knowing and understanding all the relevant facts would conclude no more than that I convened a settlement conference that did not result in an agreement to resolve the case; and that the defendants and their counsel now complain that I was rude, sarcastic, and hostile. That subjective perception, even if justified (which I believe it is not), cannot support disqualification under controlling case law. *See Liteky*, 510 U.S. at 555; *Francolino*, 365 F.3d at 143-44; *Fox Indus., Inc.*, 323 F. Supp. 2d at 387 (E.D.N.Y. 2004).

III.    Conclusion

For the reasons set forth above, I deny the motions to disqualify me pursuant to Title 18, United States Code, Section 455. I take no action on the motions pursuant to Title 18, United States Code, Section 144, which must be resolved by the assigned district judge.

SO ORDERED.

Dated:  Brooklyn, New York
        January 8, 2018

                                        _____/s/_____
                                        James Orenstein
                                        U.S. Magistrate Judge