PROCEEDINGS

1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW
2    ---------------------------------x
                                              17-CV-3706(CBA)
3    PEOPLE OF THE STATE OF NEW YORK,
     by Eric T. Schneiderman, Attorney
4    General of the State of New York,
                                              United States Courthouse
5              Plaintiff,                     Brooklyn, New York

6              -against-                      January 29, 2018
                                              11:00 a.m.
7    GRIEPP ET AL.,

8              Defendants.

9    ---------------------------------x

10

11            TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
                 BEFORE THE HONORABLE CAROL B. AMON
12                 UNITED STATES DISTRICT JUDGE

13   APPEARANCES

14   Attorney for Plaintiff:  STATE OF NEW YORK
                              OFFICE OF THE ATTORNEY GENERAL
15                            120 Broadway
                              New York, New York 10271
16                            BY:  SANDRA PULLMAN, ESQ.
                                   NANCY TRASANDE, ESQ.
17                                 JESSICA ATTIE, ESQ.
                                   LOURDES ROSADO, ESQ.
18

19   Attorney for Defendant:  LIBERTY COUNSEL
                              1053 Maitland Center Commons Blvd
20                            Maitland, Florida 32751
                              BY:  HORATIO G. MIHET, ESQ.
21                                 ROGER K. GANNAM, ESQ.

22   (Appearances continued on next page.)

23

24

25

*GEORGETTE K. BETTS, RPR, CSR*
*Official Court Reporter*

PROCEEDINGS

1    APPEARANCES:(Continued)

2    Attorney for              CANNON LAW OFFICES
     Defendants Griepp,        20374 Magnolia Road
3    R. George, Musco,         Crescent, Iowa 51526
     R. Doe, Okuonghai,        BY:  MARTIN A. CANNON, ESQ.
4    Kaminsky, B. George            -and-
     S. Doe, Ryan              CRAMPTON LEGAL SERVICES, PLLC
5    and Joseph                P.O. Box 4506
                               Tupelo, Missouri 38803
6                              BY:  STEPHEN M. CRAMPTON, ESQ.

7
     Attorney for              THOMAS MORE LAW CENTER
8    Defendants                24 Frank Lloyd Wright Drive
     Braxton and LaLande       Suite J 3200
9                              P.O. Box 393
                               Ann Arbor, Michigan  48106
10                             BY:  KATE OLIVERI, ESQ.

11

12                             NEW YORK CITY COUNCIL
                               OFFICE OF THE GENERAL COUNSEL
13                             250 Broadway, 15th Floor
                               New York, New York 10007
14                             BY:  PATRICK A. BRADFORD, ESQ.
                                    SERENA LONGLEY, ESQ.

15

16

17

18

19

20

21   Court Reporter:           Georgette K. Betts, RPR, CSR, OCR
                               Phone:  (718)804-2777
22                             Fax:    (718)804-2795
                               Email:  Georgetteb25@gmail.com

23

24   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.

25

PROCEEDINGS

1          THE LAW CLERK:  People of the State of New York

2    against Griepp, 17-CV-3706 on for oral argument.

3          THE COURT:  The parties want to state their

4    appearances, please.  First for plaintiffs.

5          MS. TRASANDE:  For plaintiff, Nancy Trasande from

6    the Attorney General's Office.

7          MS. PULLMAN:  And Sandra Pullman from the Attorney

8    General's Office.

9          THE COURT:  Good morning.

10         MS. PULLMAN:  Good morning.

11         THE COURT:  For the defendants you just want to

12   announce yourselves in the order that you are standing there,

13   it makes it easier.

14         MR. CANNON:  Good morning, Judge, it's Martin

15   Cannon.  With me my co-counsel, Stephen Crampton, attorneys

16   for the 10 Griepp defendants.

17         It's not the same order we stood at this table last

18   time and I think your diagram might be wrong.

19         THE COURT:  It would be helpful, so you don't

20   confuse an old person, to sit in the same way you sat before,

21   but anyway I have your names here and that's mister -- the

22   next in line is Mr. Mehit.

23         MR. MIHET:  Mihet, Your Honor, good morning.

24         THE COURT:  Good morning.

25         MR. MIHET:  For the defendant Scott Fitchett.  With

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1    me I have my colleague, Roger Gannam as well.

2              THE COURT:  Okay.

3              Ms. Oliveri.

4              MS. OLIVERI:  Yes, Your Honor, for the defendants

5    Braxton and LaLande.

6              THE COURT:  And now we have Mr. Bradford from New

7    York City Council, is that you, sir?

8              MR. BRADFORD:  Yes, good morning, Your Honor.

9              THE COURT:  You asked to be able to address the city

10   statute --

11             MR. BRADFORD:  That's correct, Your Honor.

12             THE COURT:  -- as an amicus and I had said that I

13   would hear briefly from you on that score.

14             So everyone can be seated.

15             And principally the issues that I want to have you

16   focus on deal with the two principal questions, which is the

17   standing of the Attorney General to bring causes of actions

18   under all three statutes, and the issue of the

19   constitutionality of the provision of the city law, the

20   harassment provision which is provision three.  So that's

21   principally what I want the parties to speak to today.

22             Have the defendants nominated among all of you there

23   a person to address these issues?

24             MR. CANNON:  I think we have, Judge.

25             THE COURT:  That must be you.

PROCEEDINGS

1      MR. CANNON:  In part.  I'd like to address the New
2  York City code with respect to standing.

3      Kate Oliveri will address --

4      THE COURT:  Let me just write this down.  I'm sorry,
5  your name again, Mr. Cannon.

6      MR. CANNON:  Martin Cannon.

7      THE COURT:  And you are going to address standing
8  under the city code?

9      MR. CANNON:  Standing under the city code.

10      THE COURT:  Okay.

11      MR. CANNON:  And Kate Oliveri representing Jasmine
12  and LaLande will address the vagueness issue under the city
13  code.

14      Roger Gannam I think will address things that he
15  feels we left out.

16      And with the Court's indulgence I'd also like to
17  address, fairly economically, the adequacy of the state's
18  allegations under FACE.  I know that's been briefed --

19      THE COURT:  I don't really want to hear on that
20  issue.

21      I'm sorry, Mr. Gannam is going to address what?

22      MR. CANNON:  I think he's just going to address
23  things he thinks we missed, I'm not sure.

24      THE COURT:  You mean on those same arguments?

25      MR. CANNON:  Maybe on those same arguments.

PROCEEDINGS

1          THE COURT:  But there are other standing issues

2    other than under the city code.  There is also standing under

3    the other two statutes.

4          MR. CANNON:  I believe --

5          THE COURT:  Standing under the city code is a bit

6    trickier than it is under the other two statutes.

7          MR. CANNON:  I'll just address it under the city

8    code.

9          THE COURT:  So who is going to address it under the

10   other statutes?

11         MS. OLIVERI:  I will, Judge.

12         MR. CANNON:  I think Kate will, Judge.

13         THE COURT:  Okay.

14         You want to go first then, Counsel?

15         MR. CANNON:  Certainly, Judge.

16         May it please the Court --

17         THE COURT:  It might be better that you stay seated

18   just because of the microphone, because it's hard you end up

19   leaning over having to make your argument.  Also, as an

20   option, if you would want to come forward to stand at this mic

21   you could, but if you've got all your papers there you may

22   just assume want to sit there.  But it's difficult to be

23   constantly leaning over trying to talk into the microphone.

24         MR. CANNON:  Can you hear me okay?

25         THE COURT:  Yes, I can hear you fine.

PROCEEDINGS

1          MR. CANNON:  I'm guess I'm more comfortable that

2     way.

3          THE COURT:  Okay.

4          MR. CANNON:  Your Honor, with respect to this New

5     York City code, I think it's uniquely situated and uniquely

6     different from the FACE Acts, both the federal act and the New

7     York State act.

8          You've already identified --

9          THE COURT:  Are you conceding standing under the

10     other two acts?

11          MR. CANNON:  I am not, but I am addressing the

12     particular uniqueness of the New York City code.

13          THE COURT:  Okay.

14          MR. CANNON:  Unlike the FACE Acts, the city code has

15     no provision for action by the Attorney General.  Under 803

16     the owner of a clinic or a victim can bring an action, under

17     804 an action can be taken by the city, and under 807 no law

18     enforcement officer, which would include the Attorney General,

19     is to be deprived of any power that he already has.  Nothing

20     about 807 grants the AG power that he doesn't --

21          THE COURT:  But assuming there is nothing on the

22     face of the statute that directly grants the AG power to the

23     way that it is in the federal and state statute, still isn't

24     there analysis to be done under common law of *parens patriae*

25     to determine that an action can be brought?

8

PROCEEDINGS

 1          MR. CANNON:  Certainly, and that's where the

 2   analysis has to go.

 3          I think in this district and probably about anywhere

 4   the best or the most dispositive case on that is the

 5   *Connecticut* versus *Physicians Health* case that the Court has

 6   already mentioned in a previous order.  And you have to start

 7   with the idea, and it's an important one, *parens patriae*

 8   sounds like such a nice thing, you know, the fatherly aspect

 9   of government.  But it really has badges of overreach and it

10   clearly invites abuse, so courts have been skeptical of it.

11   That idea alone supports the state's burden of persuasion on

12   that issue.

13          But going back to the Appellate Court opinion, the

14   Appellate Court in the *Connecticut* case took a properly

15   careful view of the matter and also gave a specific approval

16   to the rulings of the trial court, and I'll talk about the

17   Appellate Court and then I'll talk a little bit about what the

18   trial Court had said.

19          The Appellate Court addressed the statute involved

20   in that case.

21          THE COURT:  Well, that was an ERISA case --

22          MR. CANNON:  That was an ERISA case.

23          THE COURT:  -- it wasn't a case involving healthcare

24   clinics, correct?

25          MR. CANNON:  Correct.

PROCEEDINGS

1          THE COURT:  You had the *Cain* case, which is not a

2     Second Circuit case, it's a district Court case, but that

3     found that there was *parens patriae* standing, correct?

4          MR. CANNON:  It did.

5          THE COURT:  Is that wrongly decided or can you

6     distinguish it?

7          MR. CANNON:  I think it's distinguishable on the

8     facts and the facts are so compelling in that case I also

9     think they flavored the court's inclinations.

10          Our clients are in no way analogous to the

11     defendants in *Cain* --

12          THE COURT:  But what does that have to do with

13     whether there is *parens patriae* standing, what the defendants

14     did.  I don't understand how that's a factor to be considered.

15          MR. CANNON:  Well, I think it's just my --

16          THE COURT:  The fact that you think that the

17     allegations are not as -- I mean, that is a motion to dismiss,

18     that may be grounds ultimately to deny a preliminary

19     injunction, but what does it have to do with standing?

20          MR. CANNON:  It doesn't.  Standing is a strictly --

21     the facts are not -- at least the alleged facts, the disputed

22     facts don't bear upon a standing issue at all.

23          THE COURT:  I'm sorry, I thought I misunderstood you

24     to say that they did.

25          MR. CANNON:  No.  What I'm saying is I'm

PROCEEDINGS

1  distinguishing the *Cain* case, since the Court brought it up,

2  because it's very different from our case and I don't think --

3          THE COURT:  But is that a distinction without a

4  difference?

5          MR. CANNON:  Probably with respect to *parens patriae*

6  it may be.  I've looked at the *Cain* case mostly for the

7  purpose of adequacy of threat.  I don't recall much about what

8  it says with respect to standing.

9          The Appellate Court in the *Connecticut* case took a

10  very careful view addressing the ERISA statute.  It took pains

11  to point out that the ERISA statute is carefully drafted and

12  specifies who can sue.  The Court treats that as exhaustive

13  because the statute was carefully drafted.  Now they don't say

14  what makes it carefully drafted, but it seems to flow from the

15  plain fact that the drafters thought about who in government

16  could sue and they gave that authority.

17          THE COURT:  Well, that analysis wouldn't make *parens*

18  *patriae* standing clear for at least the federal and state

19  statutes.  I understand your argument with respect to city,

20  but that same analysis would make the standing clear for those

21  other two statutes, correct?  Because it says on the face of

22  those that an AG can bring these cases.

23          MR. CANNON:  It would support it, it would support

24  it.  But, interestingly, the drafters thought about who in

25  government can sue, they identified who in government can sue

PROCEEDINGS

1    and in that case of course they gave the authority to the

2    Secretary of Labor and that's important because under ERISA it

3    would be the Secretary of Labor.  Under FACE, arguably, it's

4    the AG, and under the New York code it is the city attorney

5    and nobody else.

6         The Appellate Court in the *Connecticut* case also

7    addressed Article 3 standing.  I'm only pointing out the

8    things I think are key to it, not everything they discussed.

9    But they talk about whether adequate means exists by which the

10   individual could obtain adequate relief.  That's important in

11   this case because in this case this AG is not using any

12   special process that's set aside, he's using the same process

13   that's available to all people.  The AG can neither ask for

14   nor obtain any more or different relief than an individual

15   could.

16        If the --

17        THE COURT:  Actually, can the AG even get damages?

18        MR. CANNON:  No, no.  I think --

19        THE COURT:  So an individual could get more.

20        MR. CANNON:  An individual could get more.  And,

21   again, we're talking about the -- well, in any event, if it's

22   adequate for the Attorney General, it's at least as adequate

23   and more so for an individual.

24        The *Connecticut* court addressed statutory standing

25   focusing on whether the drafters intended the government to

PROCEEDINGS

1    have *parens patriae* standing.  Under ERISA, it's important to

2    note, that some involvement, some enforcement action by the

3    state was actually contemplated and it is mentioned in the

4    statute.  Nonetheless, that *Connecticut* court still rejected

5    standing under the New York code, the state action is never

6    mentioned.  There is no indication it's contemplated at all.

7            Now the *Connecticut* court at the appellate level

8    mentioned and praised the thoughtful ruling of the trial

9    court, so it's worth going backwards a step and looking at

10   that.

11           The trial court discussed factors under Supreme

12   Court precedent affecting standing and then pointed out that

13   the Second Circuit has actually kind of added a factor, has

14   read the *Snapp* decision as indicating that availability of

15   complete relief in a private suit is a significant factor to

16   be considered in the standing question.  And under the New

17   York City code, as we've already discussed, every single

18   mechanism available to the AG is available to an individual,

19   including -- and the courts treat this as important -- the

20   availability of fees and costs.  There is nothing that impairs

21   the ability of John Q. Public to go find a capable firm to

22   take up his case.

23           And probably most important under the *Connecticut*

24   cases, both the trial and the appellate level is that the

25   complete relief factor is satisfied if a person can get relief

PROCEEDINGS

1  through somebody else presumably better situated who is

2  authorized to act in his behalf.  Under ERISA, that would be

3  the Secretary of Labor.  Under the New York code it would be

4  the city attorney.  The availability of an action by the city

5  attorney in this case satisfies the complete relief component

6  that the *Connecticut* court found was important.  *Parens*

7  *patriae*, under the New York code, has been delegated to the

8  city attorney.  The AG hasn't got a place and he isn't

9  necessary --

10         THE COURT:  I'm sorry, would the city attorney be

11  bringing it in a *parens patriae* position?

12         MR. CANNON:  I don't think he'd have to plead it

13  that way but, arguably, he could -- I mean he could certainly

14  adopt that position.

15         THE COURT:  Well what rights would he be invoking

16  other than *parens patriae* for the city attorney to bring it?

17         MR. CANNON:  Well, it would just be statutory.

18  *Parens patriae* having deep historical roots in the common law

19  I think he's got a statutory right under the New York code to

20  bring --

21         THE COURT:  Let me just ask just to clarify that

22  point -- who for the AG is going to argue this?  Would it be

23  your position that the city attorney bringing an action would

24  be bringing that in a *parens patriae* theory?

25         MS. TRASANDE:  No, Your Honor, given the fact that

PROCEEDINGS

1  the statute, actually Section 807 names the corporation

2  counsel separately, it doesn't exclusively vest in the

3  corporation counsel's authority to file suit, independent of

4  that factor the AG can bring an action.

5        THE COURT:  No, I'm not asking you that now.  I'm

6  just asking you the one -- you can respond to counsel's

7  argument in full --

8        MS. TRASANDE:  Okay.

9        THE COURT:  -- but I'm just asking you that

10  question.  Is the city attorney -- when the city attorney

11  brings a cause of action, is that in a *parens patriae* type of

12  capacity?

13        MS. TRASANDE:  No, Your Honor.

14        THE COURT:  Okay.

15        MR. CANNON:  My view of that, Judge, it's probably

16  in both capacities.  In any event, under all the case law,

17  under the statutes as we read them, *parens patriae* is

18  provided, it is delegated by law to an individual either under

19  statute or under common law.  In our case here, at least under

20  the New York City code, the AG has no standing.  The city

21  attorney is the person in position to satisfy all the needs of

22  the individual and there's no way to stretch that to provide a

23  standing for the AG that was not provided by law.  He can't

24  just take it because he wants it.

25        THE COURT:  Are you conceding standing then for the

15

PROCEEDINGS

1   other two statutes?

2        MR. CANNON:  Well, I certainly concede that it is

3   stronger.  I'm not prepared to fully concede.

4        THE COURT:  Okay.

5        MR. CANNON:  Finally, Judge -- and Ms. Oliveri is

6   going to discuss it in better depth -- but I think vagueness

7   under the city code is a big deal here.  And it's also

8   distinct from FACE.  Whatever else you can say about FACE, it

9   doesn't leave much to conjecture.  Specificity is a very

10  important safeguard.  If harassment is whatever the

11  government --

12       THE COURT:  That's just one provision of the city

13  code.

14       MR. CANNON:  Right.

15       THE COURT:  That's the one you are concentrating on,

16  right?

17       MR. CANNON:  That's the one.

18       THE COURT:  Because the others are pretty specific.

19       MR. CANNON:  Right, it's that third element.

20       THE COURT:  So what would you be asking the Court to

21  do, just to invalidate that one provision of the city code?

22       MR. CANNON:  I would ask the Court to strike

23  allegations that are predicated on harassment.

24       THE COURT:  On the theory that that portion of the

25  code is too vague?

PROCEEDINGS

1          MR. CANNON:  Unconstitutionally vague.

2          THE COURT:  Unconstitutionally vague.

3          MR. CANNON:  That's important, Judge, if harassment

4    is whatever the government wants it to be, and it's not

5    defined in that act, it's a broad concept.  If it's whatever

6    the government wants it to be.  We are all protected or

7    imperiled, whichever way it goes, only by sentiment and not by

8    law.

9          The state's most specific allegations, as has been

10   briefed, are inadequate under FACE.  The AG has no standing

11   under the code and the code is void for vagueness as to

12   harassment.

13         THE COURT:  Okay.

14         MR. CANNON:  So that's our request, Judge, is that

15   you dismiss everything of course, the AG gets off the New York

16   City code case, and the city code is void for vagueness as to

17   harassment.

18         THE COURT:  Okay, thank you, Counsel.

19         Ms. Oliveri.

20         MS. OLIVERI:  Yes, Your Honor, I just want to follow

21   up with one point on that is that under the *Connecticut* v.

22   *Physicians Health Services*, the Court need only get to the

23   idea or the test of *parens patriae* if the statute explicitly

24   authorizes the Attorney General to bring suit of *parens*

25   *patriae*, it's implicit, or if it contains such a broad

PROCEEDINGS

1  enforcement provision that anybody who is injured, and that's

2  on page 121 of the *Connecticut* case.  So the *parens patriae* is

3  not something the Court necessarily needs to consider if the

4  statute is so limiting.

5        As to the vagueness of harassment, the Supreme Court

6  or the Court of Appeals of New York has decided that

7  harassment is unconstitutionally vague in *People* v. *Gold*

8  and --

9        THE COURT:  Well, that was the way it was defined in

10  one particular statute that was invalidated, right?

11        MS. OLIVERI:  It was invalidated because of the lack

12  of specificity and we have that same lack of specificity, if

13  not more so, here.

14        THE COURT:  What statutes do you understand -- maybe

15  you don't understand that they're pointing to anything, but I

16  believe that the Attorney General has pointed to certain

17  existing statutes that define harassment.  Not the ones

18  that -- not the statute that was invalidated but other

19  statutes to define it.

20        MS. OLIVERI:  Well, those other statutes aren't at

21  issue here nor are they referenced in the city ordinance.  So

22  harassment defined some place else is really irrelevant to

23  harassment --

24        THE COURT:  But the ones that they rely on, the ones

25  that they point to, is there any constitutional infirmity with

PROCEEDINGS

1  respect to those statutes?

2          MS. OLIVERI:  I'm unsure what you're correcting.

3          THE COURT:  I'm sorry, but doesn't the AG make

4  reference to some other criminal statutes that address what

5  the harassment is and maybe for purposes of assisting counsel

6  you can tell me specifically which ones you rely on.

7          MS. PULLMAN:  Sure.  Thank you, Your Honor.

8          So all defendants seem to hang their hat on this

9  case *People* versus *Gold*.  In that case the Court of Appeals

10 was clear that they were dealing with a prohibition on pure

11 speech, that language is --

12         THE COURT:  Yes, I know, I want her to be able to

13 finish her argument before you address her entire argument.  I

14 just want to know what -- you are saying we can look to

15 certain other places to find a definition of harassment, what

16 other places other than the dictionary are you suggesting that

17 we look?

18         MS. PULLMAN:  Sure.  In fact, it is the case, the

19 Court of Appeals case is *People* versus *Shack*.  It was making

20 phone calls with intent to harass and, in fact, that's a

21 different -- it's in the same statute as the provision that

22 was struck out in *Gold*, but that provision was upheld.

23         THE COURT:  So that would be one you'd look for for

24 a definition of harassment?

25         MS. PULLMAN:  Yes, and --

PROCEEDINGS

1          THE COURT:  Which statute is it though, tell me

2    what --

3          MS. PULLMAN:  I can look it up as we sit here.  But

4    it is in the same -- it's the same Penal Code that was

5    addressed by *People* versus *Gold*, it's just a different

6    provision.

7          There's a number of provisions, frankly, within the

8    harassment prohibition in the Penal Code.  *People* versus

9    *Stuart*, also an anti-stalking statute noting that words like

10   harassment are commonly understood words.  *People* v. *Perez*

11   similar.

12         And I know that the City Council has addressed the

13   fact that they intended when they enacted this law to refer to

14   the definition of harassment in the Penal Code and,

15   specifically, I can direct you to Penal Code 240.26,

16   Harassment in the Second Degree.

17         THE COURT:  So that's what you're relying on for a

18   definition?

19         MS. PULLMAN:  Yes.  As well as the Webster's

20   Dictionary and the ordinary meaning of harassment as

21   persistent, unwelcome behavior that annoys or alarms.

22         THE COURT:  Let me let you continue your argument.

23         MS. OLIVERI:  I still, regardless of how the New

24   York Legislator defined harassment in other provisions, that

25   doesn't save the New York City code because it's not defined

PROCEEDINGS

1    here.  And I think the discrepancy in these cases of where in

2    some instances if there is enough specificity then the

3    statutes upheld shows that this is really a statute by statute

4    analysis.  And in here there are virtually no limiting

5    provisions similar to the statute that was held

6    unconstitutional in *People* v. *Gold*.

7              So in the state cite to *Grayned* for the provision

8    that's trying to analogize this statute, but in *Grayned* the

9    Court -- the Supreme Court specifically said that the issue of

10   vagueness was a close call and what saved the statute is that

11   there was a state case that defined the vague term in that

12   statute.

13             Here we have nothing defining the term in the New

14   York City code, and while I'm sure there are a multitude of

15   definitions of harassment out in the New York law and other

16   laws and dictionaries, that's exactly the problem, is this

17   statute doesn't have a definition so there's no idea of which

18   definition of harassment would apply here.  And the fact that

19   there are so many different definitions --

20             THE COURT:  At least one of which has been held

21   unconstitutional.

22             MS. OLIVERI:  At least one of which -- well, I think

23   the problem -- the reason in *People* v. *Gold* it was held

24   unconstitutional because there was no definition of what it

25   meant to harass.

PROCEEDINGS

1          THE COURT:  No, it was more what the definition was.

2     The definition was directed towards speech in *Gold*.  I think

3     that was the problem which is as it was defined in *Gold* it was

4     directed towards speech.

5          MS. OLIVERI:  Which is why this provision is even

6     more problematic because there is not even a limitation.  So

7     this is directed at speech or really whatever it is that

8     enforcement authority wants to direct it at.  There is nothing

9     to limit this provision, so without that saving grace of the

10    specificity that the Court had in *Grayned*, the statute is

11    unconstitutional.

12          We've been asking for a definition of harassment and

13    we don't have one.  What is harassment and all of these

14    different definitions go to why this ordinance is

15    unconstitutionally vague.

16          THE COURT:  Okay.

17          Did you want to address any other thing?

18          MS. OLIVERI:  Yes.  That as to standing under the

19    New York code, the Attorney General's office on page 29 of the

20    complaint brings this under New York Penal Law.  There is no

21    jurisdiction for a federal court to hear a state court

22    criminal claim.

23          THE COURT:  Well, it's a provision that allows for

24    civil enforcement.

25          MS. OLIVERI:  There is a separate provision that

PROCEEDINGS

1    allows for civil enforcement --

2              THE COURT:  Right.

3              MS. OLIVERI:  -- but that's not what they bring

4    their cause of action under.

5              THE COURT:  Well, they would have to cite both the

6    statutes.  So you say the failure to cite, what is it 79, the

7    failure to cite that is the problem.

8              MS. OLIVERI:  Yes, Your Honor.  When they bring

9    their cause of action they need to bring the cause of action

10   with specificity under the provision they're bringing their

11   cause of action under, which in this case would be the civil

12   provision, which is not --

13             THE COURT:  The civil -- well, but why isn't 8-804

14   the civil action that allows them, whenever there's been a

15   violation of 803, and that's the conduct that's set forth in

16   803.

17             MS. OLIVERI:  I'm discussing the New York law not

18   the New York City ordinance.

19             THE COURT:  Oh, I'm sorry.

20             MS. OLIVERI:  I apologize for not making that more

21   clear.

22             THE COURT:  I see.

23             MS. OLIVERI:  So on page 29 they bring their second

24   cause of action, violations of the New York Clinic Access Act,

25   New York Penal Law Section 240.70.

PROCEEDINGS

1          THE COURT:  Right.

2          MS. OLIVERI:  Yes.

3          THE COURT:  I'm sorry.  I thought you were talking

4    about a different statute, okay.

5          So your contention there is what?

6          MS. OLIVERI:  Is that this court has no jurisdiction

7    to hear a New York Penal Code case, that they failed to invoke

8    the civil provision for their cause of action and that's a

9    failure.

10          THE COURT:  So if they amended their complaint and

11    put 79-M everything would be fine?

12          MS. OLIVERI:  Well, I think there are other problems

13    with the provision, but that could correct that argument.

14          But, again, the federal rules require specificity of

15    the pleadings, requirements for amendment especially this late

16    in the game to amend the complaint would be detrimental to the

17    defendants.

18          And then, finally, FACE.  FACE allows the Attorney

19    General to bring suit as *parens patriae* only on behalf of

20    natural citizens residing in the State of New York.  The

21    complaint does not allege any injury to natural persons

22    residing in the State of New York and this is a failure of

23    pleading that --

24          THE COURT:  Well, they refer to patients trying to

25    access the clinic, correct?

PROCEEDINGS

1          MS. OLIVERI:  They do refer to individuals but just

2     because you're in New York doesn't mean you're --

3          THE COURT:  But it talks about it happening over an

4     extended period of time, correct?

5          MS. OLIVERI:  It does discuss it happening over an

6     extended period of time, again, this is -- but just because

7     you're in New York doesn't mean you're a citizen.  People

8     outside can access it.  And, again, it is a pleading

9     requirement to have standing under the FACE Act, perhaps

10    correctable with amendment, but it is a failure of pleading.

11          And if the Court has no further questions, I will

12    hand off to Mr. Gannam.

13          THE COURT:  Thank you.

14          MR. CANNON:  Judge, could I briefly address an item?

15          THE COURT:  This is something you neglected to raise

16    or --

17          MR. CANNON:  Actually it's just in follow up to the

18    Court's colloquy with Ms. Oliveri.

19          THE COURT:  Okay.

20          MR. CANNON:  The penal statute the state has

21    referred to here provides that --

22          THE COURT:  Which are you referring to, which penal

23    statute?

24          MR. CANNON:  240.633.

25          MR. CRAMPTON:  26.

PROCEEDINGS

1          THE COURT:  Is this the harassment statute?

2          MR. CANNON:  Yes.

3          THE COURT:  Yes.

4          MR. CANNON:  It provides that when with intent to

5    harass a person engages in a course of conduct or repeatedly

6    commits acts which alarm or seriously annoy such other person

7    and which serve no legitimate purpose.  That's a big element

8    here and I'm sure the Court understands that, especially given

9    the gravity of the issue on the sidewalk there.  It cannot be

10   said that there is no legitimate purposes for these

11   communications.

12         THE COURT:  But that's not that it's vague, that's

13   they can't meet that standard.

14         MR. CANNON:  They can't prove it.

15         THE COURT:  That's a different argument --

16         MR. CANNON:  Right.

17         THE COURT:  -- than it being vague, they can't prove

18   that.

19         MR. CANNON:  Right.

20         THE COURT:  Okay.

21         MR. GANNAM:  May it please the Court, Your Honor, I

22   will take you up on your offer to sit since I don't have a

23   longer microphone near me.

24         THE COURT:  This is Mr. Gannam?

25         MR. GANNAM:  Yes, Your Honor, for defendant, Scott

PROCEEDINGS

1   Fitchett.  I will try to fill in a few gaps as a matter of

2   addition to the arguments that preceded mine, Your Honor.

3          First, as to the standing, *parens patriae* standing

4   of the Attorney General under the City Act, first of all,

5   going back to basics, New York Executive Law Section 63, which

6   is essentially an authorizing statute for the Attorney

7   General, nowhere authorizes the Attorney General to bring

8   actions under municipal ordinances, and we haven't seen a case

9   cited where that has been permitted in any of the briefing to

10  date.

11         Secondly, Your Honor, as to damages specifically,

12  the case of *People of the City of New York by Abrams* v.

13  *Seneci*, 817 F.2d. 1015.  This is a Second Circuit case from

14  1987.  The context was civil RICO, but the Court said there

15  that for the purpose of damages authorized by a statute are to

16  compensate persons for injury.  The state cannot bring a suit

17  on their behalf to recover their damages nor can the state

18  bring a damages action to compensate itself under the kind of

19  quasi-sovereign interests that's required.

20         THE COURT:  But states can bring an action for

21  injunctive relief, which is in part what they are seeking to

22  bring here, correct?

23         MR. GANNAM:  That's correct, Your Honor.  So the

24  point is, is that to the extent the state here wants

25  injunctive relief and damages under the City Act, certainly

PROCEEDINGS

1   the damages part must be dismissed because there is no

2   standing.  And the statute itself, the New York City Act

3   itself makes it clear, the only governmental action it

4   contemplates by the corporation counsel is limited equitable

5   relief.  So I think it's clear under the statute that those

6   persons specifically identified as being able to bring a

7   damages action, they can bring a damages action, but if the

8   government is going to do it it must be the corporation

9   counsel and it can only be equitable.

10          Finally, I want to fill in on this vagueness issue

11  under the City Act.  I think the best way to illustrate the

12  problem is to focus on the allegations against my client,

13  Mr. Fitchett.  There are only a few specific allegations of

14  Mr. Fitchett and all of them use the language of the New York

15  City Act.  So, for example, paragraph 29 of the complaint

16  alleges that Fitchett follows and harasses by chanting at

17  individuals approaching him.  If that's the interpretation of

18  following and harassing, that is, chanting at people

19  approaching the speaker, there is no plausible or natural

20  reading of the words "follow" and "harass" that would include

21  speaking to people approaching you.

22          Then in paragraph 70, the state promises again to

23  describe in detail just how Fitchett follows and harasses.

24  And you go down to paragraph 73 and it says, he follows and

25  harasses by standing within 10 feet of the front door and

PROCEEDINGS

1    screaming.

2           So *Twombly*, the Supreme Court case, requires to

3    state a cause of action it must be plausible.  There's no

4    plausible reading of the words "follow" and "harass" under the

5    New York City Act that would include standing while speaking

6    while the person being spoken to approaches the speaker.  If

7    that's following and harassing under the New York City Act it

8    must be unconstitutionally vague because following by standing

9    just simply is nonsensical and shouldn't be allowed here.

10          Now as to Fitchett that's really all there is in the

11   complaint against him apart from an allegation that he filmed

12   and, therefore, if the New York City Act claims are dismissed

13   in this case, as they must be, either for standing or in

14   Fitchett's case for complete self-defeating allegations that

15   they are contradictory on their face, then all the claims

16   against Fitchett must be dismissed because there's simply no

17   language in the complaint specific to him that goes under FACE

18   or the state counterpart.

19          THE COURT:  Let me just clarify that for a moment.

20   Is it the Attorney General's position that the only

21   allegations against Mr. Fitchett depend upon the city code --

22          MS. PULLMAN:  No, Your Honor.

23          THE COURT:  -- which banned following and harassing?

24          MS. PULLMAN:  No, Your Honor, I don't understand why

25   there's confusion about this.  We pled FACE Act violations by

PROCEEDINGS

1    Mr. Fitchett as well as state FACE, and I know that we're all

2    eager to get to the merits, but as far as this discussion of

3    whether Fitchett actually follows and harasses, pursuant to

4    Your Honor's request I'd ask that we save that for the hearing

5    on the merits.

6              THE COURT:  But I do want to clarify that you

7    believe that your allegations against Mr. Fitchett are broader

8    than set forth -- than prohibited, rather, by the city code.

9              MS. PULLMAN:  Yes, Your Honor, we have federal and

10   state causes of action against Mr. Fitchett.

11             MR. GANNAM:  Your Honor, I would simply say in the

12   response where the Attorney General has used the word

13   "defendants" generically to refer to all them and then simply

14   recites the statutory language of FACE and the New York

15   counterpart, I would say *Twombly* says that is not enough.

16   They must allege some ultimate facts that Fitchett has engaged

17   in some conduct that he does that is those things under FACE

18   or the state counterpart.

19             And here, Your Honor, the only allegations about

20   Fitchett regarding the federal or state statutes are purely

21   conclusory.  The only allegations that are specific to him

22   saying something he actually did on the sidewalk outside of

23   Choices are couched in terms of the New York City Act and

24   those are the allegations that I pointed to the Court.  They

25   are simply self-defeating because you can't have following by

PROCEEDINGS

1    standing.

2         THE COURT:  Okay.  Anything else you wanted to

3    address?

4         MR. GANNAM:  No, Your Honor.

5         THE COURT:  I don't know if anyone wants to address

6    this at the defendants' table, but one of the arguments that

7    seem to be repeated throughout a number of briefs was that

8    regarding *parens patriae* standing that it had not been

9    established because the AG could not meet the requirement what

10   is referred to as the fourth requirement under Abrams that

11   individuals could not obtain a complete relief by a private

12   suit and there was a lot of argument about the owner of

13   Choices being able to maintain a private suit.

14         Are you pushing that argument now or not?

15         MR. GANNAM:  Your Honor, I can say confidently that

16   the New York City Act, for example, specifically authorizes

17   the owner or operator of the facility to bring an action for

18   damages or equity.

19         THE COURT:  Isn't the owner/operator also

20   specifically permitted to bring actions under the federal and

21   state statutes as well.

22         MR. GANNAM:  That's correct, Your Honor, and so --

23         THE COURT:  It refers to a provider of services.

24         MR. GANNAM:  That's correct, Your Honor.  So in that

25   case it's clear that Merle Hoffman, based on publicly

PROCEEDINGS

1    available information, has wherewithal to bring that action if

2    she wants to.  If Choices wants to pursue this, Choices is

3    certainly able to do that.

4              THE COURT:  So is it because of her as an individual

5    and her net worth that they don't meet this requirement?

6              MR. GANNAM:  No, Your Honor.  I think that's one

7    aspect of it, but the other is the statute allows for seeking

8    damages, seeking costs, seeking attorneys' fees.  Allows the

9    person prosecuting that action, the individual or corporation

10   to be made whole if they're injured and, therefore, there is

11   no need for the state to step in.  It's particularly strong in

12   the case of Ms. Hoffman.

13             THE COURT:  But it's important in terms of the

14   consideration of *parens patriae* that someone also pursue not

15   just damages on their own behalf but also injunctive relief.

16   So is a private party, such as the owner of Choices,

17   necessarily going to care about injunctive relief if they can

18   get money to satisfy themselves as to --

19             MR. GANNAM:  Absolutely, Your Honor, if the concern

20   is really for what's going on outside the clinic and stopping

21   it, it's clear in this case any injunction that the Attorney

22   General obtains will apply to Choices only.  It will apply

23   only to what goes on outside of Choices as a clinic.  It will

24   not be an injunction that applies to any other facility in the

25   State of New York.  So in this respect Choices is in even a

PROCEEDINGS

1    better position who can seek damages, if damages were

2    warranted, to obtain complete relief for whatever is going on

3    outside of Choices and a better position than the Attorney

4    General is --

5          THE COURT:  How would that work in practice?

6    Assuming the AG brings a case against Choices that happens to

7    have an owner who by all accounts has some funds, but then

8    there is another organization where let's say the person who

9    owns or operates that is not as wealthy, is this an issue

10   that's decided on a case-by-case basis depending on how much

11   money the owner of a clinic has?

12         MR. GANNAM:  I don't think so, Your Honor.  I think

13   we can look at in general.  Every attorney sitting at this

14   table works for a firm that provides pro bono services in this

15   field.  We've known, are aware of several law firms that have

16   been engaged on a pro bono basis to represent various persons

17   on that side of the room in talking about witnesses, escorts,

18   et cetera.  There is -- the statute allows those persons to

19   find counsel who will represent them to fully recover damages

20   if they are warranted, costs, attorney's fees, et cetera, so

21   there is no barrier to that person being made whole and there

22   seems to be no shortage of willing lawyers to bring these

23   cases on this issue, Your Honor.

24         The pro life versus pro abortion debate has been

25   going on for decades and it's not going away any time soon and

PROCEEDINGS

1   there's plenty of interested people on both sides who are

2   willing to enter into this fight if necessary.

3           MS. OLIVERI:  If I may, Your Honor, especially in

4   the case of a for-profit owner the financial incentive would

5   be tied with the injunctive incentive because customers and

6   therefore profits are going to be leaving your clinic if there

7   are actual violations of these acts.

8           THE COURT:  All right, thank you.

9           Does the Attorney General want to be heard on the

10  arguments that have been advanced?

11          MS. TRASANDE:  Yes, we do, Your Honor.

12          First, I'd like to address the standing issue that

13  was raised with regard to the city law.  Under

14  Section 8-807(c), that provision does not limit the authority

15  of any state -- of the state to bring suit and that is due to

16  the fact, if we refer to New York Executive Law 63, which

17  identifies the duties that the AG must perform in its capacity

18  as the lawyer for the State of New York.  The first among them

19  concerns allowing -- mandating that the state prosecute and

20  defend all actions and proceedings in which the state is

21  interested.  And that is the first -- again, first duty under

22  63(1) it ties into --

23          THE COURT:  That is a provision of what, 63(1) is a

24  provision of what?

25          MS. TRASANDE:  Of New York Executive Law.

PROCEEDINGS

1          THE COURT:  A state provision?

2          MS. TRASANDE:  A state provision, yes, a separate

3     provision that given -- similar language of 8-807(c).

4          THE COURT:  And 807(c) is.

5          MS. TRASANDE:  Under the city law -- under the New

6     York City Clinic Access Law which does not limit the authority

7     of the state to exercise its duties.

8               And, furthermore, Your Honor, in terms of how 63(1)

9     relates to the city law, specifically there are two cases in

10    which 63(1) was addressed both by the Eastern District

11    specifically, and the Northern District of New York.  In *EEOC*

12    v. *Federal Express Corporation* that matter allowed the state

13    to proceed as *parens patriae* using 63(1) for a Title VII

14    action, and also under *New York v. Utica School District*, the

15    New York State Commissioner, who was expressly referenced in a

16    New York State Education statute despite that language

17    referring to the New York State Commissioner, the Court

18    applied 63(1) to allow the state to proceed as *parens patriae*

19    and enforce the New York State law in that matter.

20         THE COURT:  I'm sorry, 63(1) again states what?

21    What is the provision you're relying on in 63(1).

22         MS. TRASANDE:  63(1) reads --

23         MR. CANNON:  Can we have Ms. Trasande speak up a

24    little bit, I'm having a hard time hearing her.

25         MS. TRASANDE:  Okay.  63(1) states that the Attorney

PROCEEDINGS

1  General shall prosecute and defend all actions and proceedings

2  in which the state is interested.

3          So given the language of 8-807(c), which does not

4  limit the authority of the state to engage in any

5  prosecutorial conduct here that favors application of *parens*

6  *patriae* under the city law and would permit us to proceed.

7          THE COURT:  Are you saying that that's the statutory

8  basis for you to have *parens patriae*?

9          MS. TRASANDE:  I am, Your Honor, and also --

10          THE COURT:  Do you need that, do you need a specific

11  statutory basis or can you just turn to common law?

12          MS. TRASANDE:  We can also turn to the common law.

13          Second to that issue and how 63(1) interacts with

14  8-807(c) under the city law, *parens patriae*, given the general

15  wording of 8-804, again which mimics -- which is functionally

16  indistinguishable from Federal Civil Rights Statutes such as

17  the Equal Educational Opportunities Act which, where those

18  statutes are silent, nevertheless allows the state to proceed

19  given the fact that there is no exclusionary language within

20  that statutory scheme.  And as to 8-804 specifically, there is

21  no exclusive vesting authority to sue under 8-804, yes, the

22  corporation counsel is referenced, but it is not restricted to

23  corporation counsel as delineated in 8-804.

24          Furthermore, again, there's no exclusionary language

25  preventing the state from exercising its *parens patriae* common

36

PROCEEDINGS

1    law authority within the New York City Clinic Access Act,

2    instead we have silence and there *parens patriae* is folded in

3    to allow us to proceed.

4          And again as stated earlier, 8-807(c), as it

5    interacts with New York Executive Law 63(1), allows the state

6    to exercise the full breadth of its authority to prosecute and

7    defend actions in which the state is interested.

8          Furthermore, Your Honor, as to the city law, we have

9    the New York City Council has opined about its own municipal

10   law and stated that the New York Attorney General's Office has

11   the authority to bring this action in *parens patriae* and that

12   the statute invites such action.  And, furthermore, the bill

13   itself should be viewed in the context of the common law

14   Doctrine of *parens patriae* as developed.  It was drafted with

15   that in mind and in that context and it should be viewed

16   through that lens.

17         Going back to *Physicians Health Services*, that case

18   is completely an outlier here.  ERISA, unlike federal --

19   unlike the federal civil rights laws referred to earlier, the

20   Educational Opportunities Act that is limited to participants,

21   beneficiaries, and fiduciaries.  This is a narrow category of

22   contractually designated roles within the federal ERISA scheme

23   and, furthermore, ERISA also has express language indicating

24   that ERISA shall supersede any and all state laws in so far as

25   they may now or hereafter relate to any employee benefit plan.

PROCEEDINGS

1    And also ERISA is silent as to -- is not --

2         THE COURT:  You say that's a preemption.

3         MS. TRASANDE:  Yes, there is a broad preemption

4    clause there also taking away state power under ERISA.  And,

5    furthermore, ERISA explicitly delineates two categories, just

6    two means under which a state can bring action under ERISA.

7    And also and, more importantly, *Physicians Health Services*

8    comes with a warning label in terms of how they issue their

9    holding.  They specifically state, and I quote, we do not, of

10   course, intend to imply that states may only sue in their

11   *parens patriae* capacity when a statute specifically provides

12   for suits by state.  And *Physicians' Health Services* also has

13   language referencing, I'll quote now from the case again, Your

14   Honor, there is considerable authority for the proposition

15   that states have frequently been allowed to sue in *parens*

16   *patriae* to enforce federal statutes that do not specifically

17   provide for standing for state attorney generals.

18        So given those -- given the way these two laws

19   interact with one another, *Physicians' Health Services* does

20   not apply.  Instead, 804 again is broadly worded, it is

21   functionally indistinguishable from so many federal civil

22   rights statutes.  Whereas, the state, the Attorney General's

23   Office has routinely sued under Title VII, under the Fair

24   Housing Act, and for that reason the Doctrine of *Parens*

25   *Patriae* should be applied here given the fact that the

PROCEEDINGS

1   municipal law, like many federal civil rights laws are silent

2   on whether or not the state can utilize those statutes, those

3   non-state statutes to file a claim for their residents.

4           Now, Your Honor, if I may, I'd like to address the

5   fourth *parens patriae* factor regarding complete relief.

6           THE COURT:  Right.  Okay.

7           MS. TRASANDE:  So much has been made by about Merle

8   Hoffman's financial status in this action, it's really

9   irrelevant to that factor.  It's how the interests compare.

10  So if you look to the interest the state would represent, the

11  state's going to represent the interests of all of its

12  residents and will be beholden to them and them alone.  A

13  plaintiff meanwhile will look to their interests, to their

14  limitations in terms of financial resources to bring suit and

15  in terms of whatever objectives they wish to advance through

16  their separate lawsuit.

17          Now the State Attorney General's Office by contrast,

18  represents many different interests.  The Civil Rights Bureau

19  covers a number of civil rights, the right to allow women

20  access to this clinic and others in the state.

21          THE COURT:  No, but it's the interest, the lawsuit,

22  not just broadly all different interests that the AG may

23  represent.  It's the interest in this lawsuit.  Why aren't her

24  interests identical to the interests of the patients?

25          MS. TRASANDE:  They are not, Your Honor.  And even

GEORGETTE K. BETTS, RPR, CSR
*Official Court Reporter*

PROCEEDINGS

1    if they were, they wouldn't prohibit this case from proceeding

2    because there are two cases that are pertinent to this issue

3    where both the State Attorney General filed a separate lawsuit

4    from private litigants and both matters were allowed to

5    proceed despite the facts being totally identical and the

6    prayer for relief also being similar.

7            Those two matters are *Connecticut* v. *American*

8    *Electric Power Company*, that is 582 F.3d 309, that's a Second

9    Circuit decision.  And *New York* v. *Utica School District*, 177

10   F.Supp 3d, 739.  These are two decisions where, again, the

11   facts were identical and two separate actions were filed based

12   on the same set of facts, one by the Attorney General's

13   Office, the other by a private plaintiff.

14           So this is an extreme example of why Merle Hoffman's

15   financial status, her ability to bring suit is irrelevant to

16   this consideration.  Also --

17           THE COURT:  Why is that because the -- then what is

18   the meaning of this requirement?  I don't understand.  You

19   seem to say if the state has an interest and a private party

20   has an interest, there are cases that say, okay, they can both

21   operate in parallel cases or they can be joined together, but

22   how does that address -- what does this requirement mean that

23   individuals could not obtain relief by a private -- what does

24   the requirement mean?

25           MS. TRASANDE:  Under *Utica* it's not a high burden,

PROCEEDINGS

1    it's a slight burden.  It really only goes to whether the

2    state has its own proprietary interest independent of the

3    action.  And, of course, private litigants may seek more

4    narrow relief and cut deals than a state attorney general's

5    office would.  We would of course be more focused on

6    injunctive relief, so the remedy would be different given the

7    underlying interest that each party would be concerned in

8    representing and advancing through their cause of action.

9          And also, Your Honor, one thing that needs to be

10   considered under this factor that I'd argue is the fact that

11   to date no action has been brought by a private plaintiff and

12   there could be a number --

13          THE COURT:  In any --

14          MS. TRASANDE:  Under --

15          THE COURT:  -- in the State of New York.

16          MS. TRASANDE:  As it relates to Choices, Your Honor,

17   I'm sorry.  As it relates to the activity outside of Choices,

18   to date no one has come forward to file a suit and that in

19   part could be due to fear of practices in discovery, seeking

20   the names of patients, exposing the clinic to intense scrutiny

21   by defendants and that is likely one reason why no one has

22   come forward to date.  So there is no reason for this --

23          THE COURT:  Of course, the other side would argue

24   it's because these people haven't done anything wrong.

25          MS. TRASANDE:  But that's a merit issue, right.

PROCEEDINGS

1    Here we're only assessing standing.  That's a consideration.

2                THE COURT:  So I should consider it as part of this

3    the fact that to date no one has no patient nor the owner of

4    Choices has seen fit to bring the action?

5                MS. TRASANDE:  No, I would -- it's a factor, Your

6    Honor, but I would focus more on the nature of the relief that

7    the state would obtain and the interest state would advance

8    and seek to advance versus those that a private litigant would

9    chose to advance.

10               THE COURT:  What interest is the state advancing

11   that a private litigant is not advancing?

12               MS. TRASANDE:  Well, there is no private litigant at

13   this moment, but I'd say the major distinction would be

14   injunctive relief and --

15               THE COURT:  No, but interest, you said that they --

16               MS. TRASANDE:  Okay, sure, the quasi-sovereign

17   interest you mean then.

18               THE COURT:  If the AG -- how does the interests

19   differ?

20               MS. TRASANDE:  Sure.  The interest we're advancing

21   here is the public health and welfare of women to seek

22   whatever medical services they choose to advance.  So that's

23   50 percent of the population here, Your Honor.

24               THE COURT:  And --

25               MS. TRASANDE:  Also to preserve the anonymity of

PROCEEDINGS

1    patients as a result of bringing this action versus an

2    independent patient or the clinic advancing the lawsuit.

3         THE COURT:  Why are you able to keep -- you talk

4    about anonymity, why are you able to shield ultimately

5    patients from being identified here, and I understand an

6    individual patient who brought an action has to obviously name

7    the action, but ultimately how are you able to shield people's

8    privacy concerns.

9         MS. TRASANDE:  In so far as that there is no

10   pleading obligation for us to name patients in our briefing.

11   *Cain* spoke directly to this issue in terms of whether or not

12   the state had standing to sue and they said -- I remember the

13   language specifically of the defendants before was that the

14   state is without a client.  So far as no specific patient had

15   been named in *Cain* and that was dismissed out of hand by the

16   Court given the fact that the state didn't need to have a

17   specific -- didn't need to put forward any natural person to

18   advance their case.  Instead, they could rely on their

19   obligation as a state -- as the litigator for the state to

20   protect the public health of women by letting them access

21   clinic services as they saw fit.

22         And, furthermore, Your Honor, I would reference also

23   language in *Connecticut* v. *American Electric Power* that states

24   that the vindication of the state's rights should not be

25   dependent upon hospital relief obtained by individuals even if

PROCEEDINGS

1   they can marshal the resources to institute and prosecute a

2   class action in that case.

3        And, furthermore, Your Honor, several courts within

4   the Second Circuit have granted injunctive relief in FACE

5   cases that have been brought by the state attorney general's

6   office that pertains to protest activity outside for-profit

7   clinics.

8        THE COURT:  Was this issue addressed?

9        MS. TRASANDE:  Yes, it was in our briefing.

10       THE COURT:  No, I meant in these cases, did they

11   address this issue?

12       MS. TRASANDE:  I believe they did in so far as they

13   held that --

14       THE COURT:  Which cases?

15       MS. TRASANDE:  Sure.

16       THE COURT:  I don't know if the argument was made,

17   but I don't think *Cain* speaks in terms of there not being --

18   this issue about whether there was individuals could not

19   obtain relief from a private suit, I don't know that that was

20   discussed in that case.

21       MS. TRASANDE:  Not in *Cain*, it comes up in *Kraeger*,

22   which is 160 F.Supp 2d. 360.  This is definitely in our

23   briefing.  And *New York* v. *Operation Rescue National*, which is

24   a slip opinion out of the Western District of New York and

25   U.S. v. Scott 958 F.Supp --

PROCEEDINGS

1          THE COURT:  They are all in your brief?

2          MS. TRASANDE:  Yes, all in our brief.

3          THE COURT:  Okay.

4          MS. TRASANDE:  Furthermore, Your Honor, another

5    matter that distinguishes the state from private individual

6    plaintiffs is that the state has the resources to conduct --

7    had the resources in this case in order to bring this lawsuit

8    to conduct a year-long investigation using investigators and

9    setting up cameras, setting up external cameras to monitor the

10   entrance of the clinic, and in turn attorneys who reviewed

11   that material to formulate their suit and identify 60 people

12   outside the clinic that were engaged in protest activity, then

13   assessing their conduct and then in turn narrowing it down to

14   the universe of defendants presently before the Court.

15          Now I would like to address the remaining *parens*

16   *patriae* factors.  The first being that whether or not the

17   state has an interest apart from the interest of a particular

18   private party.  In other words, the state must be more than a

19   nominal party.  The state has no proprietary interests or

20   anything in the area, this is purely an issue of the state's

21   quasi-sovereign interest, which takes me to the second element

22   that needs to be established and, that is, that we are trying

23   to protect and advance the public health of women within the

24   state.  And there are any number of cases in our briefing that

25   address this point, that this is a recognized quasi-sovereign

PROCEEDINGS

1   interest for purposes of *parens patriae* standing, and also as

2   to the third -- the remaining third element of *parens patriae*,

3   the OAG, in terms of whether or not we represent a substantial

4   segment of the population of New York, there is no numerical

5   talisman that is required.  Instead, Your Honor, we have

6   50 percent of the residents of the state, women within the

7   state that we are seeking to protect their access to

8   healthcare at Choices.  And in terms of the language --

9            THE COURT:  Wait a minute, you are saying you have

10  all women who --

11           MS. TRASANDE:  The interest itself is to protect the

12  public health and well being and a woman's ability to access

13  reproductive healthcare or any healthcare services in the

14  state.  That's the overarching interest under the

15  quasi-sovereign requirement for *parens patriae* standing.

16           THE COURT:  So you are saying that means you're

17  representing the interest of 50 percent of New Yorkers?

18           MS. TRASANDE:  Essentially, yes.  Assuming I believe

19  the math will hopefully carry the day that women are half the

20  population.

21           THE COURT:  That's because this clinic provides

22  services in addition to abortion-related activity?

23           MS. TRASANDE:  It does, Your Honor.  Prenatal care

24  is offered there, there is even transgender care that is done

25  through the facility.  It does many -- a great number of --

PROCEEDINGS

1          THE COURT:  Does it take care of older women?

2          MS. TRASANDE:  I'm sure it does.  I'm sure women can

3     seek hormone therapy, if necessary.  STD testing is also done

4     by the clinic and it provides routine gynecological exams.

5          THE COURT:  Is it undisputed that it provides

6     general gynecological services too?

7          MS. TRASANDE:  Yes, Your Honor.

8          THE COURT:  Okay.

9          MS. TRASANDE:  I think, finally, I'd like to address

10    the other standing arguments that were asserted by defendants

11    in terms of this natural person requirement.

12          Again, for a FACE Act claim *Cain* addressed this

13    particular issue.  There's no need to identify an individual

14    patient, what have you, sort of as a client that the AG would

15    be representing.  Instead, it is the overarching interest, the

16    quasi-sovereign interest that needs to be identified.  As part

17    of that analysis the antitrust cases they cite are in

18    opposite, those cases don't even reference a natural person

19    upon whom those suits were being brought by the state attorney

20    generals in those particular matters.

21          And also even assuming this were a requirement,

22    which it's not, Your Honor, we've identified escorts and other

23    staff affected at the clinic by the conduct outside the

24    clinic, by the protest activity outside the clinic.

25          And another point I would like to raise is in terms

PROCEEDINGS

1    of the argument about New York Penal Law 240.70 and New York

2    Civil Rights Law 79-M and whether or not we've specified or

3    alleged conduct under 75-M, given that the actual cause of

4    action omitted a reference to 79-M.  Elsewhere in the

5    complaint we do refer to 79-M and we did incorporate all

6    paragraphs by reference in that cause of action, so any issues

7    of that would be cured.  And also within the briefing, Your

8    Honor, plaintiffs -- excuse me, defendants made much of this

9    assertions sort of parsing injured versus injury.  They claim

10   we've only alleged against defendant Braxton that she only

11   interfered and intimidated.  Throughout the complaint there

12   are other references to physical injury and, notwithstanding,

13   it's a false distinction given the fact that the Penal Code

14   itself delineates interference, intimidation and injury and

15   that the New York Civil Rights Law says the New York civil

16   rights can be violated by conduct constituting a violation.

17   All of those elements would fall under that umbrella.  And

18   also the argument itself is disingenuous given the fact that

19   the defendants have maintained throughout their briefing that

20   the FACE Act and the New York State Clinic Access Act have

21   identical elements.  So at the outset, Your Honor, that

22   argument should be dismissed out of hand.

23          And, finally, in terms of -- this is again turning

24   back to the city law for a moment, that a predicate criminal

25   conviction is required in order to allege a civil action under

PROCEEDINGS

1    804.  Your Honor, this argument frankly makes no sense given

2    the fact that even the state law refers back -- in terms of

3    establishing a civil remedy under the state law for the New

4    York State Clinic Access Act it refers to a provision of the

5    Penal Code.  This is common practice done throughout the New

6    York City code, throughout the state code and for that reason

7    this argument similarly fails.

8              THE COURT:  Are you going to address the harassment?

9              MS. TRASANDE:  My colleague will.

10             THE COURT:  Thank you.

11             MS. PULLMAN:  Thank you, Your Honor.

12             At the outset I think it's important to note that

13   state and local statutes are -- the principle is strong

14   presumption it should really be construed unconstitutional if

15   at all possible and specifically with regard to vagueness,

16   facial challenges for vagueness are disfavored and the

17   defendants' burden is to show that this law is so vague as to

18   be incapable of application in all contexts.

19             The standard is simply that the statute provides

20   people of ordinary intelligence a reasonable opportunity to

21   understand what conduct --

22             THE COURT:  What's harassment?

23             MS. PULLMAN:  Harassment is repeated or persistent

24   behavior that annoys or alarms someone.

25             THE COURT:  And if someone is charged with a

49

PROCEEDINGS

1   violation of this statute, where do they go to find out what

2   harassment means?  How do they protect themselves against what

3   might be your construction of harassment?  It's not listed

4   anywhere within the statute, there's no definition.  It's a

5   pretty vague term, isn't it?

6       MS. PULLMAN:  It's not listed in a statute.

7   There's -- I think you can look at Webster's Dictionary, it

8   defines harassment as annoying persistently, creating an

9   unpleasant or a hostile situation, you know, by uninvited or

10  unwelcome conduct.

11      I think the courts have the general understanding of

12  harassment as persistent unwelcome behavior.

13      THE COURT:  So under this statute, assuming someone

14  were to follow someone into the clinic and to be on their

15  heels and saying to them, there are better choices for you to

16  make, you shouldn't kill your child, you should consider

17  having your baby, is that harassment?  They followed them and

18  they said those things to them, are they guilty of harassment

19  under the statute?

20      MS. PULLMAN:  Your Honor, I think it's clear by the

21  reaction of the listener.  The question here --

22      THE COURT:  The reaction of the listener is the

23  guide?

24      MS. PULLMAN:  If the conduct is unwelcome.  Two

25  people can walk down the street --

GEORGETTE K. BETTS, RPR, CSR
Official Court Reporter

PROCEEDINGS

1          THE COURT:  Unwelcome conduct then is harassment?

2          MS. PULLMAN:  It can be.  Persistent unwelcome

3    conduct that annoys someone or alarms someone.

4          THE COURT:  Someone just walks up to the person,

5    they're walking, what is persistent?  Let's say they follow

6    them and they repeat the kinds of things I've just said, is

7    the fact that they say that more than once, does that make it

8    persistent?

9          MS. PULLMAN:  If the listener makes clear that they

10   don't want to hear it and --

11         THE COURT:  So the listener doesn't say anything,

12   the person just keeps walking and the person keeps repeating

13   themselves, is this harassment under the city code?

14         MS. PULLMAN:  If the listener walks away at a brisk

15   pace, continues to try to get away just as an average person

16   walking down the street in New York in response to a

17   persistent --

18         THE COURT:  How does this square with some of the

19   panhandler statutes?  People can come up to you and ask you

20   for money, correct?

21         MS. PULLMAN:  Your Honor, in fact the panhandler

22   statutes were struck down because you had to examine the

23   content of someone's speech in order to determine whether they

24   were panhandling.  So someone walking up to you and saying --

25         THE COURT:  Don't you have to analyze the speech to

51

PROCEEDINGS

1  determine whether somebody is being harassed?

2          MS. PULLMAN:  No, Your Honor, you don't.

3          THE COURT:  All right.  You walk next to the person,

4  they keep saying good morning, good morning, good morning, how

5  you feeling, good morning, and the person who is walking in is

6  really annoyed by this, is that harassment?

7          MS. PULLMAN:  The question isn't -- the question of

8  whether an objective reasonable person would fit -- the

9  conduct was subjectively unwelcome and an objective person

10  would find that it was annoying and harassing.

11          For example, Your Honor, if someone tells me they

12  like my haircut, I don't think that sounds like an offensive

13  statement, but if someone is walking down the street behind me

14  whispering in my ear, I really like your haircut, I really

15  like your haircut, I really like your haircut, where did you

16  get it done, you have such lovely hair, yes, Your Honor, I

17  think a reasonable person --

18          THE COURT:  You don't think thank you would be the

19  answer to that.

20          MS. PULLMAN:  If they persisted when I said thank

21  you very much, I really need to go now, thank you very much.

22  If a man was walking down the street behind me --

23          THE COURT:  That's the creepy guy statute.  What if

24  a woman is walking behind you and says the same thing, is that

25  different?

PROCEEDINGS

1              MS. PULLMAN:  If I ask her to leave me alone -- and

2      for example, Your Honor, I think the best example of this is

3      what defendants actually do.  We've had extensive discovery at

4      this point and so -- and this is relevant and again not to go

5      to the merits, but the Supreme Court tells us that facial

6      challenge is being disfavored and given that a vagueness

7      challenge only succeeds if the statute is vague in all its

8      applications.

9              The first step is to look at what the defendants are

10     accused of and if this law clearly applies to them --

11             THE COURT:  Are you really relying that heavily on

12     this section?

13             MS. PULLMAN:  We are, Your Honor.  In fact -- and

14     this goes to what the defendants regularly do.  These

15     defendants are not -- the government is not trying to claim

16     these defendants are, you know, form a physical barrier,

17     locking their arms and barricading the door.  They are not

18     throwing punches, they are not issuing bomb threats.  This is

19     a far lower level of conduct but one that's still violates

20     federal, state and local law.

21             Federal and state law prohibits uses of force,

22     threats, physical obstruction.  We believe there are numerous

23     instances where the defendants violate those laws, but

24     90 percent of their conduct violates this provision of

25     following and harassing, and, frankly, if we can't enforce

PROCEEDINGS

1    this law and craft injunctive relief that prohibits that

2    particular type of behavior, we won't have addressed the vast

3    majority of what they do that serves to interfere with the

4    clinic's operations.

5         THE COURT:  But they've got to know clearly -- I

6    mean, I find this a bit troubling.  They've got to know

7    clearly what harassment means.  There needs to be some

8    definition.  Without a definition, I mean the examples we've

9    just talked about now are kind of troubling as to what you

10   think harassment might be.

11        MS. PULLMAN:  Your Honor, I can give you an example

12   of -- in fact, in discovery we learned from defendants' own

13   production, you know, more than we even knew from our own

14   video and escort notes, defendants have documented instances

15   where they walked next to or behind someone in attempt to give

16   them literature and that person cursed at them.  They wrote

17   down, this person said get the "F" away from me, this person

18   said leave me alone.  And in their own notes they say I

19   persisted in trying to hand them a pamphlet.  I persisted in

20   obtaining --

21        THE COURT:  Now what about the panhandler?  If I say

22   to the panhandler, leave me alone and he comes up again to me,

23   is that a clear violation of a statute somewhere?

24        MS. PULLMAN:  Well, Your Honor, the reason the

25   panhandling case struck down that particular provision was not

PROCEEDINGS

1    because panhandling was vague, it was because it distinguished

2    a certain type of speech from other types.  Going up and

3    saying would you give me $5 --

4              THE COURT:  Isn't leafleting though recognized even

5    under the *McCullen* case as a form of really protected speech?

6              MS. PULLMAN:  It is, Your Honor.  And I think that

7    the best example of the Supreme Court speaking to a statute

8    exactly like this is *in Hill* versus *Colorado*, it's the same

9    issue.  Again, keep in mind this is a time, place and manner

10   regulation.  This is outside of a clinic.

11             The *Hill* case examined a Colorado state law that

12   prohibited certain types of unwanted conduct, including

13   leafletting, including appealing, preaching within 100 feet of

14   the clinic.  Again, just to keep in mind that these are places

15   that the Supreme Court have designated as particularly

16   sensitive because you have patients seeking medical services,

17   and medical services that are admittedly politically

18   contentious.

19             THE COURT:  On the other hand, public sidewalks are

20   recognized as the quintessential public forum where people can

21   speak.

22             MS. PULLMAN:  Absolutely.  There is no question of

23   that.  And that's why it has to be narrowly tailored.  And

24   here in *Hill* the Supreme Court upheld the Colorado law that

25   regulated -- that restricted people from approaching others

PROCEEDINGS

1    within eight feet without their consent in an area that was

2    100 feet in front of the clinic.  Unlike here we're looking at

3    within 15 feet of the clinic you can't follow and harass

4    someone.

5         In *Hill* the same exact arguments that defendants are

6    making here were rejected.  They said that it was a content --

7    the defendants in that case argued that it was content-based

8    regulation, that it was vague, that it was overbroad.  And the

9    Supreme Court instead found that it was a content-neutral,

10   time, place and manner regulation that left open, importantly,

11   alternative channels.  They know that defendants can still

12   protest, shout, counsel, implore, dissuade, persuade, educate,

13   inform, and distribute literature about abortion.

14        THE COURT:  Aren't you counting some of this

15   activity as activity though that you think should be

16   prohibited, because part of the facts in your case deal with

17   shouting and these things that you're contending I guess form

18   part of your harassment claim, right?

19        MS. PULLMAN:  If someone is shouting while following

20   someone down the street that could certainly constitute

21   harassment.

22        In *Hill* the Supreme Court made a distinction.  They

23   said there is a significant difference between the state's

24   restriction on speakers' rights to address a willing audience

25   and those that protect listeners from unwanted communication.

PROCEEDINGS

1    So that the statute in *Hill* dealt with the latter.  And here

2    we have the same issues.  Defendants here are free to talk

3    about religion, they are free to hand out pamphlets, they are

4    free to engage in this calm counseling that they say they do.

5    They are free to talk to women who might want to hear from

6    them about alternatives to abortion, but they are not free to

7    persist and continue to try to force their ideas, their

8    literature, their pamphlets on people who have expressed an

9    intent not to -- have expressed a desire to be left alone.

10   And --

11           THE COURT:  So is that the conduct that's

12   prohibited?  In order to establish harassment you have to

13   establish persistent conduct meaning that it happened more

14   than once and that the person asked to be left alone?

15           MS. PULLMAN:  So as persistent I would say that it

16   continues once the person makes clear they want to be left

17   alone, yes.  So if a person approaches with the pamphlet --

18   even walks up alongside trying to hand a pamphlet and the

19   listener says, no, thank you, and they say, have a nice day,

20   that's not harassment, it didn't persist once the listener

21   made clear the conduct was unwelcome.  As to unwelcome, I

22   think there are a number of ways to indicate that it was

23   unwelcome.  You know, again, as far as this extraordinary leap

24   that the defendants want to invalidate a local statute as

25   unconstitutional --

                                                                    57
                              PROCEEDINGS

1             THE COURT:  It's one provision of the local statute.

2             MS. PULLMAN:  One provision but they'd have to show

3    that that provision would be unconstitutional if

4    impermissible --

5             THE COURT:  But there is a difference between that

6    and saying that it's vague.  And the Supreme Court, although

7    it points to the New York City Council statute and said this

8    is better than what we're dealing with here, they also said

9    that assumes that there is some definition or that the term

10   harassment isn't vague or overbroad, so that's what really

11   needs to be shown here.

12            MS. PULLMAN:  I can speak to --

13            THE COURT:  And if there was a definition of it in

14   the statute I could -- maybe that would be helpful, but I

15   don't know.

16            I know the amicus wants to address that too, I'm

17   going to let you finish your argument.

18            MS. PULLMAN:  Thank you.  What I would just note

19   that defendants again, you know, really are focused on this

20   case, this Court of Appeals case *People* v. *Gold*.  The problem

21   is, however, that they never want to address the fact that

22   *Gold* was very clearly limited to restriction on pure speech.

23   And, again, as mentioned earlier --

24            THE COURT:  Yours is not because it is following?

25            MS. PULLMAN:  It is, Your Honor, and that -- if

PROCEEDINGS

1    the --

2           THE COURT:  So it's not just speaking to someone,

3    it's following them and speaking to them?

4           MS. PULLMAN:  It is.  What our --

5           THE COURT:  Is that the distinction?

6           MS. PULLMAN:  Let me withdraw that.  It's not

7    following them and speaking to them.  Harassing conduct can

8    take a number of different forms.  I do think that there is a

9    clear understanding of what harassment conduct --

10          THE COURT:  The form of harassment that you're

11   talking about is the speech.  It's saying, here's my leaflet,

12   listen to me, this is what I want to talk to you about.  Isn't

13   that how you're defining harassment, by what they say?

14          MS. PULLMAN:  Harassment can take a number of forms

15   including this case.  For example, walking so close to someone

16   when they're trying to get away from them as to step on their

17   shoe and break it.

18          THE COURT:  Well, this is it.  What is it?  This is

19   a little troubling, I'm not sure what it is.

20          MS. PULLMAN:  But --

21          THE COURT:  If you're saying it can be speech, it

22   can be walking next to someone, it can be this, it can be

23   that, but what is it?  Someone has to know what conduct is

24   prohibited, that's the whole problem with statutes that are

25   overbroad or vague and if there were a definition somewhere

PROCEEDINGS

1    that adequately defined it -- I mean there are harassment

2    statutes that are upheld and you've pointed to some that have

3    been found constitutionally viable, but how do we know what

4    conduct is defined here in this statute?

5        MS. PULLMAN:  I do think that there's a normal,

6    everyday meaning of harassment.  If I say you are harassing

7    me, you are clearing persisting in some sort of conduct

8    whether it's verbal or whether it's physical, whether it's a

9    sibling poking at their sibling consistently --

10       THE COURT:  What if I just follow you and repeat,

11   you're doing the wrong thing, you're killing your child and I

12   follow someone, I stand a respectful distance from them but I

13   follow them and I say you're doing the wrong thing, what

14   you're doing is immoral, you're killing your child, is that

15   harassment?

16       MS. PULLMAN:  If you do it in a way that is -- I

17   think that is --

18       THE COURT:  If I stand three feet from the person

19   and walk beside them saying that, is that harassment?

20       MS. PULLMAN:  And if that person begins to cry in

21   response and you persist, if that person walks into the wall

22   to get away from you, yes.

23       I mean, I think there are factual -- there's a

24   burden that the government bears to show that this conduct is

25   harassing.  I, 100 percent, accept that we need to show that

PROCEEDINGS

1    it's harassing.

2              THE COURT:  But doesn't the person also have to know

3    whether they're -- what conduct is prohibited?

4              MS. PULLMAN:  And I think whether a reasonable

5    person -- whether the listener clearly finds it unwelcome,

6    which we have to show and we will, and whether a reasonable

7    person would find that the conduct is annoying or alarming.

8              Again, there are --

9              THE COURT:  So is harassment annoying and alarming

10   conduct?  What is it?

11             MS. PULLMAN:  Yes, it's conduct that seriously

12   annoys or alarms, that's persisting.  The Supreme Court --

13             THE COURT:  Are you relying on the Webster -- are

14   you holding yourself to what definition, what definition are

15   you holding yourself to with regard to --

16             MS. PULLMAN:  I think Webster's definition is

17   useful, and I think it accords with the common understanding

18   of what these words mean.  I just don't believe that it is

19   impossible to understand what it means to harass someone.

20             THE COURT:  I guess unless it's defined they are

21   subject to perhaps what someone else's definition of

22   harassment is, that might not be harassment -- it might not be

23   what?

24             MS. PULLMAN:  I think the two aspects, does the

25   listener make clear the conduct is unwelcome, that's one.  And

PROCEEDINGS

1   there is no -- again --

2           THE COURT:  Is that in Webster's, that the listener

3   has to make clear that it's unwelcome?

4           MS. PULLMAN:  Yes, there are two definitions under

5   Webster's.  One is to create an unpleasant or hostile

6   situation, especially by an uninvited or unwelcome verbal or

7   physical conduct.

8           The Supreme Court has spoken again to this concept

9   of vagueness and said it's not about hypertechnical theories

10  of what hypothetically could be or could not be.  The question

11  is just, does an ordinary person have a reasonable opportunity

12  to understand what this is.  And, again, the Supreme Court has

13  counseled, you know, condemned to the use of words we can

14  never expect mathematical certainty from our language, but are

15  we using everyday words that people understand what they mean.

16  And I believe that here we are.

17          I think that it is important to note that the Court

18  of Appeals in New York upheld other statutes about making

19  phone calls with the intent to harass.  They've upheld other

20  provisions of harassment statutes that prohibit stalking.  You

21  can say what is stalking.  Does it mean following someone

22  once, following someone twice, but the Court of Appeals has --

23  the New York State courts have upheld these statutes because

24  not only is it generally understood, but defendants in --

25          THE COURT:  Isn't stalking defined in the statutes?

PROCEEDINGS

1          MS. PULLMAN:  There are a number of ways they

2     describe conduct that is harassing, conduct that is made with

3     no legitimate purpose.  All of these terms are consistently

4     used.

5          I mean, it's also notable that the New York Court of

6     Appeals has never applied the overbreadth statute --

7     overbreadth concept to statutes that criminalize conduct, and

8     not just pure speech, expressly conduct and not pure speech.

9          THE COURT:  And so what's that, following?

10         MS. PULLMAN:  The following and harassing.  Because,

11    again, you don't need to determine whether language is

12    harassing language alone.  We're talking about course of

13    action.  And, again, I think that *Hill* makes clear -- *Hill*

14    rejected this question of the challenges for vagueness,

15    rejected challenges for overbreadth and specifically says that

16    you're regulating the way in which people are communicating,

17    not the content of their speech, not the message, but the way

18    that they're communicating.  And again the vast majority of

19    pro-life Americans or pro-life New Yorkers are not outside of

20    a clinic harassing women, are not obstructing clinics, are not

21    issuing threats of force.

22         THE COURT:  Well so what?

23         MS. PULLMAN:  So this statute is not overbroad

24    because it doesn't burden --

25         THE COURT:  It's not overbroad because it doesn't --

PROCEEDINGS

1              MS. PULLMAN:  Because it leaves open ample

2    alternatives for communicating a message, whatever that

3    message may be.  Again, I apologize, Your Honor, I think that

4    a lot of times the issue of vagueness and overbreadth are

5    conflated, so this speaks more to the issue of overbreadth,

6    this is not about vagueness.  You know, but for an overbreadth

7    challenge about -- or is this concept of following and

8    harassing too much of an intrusion on the First Amendment

9    rights.  The Court in *Hill* again found -- the Supreme Court

10   said that this prohibition on approaching people without their

11   consent within 100 feet of a clinic was not overbroad because

12   the First Amendment --

13             THE COURT:  But you don't -- the statute doesn't say

14   approaching people without their consent.

15             MS. PULLMAN:  The statute -- right, again, this

16   is --

17             THE COURT:  Here your claim is not that you're

18   approaching somebody without their consent.

19             MS. PULLMAN:  Part of harassment I think involves a

20   lack of consent, an unwillingness to hear.  And again, I think

21   that the conduct really saves this.  *Gold* made clear that the

22   problem with the word harassment was that it was only talking

23   about verbal conduct, it was pure speech.  And no other case

24   has struck down a restriction on conduct as being vague or

25   overbroad because it doesn't define harassment.

64

PROCEEDINGS

1          THE COURT:  Okay.  I want to give the *amici* time, he

2     asked to speak so I wanted to give him time.

3          MR. BRADFORD:  Thank you, Your Honor, Patrick

4     Bradford on behalf of the City Council.

5          You've asked we, as a class define -- the City

6     Council addressed this issue in a memorandum which is

7     Exhibit 8 to our *amicus* filing.  It's a memorandum dated

8     April 1st of 2009, which was a couple of days before the

9     council passed the law.

10          I'm reading from page 10.  Again, this is cited in

11     our brief.

12          The word harass has its ordinary meaning --

13          THE COURT:  What is this memorandum, legislative

14     history?

15          MR. BRADFORD:  Yes, Your Honor.  This is part of the

16     legislative record that is available on the website for the

17     City Council.

18          THE COURT:  Where someone can go look to define what

19     harassment means?

20          MR. BRADFORD:  Yes, Your Honor.  And counsel has had

21     access to it and it is Exhibit 8 to our pleading.

22          So with respect to your concerns about specificity,

23     what it --

24          THE COURT:  What does it say?

25          MR. BRADFORD:  -- says, the word harass has its

PROCEEDINGS

1    ordinary meaning just as it does when it is used in the crime

2    of harassment in the state penal law.  In fact, the crime of

3    harassment is defined as, among other things, subjecting a

4    person to physical contact with the intent to harass, annoy or

5    alarm another person.

6           The memo cites to the Penal Law Section 240.26.

7    Counsel for the defendants read a portion of it, and that

8    portion left the impression that somehow it was vague when it

9    is not.  A person -- it reads as also follows:

10           A person is guilty of harassment when with the

11    intent to harass, annoy or alarm another person, 1, he or she

12    strikes, shoves, kicks or otherwise subjects such other person

13    to physical contact or attempts or threatens to do the same

14    or, 2, he or she follows a person in or about a public place

15    or places, or 3, he or she engages in a course of conduct or

16    repeatedly commits acts which alarm or seriously annoy such

17    other person and which serve no legitimate purpose.

18           Your Honor, if this statute can be acted upon by

19    police officers outside --

20           THE COURT:  You say it's defined harassment as used

21    in your statute is what the conduct that is contained in

22    240.26, is that --

23           MR. BRADFORD:  Yes, to be clear, Your Honor, the

24    memo refers to both harassment in the first degree, which is

25    240.25 and I just read an excerpt of harassment in the second

PROCEEDINGS

1   degree, which is 240.26.

2           THE COURT:  Which one does the memo refer to?

3           MR. BRADFORD:  Both, Your Honor, both.

4           THE COURT:  So that's where you find the definition?

5           MR. BRADFORD:  Yes, Your Honor.

6           THE COURT:  Unless the conduct meets that

7   definition, then it's not harassment under the city statute,

8   correct?

9           MR. BRADFORD:  What I'm saying is when the City

10  Council considered using that language it expressly did so

11  with reference to the penal law, which penal law applies

12  everywhere, if it applies everywhere then it certainly it can

13  apply within 15 feet with respect to the law.  Of course the

14  City Council is extremely concerned about the idea that its

15  statutes would be declared facially invalid for any reason, so

16  I wanted to make sure that Your Honor understands that it is

17  defined and you have it in our brief.

18          THE COURT:  So that's the definition.  The conduct

19  has to meet the definition of harassment in 240.25 or 240.26.

20          MR. BRADFORD:  I'm going to say yes, that's --

21          THE COURT:  Does the AG agree with that?

22          MR. BRADFORD:  Your Honor, to be clear, I'm speaking

23  about the issue of whether or not -- your consideration of

24  whether or not this statute is on its face constitutionally

25  sufficient.

PROCEEDINGS

1          THE COURT:  Yes.  You say -- the argument has been

2     it's vague, it's overbroad because there is no definition of

3     harassment.  You say, yes, in fact there is a definition, it's

4     in the legislative history, of course that's not in the

5     statute itself, but you say there is legislative history that

6     says it is these two sections, 240.25 and 26.  And if you meet

7     that, that's harassment --

8          MR. BRADFORD:  Your Honor --

9          THE COURT:  -- right?

10          MR. BRADFORD:  Your Honor, under the criminal law

11     that's harassment anywhere.

12          THE COURT:  I got it, but that's what the City

13     Council meant when they used that term in that statute?

14          MR. BRADFORD:  Yes, Your Honor.

15          THE COURT:  Okay.  So the AG then, your conduct

16     would have to satisfy one of those two sections, do you agree

17     with that?

18          MS. PULLMAN:  I do, Your Honor.

19          THE COURT:  Okay.  We've made progress.

20          It's almost 1:00 o'clock, but let me just give

21     anyone want to address that, the harassment issue?

22          MR. CANNON:  If I could, Judge, I'd like to very

23     quickly respond to the various things that the plaintiffs have

24     addressed.

25          THE COURT:  Okay.

PROCEEDINGS

1        MR. CANNON:  They indicate that -- Ms. Trasande

2   argued that under 63.1 the AG shall prosecute and defend all

3   suits in which a state --

4        THE COURT:  No, don't bother addressing that.

5        MR. CANNON:  That's just grossly overbroad, you

6   can't --

7        THE COURT:  I don't find that totally persuasive.

8   Go on.

9        MR. CANNON:  She mentioned the warning label in the

10  *Connecticut* case, and I won't repeat her argument, but that's

11  just a way to say that *parens patriae* is a function of either

12  statute or common law.  It does not say that the AG gets

13  common law or gets *parens patriae* any time the statute doesn't

14  exclude it.

15       She argued that the state represents all residents

16  and an individual may protect only his own interest.  The

17  problem is that under these statutes there's no difference in

18  the resulting injunction.  There is no difference in outcome.

19  In fact, it's better for the individual.

20       She indicates --

21       THE COURT:  But an individual could say I just want

22  money, give me money, let me go home.  I mean, that's the

23  difference.  The AG is interested in -- more interested in

24  stopping the behavior going forward than an individual would

25  be presumably.

PROCEEDINGS

1          MR. CANNON:  But the question is what can be done

2     and presumably the owner of a clinic would want prescriptive

3     relief just as the state would.

4          THE COURT:  Okay.

5          MR. CANNON:  The fact that an individual may have

6     options beyond what the AG has that he might not elect, I

7     don't think defeats the argument.

8          Ms. Trasande also indicated there's been no suit by

9     Choices, and of course speculating she said that's because

10    they're afraid of discovery.  The Court pointed out that may

11    we would say it's because we did nothing wrong, but the

12    biggest reason that I don't think requires speculation that

13    there hasn't been other civil litigation by Choices is that

14    she's got the AG doing it for her.  We don't have to guess

15    about that, it's happening.  Why would she get into it the way

16    she has her right to do?

17         Ms. Trasande indicated that the state has the

18    resources to do the investigation and, of course, I would

19    argue that resources really aren't relevant to this, but she

20    just kind of made it relevant.

21         More importantly, if offenses are occurring, they're

22    right out there in plain sight, it doesn't take a lot of

23    resources to establish them.  The fact that a lot of resources

24    have been expended, and we only have very trivial allegations

25    of specific conduct here, actually says a lot about how rare

PROCEEDINGS

1    the misdeeds may be.

2            They point out that a natural person could be

3    anybody coming into the clinic.  The problem is that under

4    FACE it's not just a natural person.  It's a natural person --

5    and this is goes to the authority given by the state AGs, they

6    are to vindicate their rights of a natural person residing in

7    such state.  The AG cannot vindicate the rights of out of

8    state patients that come to Choices for their abortions.

9            THE COURT:  Practically speaking, I know what you're

10   talking about allegations, but it's not like states

11   surrounding New York ban abortions so everybody has to come to

12   New York.  I mean, you would think that it would be fairly

13   obvious that people coming to -- patients coming to this

14   facility are New Yorkers.

15           MR. CANNON:  I don't think that gets to be assumed

16   under the constraint of the statute.  I can tell you, Judge, I

17   don't know what the chemistry is in New York, but certainly

18   it's very common elsewhere in the country that people come

19   from other states to a certain clinic to have their abortion

20   for obvious reasons.

21           THE COURT:  Yes, but we're talking about New York,

22   New Jersey, Connecticut, states that are -- I don't think the

23   same inference would be drawn.

24           MR. CANNON:  But if the AG is given power and he

25   doesn't get power except by the statute, and if it gives him

71

PROCEEDINGS

1   the power only to assert the rights of New York residents, I

2   don't think we get to just assume everybody is a New York

3   resident.

4           Now Ms. Pullman mentioned facial challenges are not

5   favored and that harassment is persistent and annoying.  That

6   kind of leaves out the fact that -- and we've seen it here

7   during your colloquy -- what tends to float up in discussions

8   of what constitutes harassment is always the legitimacy thing.

9   The language or conduct that serves no legitimate purpose can

10  be proscribed and what that really does it's just another way

11  of saying that they don't have a First Amendment right to cry

12  fire in a crowded theater.  We've all heard that.  Legitimacy

13  of purpose matters here.  And it cannot be argued that our

14  people don't have legitimacy of purpose.

15          THE COURT:  Well, let me ask you, would it be your

16  position that someone could follow a person for 30 feet

17  screaming in their ear you're a murderer, you're a murderer,

18  you're a murderer, when the person says leave me alone and

19  bursts into tears, if they continue that conduct standing

20  right up next to them screaming in their ear, could they do

21  that?

22          (Continued on the next page.)

23

24

25

PROCEEDINGS

1          MR. CANNON:  I don't believe so.  And I think that

2     goes to legitimacy of purpose.  You know, of course, we're in

3     an area where speech is concerned, and it's painful to get

4     into addressing legitimacy, but it must be done.  Fire in a

5     crowded theater is not legitimate.  You're a murderer, you're

6     a murderer, you're a murderer 20 times as you go down the

7     sidewalk is not legitimate.  That is what's alleged here.

8     Never once is it alleged here.

9          Ms. Pullman argued that if a person doesn't want to

10    hear it, if the language is subjectively unwelcome, or if it's

11    persistent, it's harassment.  But the Court knows that

12    preaching to the choir is not the only protected speech; in

13    fact, it's the need to preach to people who aren't in the

14    choir, who might not want to agree or hear from you that makes

15    the First Amendment protections important.  And, of course,

16    the McCullen case, and they cite Hill for certain, things but

17    the McCullen case essentially overruled the Hill case even

18    though it didn't' do it specifically.

19          THE COURT:  Overruled it how?

20          MR. CANNON:  Just by changing the landscape a little

21    bit and changing the analysis of what's protected.  And in the

22    McCullen case, the Court provides, it says, It's no accident

23    that public streets and sidewalks have developed as venues for

24    an exchange of ideas.  Even today, they remain one of the few

25    places where a speaker can be confident that he is not simply

PROCEEDINGS

1    preaching to the choir.  With respect to other means of

2    communication, an individual confronted with an uncomfortable

3    message can always turn the page, change the channel, or leave

4    the website.  Not so on the public streets and sidewalks.

5    There, a listener often encounters speech he might otherwise

6    tune out.

7            THE COURT:  I've seen the language.

8            MR. CANNON:  You've seen the language, Judge.

9            I think what's really telling here is the colloquy

10   between the Court and the State, the colloquy between two

11   intelligent, learned people who cannot pin down what

12   harassment means.

13           THE COURT:  Which ones in that group are you saying

14   are intelligent?

15           MR. CANNON:  The Court.

16           THE COURT:  The two lawyers I was speaking to, I

17   suppose.

18           MR. CANNON:  I was mostly thinking of your

19   conversation with Ms. Pullman.  The conversation itself, it

20   raises all kinds of fair questions, it points out the

21   problem -- nobody knows who what it means.

22           And Ms. Pullman says, well, if the person begins to

23   cry.  That's an extremely dangerous position to take.  If

24   harassment is established only by observing the affect on the

25   listener, the person doesn't know if he's committed a

PROCEEDINGS

1  violation until after he's done the act.  We can't go there.

2  Daniel Webster is not proscribing conduct with criminal

3  sanctions.

4       THE COURT:  Well, why don't you address yourself to

5  argument by the amici that it refers to the two criminal

6  provisions that, as far as I know, have not been held to be

7  unconstitutional yet.

8       MR. CANNON:  The reason that's not controlling is

9  because we all know that the legislature, in this case, the

10 City Council is presumed to understand and intend the language

11 they put in their act.  When they passed this ordinance, they

12 had the memo that said the things that Mr. Bradford pointed

13 out to you.  They didn't put it in the statute.  For all we

14 know they rejected it.  We don't get to just incorporate other

15 statutes because they're hanging around.  This ordinance

16 itself is defective.

17       One other thing, your Honor.  Two other things.

18       With respect to arm alternatives.  If the state had

19 its way our people would be across the street, but McCullen

20 clearly recognizes and talks about the value of proximity and

21 close personal conversation.  It's not good enough to say we

22 get to hold our signs or holler things at people from 50 feet

23 away.

24       And finally, Judge, with respect to harassment where

25 it is defined, I guess this goes more to the merits of the

PROCEEDINGS

1   case.  Even if you did incorporate the penal statute or the

2   memo that Mr. Bradford talks about it requires physical

3   contact, and that goes to merits more than anything else.

4        My concern here is we don't get to fix this by

5   incorporating the penal statute.  The City Council didn't do

6   it, we don't get to do it for them.

7        MR. GANNAM:  Your Honor, briefly if the -- on the

8   vagueness issue of the City Act.  If the Attorney General can

9   construe following and harassing, meaning, standing and

10  speaking then the ordinary person is hopeless to understand

11  what's intended by the statute.  That is what has been alleged

12  by the case.

13       Secondly, to echo what counsel said.  Hill preceded

14  McCullen.  The act of walking alongside of a person while

15  trying to give them literature talk to them about abortion was

16  upheld as protected conduct.  You can't take that protected

17  aspect of following along with someone, add it to the vague

18  term "harassment," and say we've solved the problem of its

19  vagueness.

20       Finally, in the context of stalking and harassing

21  statutes in the criminal law, in all of them, I believe,

22  there's an aspect of whatever the person is saying or doing

23  causes the listener under an objective standard to feel like

24  they're going to be harmed in some way.  The following, the

25  type of harassing that is prohibited criminally and in

PROCEEDINGS

1    stalking statutes and similar statutes.  It's not enough that

2    you annoy someone.  It's not enough to say something a person

3    doesn't want to hear, or have an emotional response.  It's

4    only criminal if that person feels like their person is going

5    to be subjected to harm under an objective standard because of

6    what the person is doing.

7             I think that's a standard we can all live with and

8    agree we will stand First Amendment scrutiny.  But simply

9    saying, I mean, even using the word "annoying" as being a

10   prohibited type of conduct or prohibiting speech that's

11   annoying.

12            THE COURT:  I can sue all of you here today, right?

13            MR. GANNAM:  And with that, your Honor, I will

14   conclude.

15            MS. OLIVERI:  If I may?  Sorry.

16            I believe the state conflated the test for *parens*

17   *patriae*.  The first element goes to interest, and whether the

18   interest of the abortion facility and the state are the same,

19   but the fourth element, which must be satisfied as well, is:

20   Is an individual could obtain relief?  It's not incentives are

21   the same if it's open, if it's available, and here the relief

22   is available to Choices.

23            And then to harassment.  The state defined it as

24   clear by reaction of the listener and unwelcome, well, the

25   United States v. Playboy explicitly states you can't punish

77

PROCEEDINGS

1    speech based on the reaction on the listener.  And in

2    Schneider v. Phelps it was abhorrent conduct with offensive

3    signs at a funeral.  And as abhorrent as that was, and

4    unwelcome as that was, emotionally harming that speech may be,

5    the Supreme Court upheld it saying that this country has taken

6    this stance that we're going to protect that speech and that's

7    it.

8             THE COURT:  All right.  Thank you very much.  Thank

9    you all.

10            (WHEREUPON, this matter was adjourned.)

11

12                      *     *     *     *     *

13

14   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
15

16   s/ Georgette K. Betts              February 5, 2018

17   GEORGETTE K. BETTS                 DATE

18

19

20

21

22

23

24

25