UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
People of the State of New York, by BARBARA
D. UNDERWOOD, Acting Attorney General of
the State of New York,

                Plaintiff,

    -against-

Kenneth Griepp, Ronald George, Patricia Musco,
Randall Doe, Osayinwense N. Okuonghae, Anne
Kaminsky, Brian George, Sharon Doe, Deborah
M. Ryan, Angela Braxton, Jasmine LaLande,
Prisca Joseph, and Scott Fitchett, Jr.,

                Defendants.
--------------------------------------------------------x

<u>NOT FOR PUBLICATION</u>
**MEMORANDUM & ORDER**
17-CV-3706 (CBA)

**AMON, United States District Judge:**

**TABLE OF CONTENTS**

**INTRODUCTION**.................................................................................... 3

**FINDINGS OF FACT**............................................................................. 5

  **I.**   **Background**.................................................................................. 6

  **II.**   **The OAG's Evidence**................................................................ 10

    1.   Video and Photo Evidence ............................................................ 10

    2.   Clinic Escort Recaps and Protestor Experience Questionnaires .................... 11

    3.   Pearl Brady ............................................................................ 13

    4.   Mary Lou Greenberg .................................................................. 14

    5.   Margot Garnick........................................................................ 15

    6.   Theresa White.......................................................................... 16

7.     Troyd Asmus .................................................................................... 17

**III.   Specific Findings of Fact** ................................................................ 18

1.     Kenneth Griepp.................................................................................. 18

2.     Ronald George .................................................................................. 21

3.     Patricia Musco .................................................................................. 26

4.     Ranville Thomas ............................................................................... 29

5.     Prisca Joseph.................................................................................... 35

6.     Osayinwense Okuonghae .................................................................. 40

7.     Anne Kaminsky ................................................................................ 42

8.     Brian George.................................................................................... 43

9.     Sharon Richards................................................................................ 43

10.   Deborah Ryan .................................................................................. 46

11.   Angela Braxton................................................................................. 46

12.   Jasmine LaLande .............................................................................. 49

13.   Scott Fitchett, Jr............................................................................... 51

**CONCLUSIONS OF LAW** ........................................................................... 54

**I.    Standard of Review** ...................................................................... 54

**II.   Standing** ......................................................................................... 56

1.     Quasi-Sovereign Interest ................................................................. 57

2.     Injury to a Substantial Segment of New York's Population ............. 59

2

    3.     Availability of Complete Relief Through a Private Suit ................................. 60

**III.   First Amendment Challenge** ........................................................... 63

**IV.   Specific Conclusions of Law** ........................................................... 66

    1.     Force ....................................................................................................... 67

    2.     Threats of Force ...................................................................................... 72

    3.     Physical Obstruction ............................................................................... 86

    4.     Follow-and-Harass ................................................................................. 95

    5.     Interference with the Operation of a Reproductive Health Care Facility ...... 102

**CONCLUSION** ....................................................................................... 103

## INTRODUCTION

Every Saturday morning for the past six years, anti-abortion protestors and volunteer clinic escorts have been clashing outside Choices Women's Medical Center ("Choices" or the "Clinic") in Jamaica, Queens. Starting before Choices opens at 7:00 a.m., the anti-abortion protestors set up along the sidewalk leading to the Clinic entrance and proceed to engage in a variety of activities. Some hold large signs that purport to show images of aborted fetuses; others principally preach; still others attempt to hand approaching patients and their companions anti-abortion literature and to engage them in conversation about the morality of their actions. The escorts also arrive early in the morning. They attempt to accompany the patients to the Clinic entrance and to shield them from what the escorts believe is illegal conduct by the protestors.

The New York State Office of the Attorney General ("OAG") filed this action against thirteen named protestor-defendants on June 20, 2017, seeking declaratory, injunctive, and monetary relief under federal, New York State, and New York City law. (D.E. # 1 ("Compl.").) The OAG brings its first cause of action under the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. §§ 248(a)(1), 248(c)(3)(A), its second cause of action under the New York Clinic Access Act ("NYSCAA"), N.Y. Penal Law § 240.70(1)(a)–(b); N.Y. Civ. Rights Law § 79-m, and its third cause of action under the New York City Clinic Access Act ("NYCCAA"), N.Y.C. Admin. Code §§ 8-803(a)(1)–(4), (6), 8-804. (Compl. ¶¶ 98–110.) The OAG filed a motion for a preliminary injunction the same day it filed its complaint, and the defendants filed motions to dismiss shortly thereafter.

On October 23, 2017, the parties agreed that it would be most efficient to bypass the usual preliminary injunction procedure, expedite discovery, and proceed directly to trial. (D.E. dated Oct. 23, 2017.) On January 18, 2018, however, after discovery was largely completed, it was decided that the trial should be styled as a preliminary injunction hearing since the case could not be fully resolved. (D.E. dated Jan. 18, 2018.) The defendants stated that, if their motions to dismiss were denied, they intended to answer and file counterclaims based in part on former–Attorney General Eric Schneiderman's statement, at a press conference held outside Choices to announce this action, that this is "not a nation where you can choose your point of view." (Id.)

The preliminary injunction hearing was held between February 12 and March 6, 2018. The parties presented documentary evidence, including videos, pictures, Protestor Experience Questionnaires, Clinic Escort Recaps, and Investigator Surveillance Reports. The OAG called seven witnesses: Pearl Brady, Mary Lou Greenberg, Margot Garnick, Theresa White, Troyd Asmus, Esther Priegue, and Angelica Din. The defendants called ten witnesses: Kenneth Griepp,

Ronald George, Prisca Joseph, Patricia Musco, Ranville Thomas, Angela Braxton, Peter Nicotra, Scott Fitchett, Jr., Merle Hoffman, and Luis Carter. On May 22, 2018, argument was held on the OAG's motion for a preliminary injunction.

Pursuant to Federal Rule of Civil Procedure 52(a), I set forth below my findings of fact and conclusions of law.

## FINDINGS OF FACT

At the preliminary injunction hearing, the OAG, in attempting to carry its burden of proof, relied on three primary categories of evidence to establish that the defendants violated federal, state, and city law: (1) videos and photographs, (2) Clinic Escort Recaps and Protestor Experience Questionnaires, and (3) the testimony of witnesses Brady, Greenberg, Garnick, White, and Asmus. I discuss generally the credibility of each of these categories of evidence before making its specific findings of fact as to each defendant. I address the credibility of each of the OAG's principal witnesses, because the reliability of their testimony is crucial to the OAG's attempt to carry its burden as to each defendant. The testifying defendants carry no similar burden. I address their credibility only when their testimony is necessary to a specific finding of fact.

When making specific findings of fact, I place significant weight on the video and photographic evidence, no weight on the Clinic Escort Recaps or Protestor Experience Questionnaires, and limited weight on the OAG witness testimony. The most problematic of the credibility issues discussed below is the tendency for the Clinic Escort Recaps, Protestor Experience Questionnaires, and OAG witness testimony to exaggerate the impropriety of the defendants' conduct and to omit mitigating circumstances. In this regard, it is notable that, despite the availability of hundreds of hours of video evidence, the OAG has not cited a single video that

corroborates the witness testimony claiming near-weekly violations. Instead, the video evidence contradicts the escorts' accounts of protestor conduct on specific occasions.

I do not suggest that the escorts intentionally lied at the hearing. No doubt, their overstatements of what occurred and who caused it are colored by their views that the protestors are overzealous and that it is the escorts' mission to shield patients from any interaction with them. Nonetheless, much of their testimony is unreliable.

I do credit some of the testimony by the OAG's witnesses regarding statements made by specific defendants outside Choices for two reasons. First, descriptions of specific protestor speech are less susceptible to mischaracterization than are descriptions of protestor conduct. Second, the defendants for the most part have not denied making these statements.

## I. Background

Choices is an ambulatory outpatient medical center, (D.E. # 186 ("Joint Pretrial Order") at 16; Priegue at 1380:3–8),[1] that provides services including abortions, obstetrics and gynecological services, prenatal care, colposcopy, and cryo-LEEP. (Priegue at 1380:3–8.) Patients range in age from eleven to ninety-three. (Id. at 1380:12–14.)

Choices is located at 147-32 Jamaica Avenue in Queens, New York, and occupies the full length of Jamaica Avenue between 147th Place and 148th Street and approximately half the length of these side streets. (Joint Pretrial Order at 16; Ex. 539; Ex. 540.)[2] The Clinic has three means of ingress and egress: (i) a public entrance that opens on 147th Place at the mid-point of that block, between Jamaica and Archer Avenues; (ii) an administrative entrance for employees that opens at

---

[1] "Priegue at 1380:3–8" is an example of a citation to the transcript of the preliminary injunction hearing, which is continuously paginated and filed on the docket. (D.E. # 204–10, 214–15.) The name of the testifying witness is included in the citation. In this example, the witness is Esther Priegue.

[2] Exhibits 539 and 540 are among the many exhibits introduced during the preliminary injunction hearing. Exhibits that include letters, (e.g., SF97), were introduced by the defendants.

the midpoint of 148th Street, between Jamaica and Archer Avenues; and (iii) a patient exit that opens at the midpoint of Jamaica Avenue, between 147th Place and 148th Street. (Joint Pretrial Order at 16; Ex. 539; Ex. 540.) Jamaica Avenue is a two-way street and 147th Place is a one-way street heading north toward Jamaica Avenue. (Brady at 241:21–242:6.)

The majority of Choices patients arrive on foot, with the remainder arriving by car. (Id. at 98:8–19.) Patients usually walk from Jamaica Avenue to the main patient entrance on 147th Place. (Id.) Much less frequently, patients come up 147th Place from Archer Avenue. (Id.) Sometimes patients cross through the private parking lot to the south of Choices, although this is not a common route. (Id.) The patients who arrive by car generally are dropped off at the curb outside the main entrance on 147th Place. (Id.)

Choices opened in its current location in Jamaica, Queens, in early 2012. (Greenberg at 939:5–940:9.) Soon thereafter, the Clinic saw a dramatic increase in protest activity on Saturday mornings. (Id. at 946:10–947:21.) Among the protest groups are congregants from Church at the Rock; congregants from Grace Baptist Church; a group called the Helpers of God's Precious Infants; a Catholic group; and various "independent" protestors. (Id.; Brady at 89:10–105:1.) Defendants Kenneth Griepp, Ronald George, Patricia Musco, Ranville Thomas, Osayinwense Okuonghae, Anne Kaminsky, Brian George, Sharon Richards, Deborah Ryan, and Prisca Joseph are affiliated with Church at the Rock.[3] Defendants Angela Braxton and Jasmine LaLande are or were affiliated with Grace Baptist Church. Defendant Scott Fitchett, Jr. does not belong to any particular religious group. On a typical Saturday, there are two to three dozen protestors and escorts, with the escorts often outnumbering the protestors two to one. (Brady at 78:3–81:4.)

---

[3] Defendants Ranville Thomas and Sharon Richards are identified in the Complaint and in the caption above as Randall Doe and Sharon Doe, respectively. (See Compl.)

The protest activity from these different groups varies. According to the OAG, "[t]he problematic protesters hold large signs scattered up and down the sidewalk or move around with such signs; run up to people who are walking down the street; yell and preach very loudly; follow patients to try and get them to take pamphlets despite their refusal; walk alongside people to divert their intended path down the sidewalk, walk slowly in front of patients; bump and shove escorts and patients; approach patients arriving by car and lean into or stand in front of car doors to distribute pamphlets and address patients; and videotape or take photographs of patients and escorts outside the clinic." (D.E. # 189 ("OAG Findings") ¶ 81 (citing Brady at 91:11–100:19).)

The protestors' testimony corroborates some, but not the most problematic, of these allegations. For example, Griepp testified that members of the Church at the Rock have been protesting outside Choices on most Saturdays since 2012. (Id. at 2542:13–21.) He testified that they generally arrive at Choices in two shifts. (Id. at 2480:7–9, 2542:16–2543:3.) Griepp usually supervises the first shift, which starts around 6:30 a.m. and ends around 8:00 a.m. (Id. at 2480:7–9, 2542:16–2543:3.) R. George[4] often leads the second shift until it ends around 10:00 a.m. (R. George at 2919:22–2920:8.) The leaders assign the other protestors one or more different roles, including preaching, sidewalk counseling, handing out literature, or holding signs. (Griepp at 2543:4–2550:4.)

Griepp testified that he and his fellow protestors designed these roles after obtaining copies of the relevant statutes and familiarizing themselves with the law. (Id. at 2466:2–2470:25.) He explained that they did this legal research in response to claims that their conduct violated the law, and that one of his daughters is an attorney and that she helped them understand what conduct was and was not allowed outside the Clinic. (Id.)

---

[4] To avoid confusion between defendants Ronald George and Brian George, they are referred to as R. George and B. George, respectively.

Griepp also explained that the signs are "somewhere around" three feet by five feet in size and generally display what appear to be the bloody and mutilated remains of an aborted fetus. (Id. at 2544:10–17, 2552:17–19; see also, e.g., Ex. 123.) Notably, Griepp testified that he instructs his sidewalk counselors to approach patients in waves, such that "one church member might walk ten feet with a patient and then another church member will pick up and have a second opportunity at the patient." (Griepp at 2572:1–11; see also Joseph at 2690:2–15 (stating that Griepp encourages church members to make "multiple passes" at women outside Choices).) The protestors have followed this guidance. (Musco at 2736:20–2737:5, 2764:12–2765:14, 2781:11–2782:10 (explaining that she often gives up her attempts to speak with a patient based on her knowledge that R. George, Kaminsky, or another protestor might have the opportunity to appeal to the patient).)

In response to the protest activity, Choices began an escort program. (Greenberg at 946:18–25, 948:19–949:3.) The Clinic first escorted patients informally but, by the fall of 2012, the Clinic decided that it needed to establish a formal escort program, based on what it perceived to be excessive or unlawful protest activity. (Id. at 959:14–969:13.) Accordingly, Choices reached out to the National Organization for Women – New York City ("NOW-NYC") for assistance. (Id.) To this day, volunteer escorts sign up to escort at Choices through the NOW-NYC website. (Id.) NOW-NYC also provides training to new escorts, either in person at the NOW-NYC office or by phone. (Id. at 975:5–7; Brady at 36:3–12.)

The escort program includes volunteer escorts, who receive no compensation, and escort leaders, who receive a reimbursement for travel to and from the Clinic. (Garnick at 1435:22–1436:16.) Escorts volunteer at Choices on Saturdays, arriving when the Clinic opens at 7:00 a.m. and continuing until the protesters leave, which is usually around 10:00 a.m. (Brady at 77:5–78:2.)

Escorts greet and walk patients down the sidewalk to the Choices entrance. (White at 2190:6–7.) Escorts typically station themselves on either side of a patient and accompany the patient to the Clinic entrance. (Brady at 528:3–531:2.) Sometimes, additional escorts walk in front of and/or behind the approaching patient. (Id.) In this way, the escorts use their bodies to shield patients from protestors and "to make space for [the patients] to get down the sidewalk." (Id.) Some escorts hold their arms out around the patients to keep the protestors farther from the approaching patient. (Id.; see also Ex. M-1; Ex. M-2.) Escorts also stand in front of the defendants' signs, blocking them from the view of oncoming patients and their companions. (Brady at 567:16–569:2)

Escort leaders are responsible for all escorts at Choices. (White at 2190:8–13.) Four of the OAG's five principal witnesses were escort leaders.

## II. The OAG's Evidence

### 1. Video and Photo Evidence

For years, Choices has had security cameras trained on 147th Place. (Greenberg at 941:22–942:11.) In June of 2016, the OAG installed a high-mounted surveillance camera, which it repositioned that July to capture the exterior of Choices' main patient entrance on 147th Place and the surrounding sidewalk. (D.E. # 187 ("Stipulations") ¶¶ 1–2.) The camera has not been moved since then and continues to capture surveillance footage. (Id.) Neither surveillance camera records audio.

The OAG had its investigators obtain additional video evidence via undercover operations. Most of those operations involved OAG investigators approaching Choices, pretending to be patients and their companions, and wearing hidden cameras recording video and audio. (See Stipulations ¶¶ 3–9; see also, e.g., Ex. SF69.) The investigators gathered evidence about protestor

conduct in this manner on a number of occasions in the second half of 2016.  (Id.)  The OAG's investigators also outfitted Brady and White with recording devices on one and two occasions, respectively.  (Brady at 483:2–8; White at 2348:8–17.)

Despite these investigative activities, the OAG did not call any of its investigators as witnesses, and introduced few of the undercover videos as evidence at the preliminary injunction hearing.  Instead, the OAG relied on the surveillance videos described above and on the videos and photographs taken by escorts and defendants on their cell phones and other personal recording devices.  The video evidence is given significant weight.

2. Clinic Escort Recaps and Protestor Experience Questionnaires

The OAG introduced several Clinic Escort Recaps and Protester Experience Questionnaires.  This hearsay evidence is given no weight.

The Clinic Escort Recaps are feedback forms completed by escorts and escort leaders during a debriefing held inside Choices each Saturday after the protestors leave.  (Brady at 49:21–54:13; see also, e.g., Ex. 149.)  These forms are supposed to provide an overview of the day's events and document any notable incidents.  (Brady at 49:21–54:13.)

Choices collected Protester Experience Questionnaires from its Saturday patients to solicit feedback on their experiences with protesters outside the Clinic.  (Greenberg at 1013:7–13, 1362:3–7.)  The forms include questions with yes/no answers and follow-up questions that request elaboration.  (See, e.g., Ex. 254.)  The yes/no questions include:

- "Did any protestors approach you as you arrived at Choices for your appointment?"

- "Did they try to prevent you from entering Choices?"

- "Did they touch you or your companion, or try to?"

- "Did you tell them to stop or that you did not want to talk to them?  If you told them to stop, did they?"

(Id.)  The Protester Experience Questionnaires ask for elaboration about any protestor efforts to prevent patients from entering Choices and about protestors' failures to abide by the patients' requests to be left alone.  (Id.)

Although "hearsay testimony is admissible to support the issuance of a preliminary injunction," district courts must still determine the weight to give to this inherently unreliable form of evidence.  Mullins v. City of New York, 626 F.3d 47, 48 (2d Cir. 2010).  In this case, I conclude that the Clinic Escort Recaps and Protester Experience Questionnaires deserve no weight, given that the parties have already conducted discovery and presented extensive live testimony from seventeen different witnesses.  That is, the preliminary injunction hearing was hardly "preliminary," and that fact removes the urgency usually supporting the use of hearsay testimony in this setting.  See, e.g., id. (holding that hearsay testimony is admissible in preliminary injunction hearings, because holding otherwise "would be at odds with the summary nature of the remedy and would undermine the ability of courts to provide timely provisional relief").

Nor is there anything in or about the Clinic Escort Recaps or Protester Experience Questionnaires that enhances their reliability.  Indeed, reliance on these forms is problematic in part because they tend to exaggerate the impropriety of protestor conduct and generally fail to provide the context of the interactions they describe.  For example, one Clinic Escort Recap includes the following statement: "Mary Lou called [the police] at 8:10 after being shoved by Ron and Griepp."  (Ex. 238-46.)  But, at the preliminary injunction hearing, Greenberg explained that neither R. George nor Griepp actually shoved her.  (Greenberg at 1033:22–1037:21.)  Instead, Greenberg explained that the men "mov[ed] at [her] very quickly when [she] was standing close

to the entrance," and that this alarmed her and made her "concerned that this would represent a physical altercation that we did not want." (Id.) Greenberg further explained that "[she] wouldn't call it shoving, but it was moving close and threatening that that was going to happen." (Id.)

Finally, only a sample of the Protester Experience Questionnaires were submitted. Their representative value is impossible to ascertain, because Greenberg admitted that she destroyed a large number of them. (Greenberg at 1013:7–1014:19, 1019:9–13, 1366:17–1369:1.) After making non-credible statements at the preliminary injunction hearing that she had a system to determine which Protester Experience Questionnaires to keep and which to destroy, Greenberg eventually admitted that she had no system. (Id.)

For these reasons, I do not rely on the Clinic Escort Recaps or the Protestor Experience Questionnaires in making its factual findings.

3. Pearl Brady

Brady began working as a volunteer escort outside Choices in the spring of 2015. (Brady at 477:1–11.) She was an "escort leader" from approximately February 2016 to October 2017, when she stopped escorting outside Choices. (Id.)

Brady was responsible for coordinating and collecting much of the information used by the OAG in this case. One of the ways Brady collected information was by assisting in the creation of a "protestor dossier," which included personal information about the Saturday protestors. (Id. at 477:19–23, 480:11–483:1, 727:13–17.) She also collected documents and videos related to activities outside Choices on a Google drive. (Id. at 477:24–478:4.) Brady conducted Internet searches to learn information about individuals engaged in protest activities outside Choices, including individuals ultimately named as defendants in this lawsuit. (Id. at 478:7–13.) As part of this effort, Brady created and maintained a Facebook account in which she pretended to be

"Shelly Walker," a vocal and fictitious anti-abortion advocate. (Id. at 478:14–479:7, 727:18–764:10.) Brady used this fake account to "friend" some of the protestors on Facebook, gather information about them, and determine whether they posted online any of the photos and videos they took outside Choices.[5] (Id.) Finally, Brady wore a hidden recording device on October 29, 2016 to help provide evidence in support of the OAG's case. (Id. at 483:2–17.)

In a "group chat" on Facebook messenger, Brady advised her fellow escort-leader witnesses about how to testify during their depositions. (Garnick at 2039:1–2043:7; Ex. BL152b at 19.) "Just remember," Brady said, "yes, no, I don't know, I don't remember, and I don't understand the question. Short answers. Don't elaborate. This is for them to get more information, and it's our job to give them as little help as possible." (Ex. BL152b at 19.)

I have carefully considered Brady's credibility as a witness, including her demeanor while testifying on cross-examination and her questionable candor as reflected by her advice to colleagues as to how to testify. Of most concern are the inconsistencies between her descriptions of protestor conduct and the conduct shown in the supporting videos and photographs. (See, e.g., infra F.III.2, L.III.3 (discussing Exhibit 31).)[6] Based on these considerations, I find that Brady is not entirely credible, because her recollection of events has proven to be biased and unreliable.

### 4. Mary Lou Greenberg

Greenberg is an independent contractor for Choices whose responsibilities include community outreach and directing the volunteer escort program. (Greenberg at 933:15–20.) Greenberg has worked with Choices owner Merle Hoffman in the pro-abortion movement for decades and has used strong, negative language when referring to those who protest outside

---

[5] With a few exceptions, the protestors did not post their videos and photos on Facebook.

[6] In internal cross-references, a capital "F" refers to the FINDINGS OF FACT section and a capital "L" refers to the CONCLUSIONS OF LAW section.

Choices.  (Id. at 1286:22–1294:13.)  Even among escort leaders, Greenberg has a reputation of being overly cautious and even "paranoi[d]."  (Garnick at 2157:14–2158:24; Ex. SF98 (email chain between escort leaders).)  The escort leaders have also expressed frustration about Greenberg's inability to recall details with accuracy.  (See Garnick at 2150:25–2154:22; Ex. SF97 (Garnick saying about Greenberg, in an email chain between escort leaders, "Messing up the security guard's name, confusing times by A LOT . . .  She does not seem to be doing well.").)

I have carefully considered Greenberg's credibility as a witness, including her demeanor while testifying, the evasiveness of many of her responses, Greenberg's tendency to exaggerate the impropriety of protestor conduct and omit mitigating circumstances, and the fact that Greenberg's testimony at the preliminary injunction hearing frequently failed to accord with photographic, video, or other evidence of the same events.  (See, e.g., Greenberg at 1033:22–1037:21 (testifying that, on one occasion, R. George and Griepp "moved into [her]" before explaining, after being asked whether either man physically touched her, that the men only "[m]oved very close to [her]"); id. at 1321:1–1340:17 (admitting, after being confronted with a video recording of the event, that her deposition testimony claiming unlawful obstruction in connection with that event was wrong).)  Based on these considerations, I find that Greenberg's testimony is not entirely credible, because her recollection of events has proven to be biased and unreliable.

### 5.  Margot Garnick

Margot Garnick began volunteering as an escort outside Choices in late July or early August of 2014 and has since become an escort leader.  (Garnick at 1432:14–16, 1435:6–21.)  I have carefully considered Garnick's credibility as a witness, including her demeanor while testifying, her tendency to exaggerate the impropriety of protestor conduct, and the inconsistencies

between her descriptions of protestor conduct and the conduct shown in the supporting videos and photographs. (See, e.g., infra F.III.12, L.III.1 (discussing Exhibit 21); infra F.III.4, L.III.3 (discussing Exhibit 41).) Based on these considerations, I find that Garnick is not entirely credible, because her recollection of events has proven to be biased and unreliable.

6. Theresa White

White has been an escort leader for many years and is among the few escorts to receive hourly compensation for her time. (White at 2190:2–3, 2319:10–12.) White helped gather evidence in support of the OAG's investigation by wearing a hidden recording device while escorting outside Choices on two occasions. (Id. at 2319:16–24.) She also made it a practice to take down the protestors' license plate numbers to help the OAG determine the names and addresses of the protestors ultimately named as defendants in this case. (Id. at 2320:22–2322:16.) White assisted in obtaining information for the "protester dossier" and periodically searched the Internet for information about the protesters. (Id.) Finally, White made clear that she finds the defendants' speech offensive and that she thinks their mere presence is intimidating. (Id. at 2364:17–2367:3.)

When she took the stand, White often said that she could not remember given events, testified that she has "really bad eyesight," and stated that "the days sort of run together regarding what all happened out there at the clinic over the past several years." (Id. at 2294:23–2295:6.) White also misremembered specific events while testifying. (See, e.g., id. at 2367:17–2376:18 (showing, with video evidence, that White was wrong when she said that a patient became aggressive based on something Braxton said to her, because Braxton did not enter the scene until after the patient became aggressive).) Finally, White admitted that she sometimes confused

protestors with one another, stating: "[T]here's been confusion over everybody on the sidewalk." (Id. at 2323:14–23.)

I have carefully considered White's credibility as a witness, including her demeanor while testifying, her inability to recall events with accuracy, her admittedly faulty memory and eyesight, and her sometimes exaggerated descriptions of protestor misconduct. (See, e.g., infra F.III.3, L.III.3 (discussing Exhibit 138).) Based on these considerations, I find that White is not entirely credible, because her recollection of events has proven to be biased and unreliable.

7. Troyd Asmus

Asmus was a security guard at Choices from January 2013 to August 2016. (Asmus at 1767:21–1768:9.) In this role, Asmus would monitor video surveillance footage in real time in the Choices security booth and would patrol the surrounding areas on Jamaica Avenue, 147th Place, 148th Street, the parking lot, and the floors of the facility. (Id. at 1769:2–1770:14) Asmus would also pull and save security footage on request. (Id.)

When he took the stand, Asmus often failed to recall the names of the protestors and the dates and other details of the events that he recounted. (Id. at 1779:2–3, 1790:24–25, 1794:5–9, 1795:12–16, 1804:13–18, 1805:10–16.) On cross-examination, Asmus also admitted to exaggerating in his descriptions of protestor conduct outside Choices. For example, in his direct testimony, Asmus testified that the only things the defendants did that he considered improper were "shoulder checking" and "shoving paperwork at people." (Id. at 1834:21–25.) On cross-examination, Asmus explained that, by "shoulder checking," he meant "somebody bumping into another person not making a deliberate effort to shove into them or push them." (Id. at 1835:10–20.) What Asmus meant by "shoving paperwork at people" was merely "reaching out and wanting them to take it." (Id. at 1836:4–8.)

I have carefully considered Asmus's credibility as a witness, including his inability to recall certain details with specificity and his admitted exaggeration of the impropriety of protestor conduct. (See, e.g., Asmus at 1774:23–1775:7 (testifying that, when he accused protestors of "pretty much blocking, standing too close to the door and stopping people from coming into the clinic," he simply meant that the protestors "were congregating very close to the door," not that they actually impeded anyone's access to the Clinic).) Based on these considerations, I find that Asmus is not entirely credible, because his recollection of events has proven to be unreliable.

## III.  Specific Findings of Fact

### 1. Kenneth Griepp

As stated above, Griepp has protested outside of Choices on most Saturdays since 2012 and has led his fellow Church at the Rock protestors while doing so. (Griepp at 2480:7–9, 2542:13–2543:3.) Griepp also leads those protestors at the church itself, where he is the senior pastor and highest-ranking individual. (Id. at 2541:11–20.)

In addition to coordinating his congregants' protest activities, Griepp sometimes attempts to speak with approaching patients. He explained that he does not necessarily stop trying to speak to a patient when she says that she does not want to hear what he has to say, because he wants to help people "see the truth" and "hear issues that are difficult to hear at this moment." (Id. at 2531:6–12, 2533:5–11.) Instead, Griepp "make[s] an assessment on whether or not [he] can adjust and maybe go to a different—different topic or something else like that at that point. [He doesn't] necessarily stop." (Id. at 2531:7–14.) Griepp also testified that he ignores the escorts' statements that the patient does not want to speak to him altogether, and he instructs his congregants to do the same. (Id. at 2530:1–10, 2571:15–21.)

The OAG has accused Griepp of filming patients outside Choices with the intent to injure, intimidate, or interfere with access to the Clinic. (OAG Findings ¶¶ 146–52, 158–59.) When he took the stand, Griepp admitted to filming outside Choices, but denied doing so with that unlawful intent. (Griepp at 2577:3–2579:18, 2578:7–11, 2615:7–14.) The OAG argues that Griepp's testimony on this issue is not credible, because it is inconsistent with his deposition testimony in two ways. (See OAG Findings ¶¶ 146–52, 158–59.) First, Griepp stated at his deposition that he filmed to make the escorts behave better, but, at the preliminary injunction hearing, Griepp added that he also filmed when he wanted to document a conflict and prevent the protestors from being wrongfully accused of unlawful conduct. (Griepp at 2577:16–2579:18.) There is nothing inconsistent in filming to make escorts behave better and wanting to document conflicts to protect themselves. At best, Griepp did not give a complete answer at his deposition. Second, Griepp testified at his deposition that he always stopped filming patients when they asked, but, at the preliminary injunction hearing, he testified that he sometimes continued filming over a patient's objection if there was a conflict and he believed the protestors might be accused of illegal conduct. (Id.) This is an inconsistency, but not one that causes me to find that Griepp's stated reasons for filming were pretext for an unlawful motive.

The OAG cites two videos to help establish that Griepp filmed with the intent to injure, intimidate, or interfere with access to Choices. They do not support such a finding. The first video, taken by Joseph, shows Griepp and a young protestor filming the sidewalk outside Choices on May 10, 2014, when it was crowded with at least six protestors and eight escorts. (Ex. 462.) The video shows several protestors surrounding the approaching patient and using their bodies to restrict another protestor's access to her. (Id.) When the patient noticed Joseph filming the scene, the patient stated that she did not want to be filmed and put her hand up to block her face. (Id.)

Although the three protestors continued filming after the patient's request that they stop, they did not focus on the patient, but rather on the escorts, two of whom held umbrellas even though it was not raining and one of whom ran at Joseph and invaded her personal space in an attempt to block her camera. (Id.) Griepp himself began by filming the cluster of escorts around the patient from behind them, an angle from which he could not capture their faces. (Id.) He then trained his camera on the confrontation between Joseph and the escort blocking her camera, not on the patient who asked not to be filmed. (Id.) Finally, Griepp took a panorama of the sidewalk, in which he captured the patient's back as she walked away from the Clinic entrance. (Id.)

The second video, taken by Griepp, primarily captures a confrontation between a patient and a protestor. (Ex. 327.) The video first shows Griepp racing to the confrontation, which involved a patient attempting to drown out a protestor's speech by repeatedly yelling, among other things, "[W]e don't want to hear it." (Id.) Griepp continued to film the scene, from a distance, until the patient went into the Clinic as it opened two and a half minutes later. (Id.)

After careful consideration of Griepp's testimony, the escorts' testimony, the related video evidence, and the record as a whole, I find insufficient evidence indicating that Griepp filmed outside Choices with an intent to injure, intimidate, or interfere with access to the Clinic. Of course, defendants will rarely admit an improper purpose. But, in this case, there is little to no evidence that Griepp's or any other protestor's videos focused on patients' faces, that Griepp or any other protestor announced to patients—let alone in an intimidating fashion—that they were being filmed, or that Griepp otherwise used a camera in a manner that would intimidate patients and deter them from entering the Clinic.

The OAG also accuses Griepp of physically obstructing access to Choices on May 14, 2016 and other occasions, but supports that claim with only Clinic Escort Recaps and escort testimony.

(OAG Findings ¶¶ 156–57, 160–61.)  For the reasons stated above, this evidence is insufficient to support a finding that Griepp physically obstructed access to the Clinic.  (See supra F.II.)  Additionally, Griepp credibly testified that he and his fellow protestors do not block access to Choices, and that they certainly do not do so intentionally.  (Griepp at 2563:6–2564:5.)

2.  Ronald George

R. George is an assistant pastor at the Church at the Rock and has been a regular protestor outside Choices since the Church at the Rock protestors started demonstrating there in 2012.  (R. George at 2915:17–18, 2916:8–2918:8.)  In addition to leading the second group of Church at the Rock protestors outside Choices, R. George holds signs, attempts to counsel patients and their companions, attempts to hand them literature, and often preaches quite loudly, sometimes within 15 feet of the Clinic entrance.  (Id. at 2918:10–2920:8; see also, e.g., Ex. 109.)

The OAG accuses R. George of using force against escorts outside Choices.  (OAG Findings ¶¶ 182–84, 214–15.)  The OAG supports this argument almost exclusively with Clinic Escort Recaps and Brady's testimony.  (See id.)  The one exception is July 2, 2016.  (See id.)  R. George explained at the hearing that, on that occasion, an escort put his hands on R. George's chest, and R. George responded by swatting the escort's hands away, saying, "Don't put your hands on me."  (R. George at 2943:14–2944:9; see also Brady at 200:8–203:22; 681:5–683:1 (testifying that she saw R. George struggling with the escort, but not explaining how the incident began).)  R. George later apologized for his reaction, because he knew that "in [his] heart there was some anger" when he swatted the escort's hands away.  (R. George at 2943:14–2944:9.)  R. George otherwise denied intentionally making contact with anyone else outside Choices.  (R. George 2943:1–2944:9.)  The OAG has failed to introduce sufficient credible evidence to establish

that R. George ever initiated contact with an escort outside Choices with the intent to injure, intimidate, or interfere with access to the Clinic. (See supra F.II.)

The OAG also accuses R. George of making verbal threats of force outside Choices on two occasions. (OAG Findings ¶¶ 189–90, 216–18.) First, the OAG cites Brady's testimony that R. George once told her, "[T]he people who went to work on 9/11 didn't know what was going to happen that day, you never know when you're going to die." (Id. (citing Brady at 205:15–207:2.) Brady further explained that R. George "talks about death a lot when he preaches" and that, after he made his comment referring to 9/11, "he talked about repenting." (Brady at 205:15–207:2.) Second, the OAG cites Garnick's testimony that, as patients approached Choices on July 22, 2017, R. George "started screaming that women were being assaulted when they leave this clinic." (OAG Findings ¶¶ 189–90, 216–19 (citing Garnick at 1483:24–1487:3).) Garnick explained that R. George "was standing outside of the clinic near the entrance and shouting about the dangers of abortion and how it is—and how he believes it is wrong, and saw a patient walking down the sidewalk towards the entrance and then shouted that." (Garnick at 1483:24–1487:3.) Garnick also explained that she found this statement to be "very threatening, because [she] was not aware of any assault." (Id.) Garnick elaborated on her view that the implication to a patient that she might be assaulted as she left the Clinic would be very scary. (Id.) But Garnick did not elaborate on the patient-recipient's response to the statement. (See id.)

R. George has not denied that he made these statements. However, because it is undisputed that R. George "talks about death a lot when he preaches" and made his comment referring to 9/11 in the context of religious speech about repenting, (Brady at 205:15–207:2), I conclude that he made that statement as part of his religious message rather than with the intent of placing the escorts in fear of bodily harm or death.

The OAG makes one further threat-of-force allegation against R. George, accusing him of filming a patient outside Choices with the intent to injure, intimidate, or interfere with her access to the Clinic.  (OAG Findings ¶¶ 194, 219.)  R. George admitted that he sometimes films outside Choices, but explained that he and his fellow protestors film to "protect [them]selves," not to injure, intimidate, or interfere with access to the Clinic.  (R. George 3029:10–3030:17.)  He testified that he and the other protestors would see interactions with the escorts that "brought [them] concern" and decided to document them.  (Id.)  He also explained that the protestors do not intend to capture patients' faces when they film, but that their faces are often captured incidentally, because the interactions between protestors and escorts usually surround a patient.  (Id.)  The OAG attempts to undermine this testimony by relying primarily on Brady's, White's, and Greenberg's testimony.  (See OAG Findings ¶¶ 194–97, 219.)  I do not credit this testimony.  (See supra F.II.3–5.)  The only video the OAG cites in support of its attempt to establish R. George's unlawful intent is a video that shows R. George standing on the corner of Jamaica Avenue and 147th Place as a patient turns the corner with escorts.  (Ex. 410.)  Her face is visible for about one second.  (Id.)  R. George makes no effort to film the patient's face or to make his camera visible to the patient.  (Id.)  Nothing about the video suggests that R. George had an improper purpose in filming on that occasion.  Thus, after careful consideration of Griepp's testimony, the escorts' testimony, the related video evidence, and the record as a whole, I find insufficient credible evidence indicating that R. George filmed outside Choices with an intent to injure, intimidate, or interfere with access to the Clinic.

The OAG accuses R. George of physically obstructing patients and escorts outside Choices on at least five different occasions.  (OAG Findings ¶¶ 175–76, 180, 199–200, 220–23.)  R. George denied doing so, testifying that he never blocked patient or escort access to Choices.  (R. George

at 2943:1–6.)  The OAG's meets this testimony with Clinic Escort Recaps; Brady's, Greenberg's, White's, and Garnick's testimony; and three videos.[7]  (See OAG Findings ¶¶ 175–76, 180, 199–200, 220–23.)  For the reasons stated above, the Clinic Escort Recaps and escort testimony are not sufficiently credible to support a finding that R. George intentionally interfered with patient or escort access to Choices.  (Supra F.II.2–6.)  For the reasons stated below, the OAG's cited videos also fail to support such a finding.

First, Exhibit 39 shows that, on November 19, 2016, R. George approached a patient and her companion as they exited their car and removed a child from the back seat.  (Ex. 39.)  Once R. George approached the patient and companion, it appears that four protestors—Musco, Okuonghae, Thomas, and R. George—were speaking to them at the same time.  (Id.)  None of the protestors obstructed or otherwise impeded the patient's or the companion's access to the Clinic.  (See id.)

Second, Exhibit 307 shows that, on the morning of March 25, 2017, a patient's access to the Clinic door was accidentally and briefly impeded, but not by R. George.  (Ex. 307; see also Greenberg at 1534:10–20 (stating that the incident captured in Exhibit 307 occurred on March 25, 2017).)  At the beginning of the incident, R. George reached the patient first and handed the patient a pamphlet, which she took.  (Ex. 307.)  Two escorts soon reached the patient and attempted to position themselves on each side of her, with one escort stepping in front of R. George and slowing his pace, forcing R. George to step around the escort to access the patient and continue his attempts to engage her in conversation.  (Id.)  As R. George did so, the escort on the far side of the patient stepped partially and then completely in front of her in an attempt to block R. George's access to

---

[7] The OAG also cites Exhibit 304 for the proposition that R. George often moves in front of patients, (OAG ¶ 180), but does not appear to base any specific claim of physical obstruction on that video or proposition, (see id. ¶¶ 220–23).  In any case, Exhibit 304 does not show R. George moving in front of a patient.  (Ex. 304.)

her.  (Id.)  This momentarily blocked the patient's path to the Clinic entrance, causing her to slow down and then walk around the other side of the escort standing in front of her.  (Id.)  From there, the patient walked to the door without impediment.  (Id.)  After reviewing Exhibit 307 in light of the record as a whole, I conclude that R. George neither intended to impede the patient's access to the Clinic entrance, nor did so in fact.  The obstruction shown in Exhibit 307 appears to be the accidental result of the escort's attempts to block R. George from reaching the patient.

Third, Exhibit 31 shows that, on the morning of October 29, 2016, R. George attempted to make his sign visible to an approaching patient by repeatedly moving it in response to two escorts' persistent attempts to block it from view.  (Ex. 31.)  In so doing, R. George twice placed the sign directly in front of an escort.  (Id.)  Brady testified that he used his sign to block the escorts' access to the approaching patient.  (Brady at 218:2–7.)  He did not.  (Ex. 31.)  In fact, the escorts were not "trying to walk toward an arriving patient" at all, (Brady at 218:2–7); they were only trying to step in front of R. George's sign to block it from sight.  (Ex. 31; see also, e.g., Ex. K-14 (showing Brady standing in front of a non-party protestor's sign, the protestor repeatedly moving his sign to make it visible, and Brady repeatedly following the protestor to step back in front of his sign); Brady at 669:15–672:4 (admitting that she "may have" been moving to continuously reposition herself in front of the non-party protestor's sign).)  There were two different escorts who flanked the patient, and the other two who stepped in front of the sign did not attempt to join them.  (Ex. 31.)  Additionally, the approaching patient did not have "to go around [R. George] in order to get into the clinic."  (Brady at 218:2–7.)  She walked right past him without deviating from her path or breaking her stride at all.  (Ex. 31.)

Finally, the OAG accuses R. George of following and harassing patients or their companions, with an intent to harass, alarm, or annoy them, as they approached Choices on at least

five occasions.  (OAG Findings ¶¶ 203–04, 209–10, 212, 224–25.)  When he testified, R. George explained that he often attempts to speak with and hand literature to patients approaching Choices. (R. George at 3000:5–3005:12.)  He testified that he does not ask the patients' permission before speaking with them and that, if the patient remains silent or refuses his literature, he walks alongside the patient and further attempts to speak with her until she reaches the Clinic entrance. (Id.)  When a patient asks to be left alone, R. George typically will not follow her all the way to the door; instead, he feels that he has "another five seconds where [he] can still address or appeal in a closing remark about what could happen on the other side of those doors."  (Id.)  The OAG attempts to establish R. George's intent to harass, alarm, or annoy with only Clinic Escort Recaps and Brady's and Garnick's testimony, (see OAG Findings ¶¶ 203–04, 209–10, 212, 224–25)— evidence that is insufficiently credible to support such a finding of fact, (supra F.II.2–3, F.II.5).  I find no credible evidence that R. George followed any patients or companions with an intent to harass, annoy, or alarm them.

3.  Patricia Musco

Musco has been a regular protestor outside Choices since the Church at the Rock protestors started going to Choices in 2012.  (Musco at 2732:12–17.)  Musco generally goes to Choices with the second group of Church at the Rock protestors and, once there, takes notes on her iPhone, holds signs, hands out pamphlets, and attempts to speak to approaching patients.  (Id. at 2734:2–2735:5.) Musco sometimes continues trying to appeal to women inside the Clinic by yelling through the open door.  (Id. at 2750:24–2751:15.)  Musco will also approach patients arriving by car and attempt to speak to them through the passenger-side window, sometimes even leaning into the open window while doing so.  (See, e.g., Ex. 105 (leaning into car window while speaking to occupant); Ex. 49B (attempting to hand the driver of a car a pamphlet through an open car

window).)  Musco does not film very often outside Choices because she has low storage space on her cell phone.  (Id. at 2735:16–23.)

The OAG accuses Musco of physically obstructing access to Choices by crowding patients who arrive by car and by "positioning her body and her signs in front of [those trying] to enter the clinic, at times holding two signs side by side, perpendicular to the curb . . . ."  (OAG Findings ¶¶ 229–30, 232, 238–39, 247–48.)  Musco testified that she has never intentionally blocked or otherwise interfered with a person's access to Choices.  (Musco at 2733:3–14.)  The OAG attempts to rebut this testimony with Brady's, Garnick's, and Greenberg's testimony; two videos; and a picture of Musco purportedly blocking access to the Clinic by narrowing the sidewalk with two signs (and a third sign held by a non-party protestor).  (OAG Findings ¶¶ 229–30, 232, 238–39, 247–48.)  For the reasons stated above, I find the escort testimony insufficiently credible to support a finding that Musco intentionally obstructed access to Choices.  (Supra F.II.3–5.)  The OAG's video and photo evidence also fail to support such a finding.

First, Exhibits 49B and 105 show Musco leaning into the open passenger-side windows of cars parked outside Choices and speaking with the occupants.  (Ex. 49B; Ex. 105.)  The videos do not suggest non-consensual interactions—let alone that Musco obstructed the passengers from exiting their vehicles and accessing the Clinic or impeded the drivers from leaving.  (Ex. 49B; Ex. 105.)  Indeed, Exhibit 105 shows Musco approaching the car and attempting to hand the driver a pamphlet only after the passenger exited the car and walked into Choices.  (Ex. 105.)  Musco appears to speak to the driver for about thirty seconds before returning to her post on the sidewalk, and the driver does not drive off before the video ends a few seconds later.  (Id.)

Second, Exhibit 119 does not suggest that Musco intentionally or even accidentally obstructed access to Choices.  The photo shows Musco narrowing the sidewalk by holding two

27

signs perpendicular to the Clinic wall. (Ex. 119.) However, she is narrowing the low-traffic portion of the sidewalk to the south of the Clinic entrance, facing her sign north. (Id.) Musco appears to be making her signs visible to the majority of patients who approach from Jamaica Avenue—all of whom would reach the Clinic door without passing Musco. (Id.) Even if the OAG could establish Musco's intent to obstruct, one could not infer that Musco's positioning in this picture made access to Choices unreasonably difficult for any patient, because the photo does not show any patients approaching, (Ex. 119), and because patients rarely approached Choices' main entrance from the south, (Brady at 98:8–19.)

The OAG also accuses Musco of following and harassing patients and companions outside Choices with the intent to harass, annoy, or alarm. (OAG Findings ¶¶ 240–46, 249.) The OAG attempts to establish Musco's improper conduct and intent with Asmus's, White's, Garnick's, and Brady's testimony, which I do not find sufficiently credible, (supra F.II.3, F.II.4–7), as well as with a video and with Musco's testimony. That video shows Musco standing in one place outside Choices, attempting to persuade a woman not to go into the Clinic as the woman yells over her. (Ex. 452.) When the woman walks toward the Clinic entrance, Musco does not follow her, although she does yell: "You won't even talk to me!" (Id.) The video shows Musco standing in one place; it does not show her following anyone outside Choices. (Id.)

Musco testified that she often attempts to speak with and hand literature to patients approaching Choices. (Musco at 2764:12–18; 2769:24–2770:1, 2771:4–11, 2783:9–2784:2.) She further explained that, when a person tells her that he or she does not want to hear from Musco, Musco will make a last offer of literature and a last appeal: "We can help you, if you are going in for an abortion, we—please don't hurt your baby, we can help you." (Id.) This testimony does

not establish that Musco interacts with people outside Choices with the intent to harass, annoy, or alarm.

Finally, the OAG accuses Musco of interfering with the provision of reproductive health care services at Choices on one occasion by falsely telling a patient and her mother that the Clinic was closed when it was open, causing the patient and mother to turn around and leave. (OAG Findings ¶¶ 235, 250.) This argument relies entirely on Asmus's testimony, (id.), which has significant credibility problems, (supra F.II.7). Asmus testified that he was within earshot of Musco's statement but failed to correct it. (See Asmus at 1804:13–1807:1.) It is odd, at the very least, that Asmus allowed the patient and her mother to leave the area based on a mistaken belief that the Clinic was closed. (See id.) Nevertheless, I find that Musco made this statement and that the patient and her mother did leave the area, since Musco testified did not specifically deny it.

### 4. Ranville Thomas

Ranville Thomas has been a regular protestor outside Choices since the Church at the Rock protestors started going to Choices in 2012. (Thomas at 2819:16–2820:7.)

The OAG accuses Thomas of using force against escorts outside Choices on more than a dozen occasions. (See OAG Findings ¶¶ 256–65, 287.) Thomas denied using force outside Choices. (Thomas at 2824:22–2826:10.) Thomas explained that, although he has come into physical contact with escorts on many occasions, these contacts were accidental and happened because the escorts would "come and plug themselves right in between [Thomas and the patient] and cut [him] off." (Id. at 2837:10–2839:25.) He also testified that he could not remember coming into contact with any patients because he stays further away from them. (Id. at 2840:1–14.) The OAG cites no videos in support of its force argument against Thomas. (See OAG Findings ¶¶ 256–65, 287.) Instead, the OAG relies entirely on Clinic Escort Recaps and Garnick's, Brady's,

and Greenberg's testimony.  (See id.)  For the reasons stated above, this evidence is not sufficiently credible to establish that Thomas intentionally used force outside Choices.  (Supra F.II.2–5.)

The OAG also accuses Thomas of making several threats of force outside Choices.  (OAG Findings ¶¶ 267–70, 278.)  The OAG supports this accusation with evidence that Thomas made six specific statements outside the Clinic.  (Id.)  Although this evidence comprises of Clinic Escort Recaps and escort testimony, (see id.), in this instance, I conclude that Thomas made these statements, principally because he has not denied it.  Accordingly, I find that Thomas made the following statements outside Choices:

- Thomas once told Greenberg, "You're going to kick the bucket soon, Marylou," (Greenberg at 1073:10–1075:8);

- Thomas told Greenberg soon after a shooting at a Planned Parenthood in Colorado Springs, "You never know when you're going to die," (id.);

- Thomas said to escorts, also shortly after the Colorado Springs Planned Parenthood shooting, that "they could die at any moment"; that they "never know when death may come"; and that "they could die from being shot by a bullet while on the sidewalk," (Garnick at 1550:21–1553:18);

- Thomas said to Greenberg, on the day an unknown man pulled a knife on another unknown man across the street from Choices, "That could be you one day.  Someone could pull a knife on you," (Asmus at 1789:10–1790:13);

- Thomas has gotten within inches of patients and told them "not to murder their baby," "not to go into the clinic," and not to expect the escorts to "be here when you leave."  (Garnick at 1537:15–1538:18); and

- Thomas once said "that the clinic will be shut down," (id. at 1553:20–1556:14).

Although Thomas did not deny making these statements, he did deny threatening escorts and patients. (Thomas at 2829:21–24.) Thomas testified that he often preached about repentance outside Choices and that his comments about not knowing when one will die were made in that context. (Thomas at 2828:3–2830:8.) Specifically, Thomas referenced a passage from the Bible, which he paraphrased as, "And it's appointed once for men to die and then comes judgment." (Id. (citing Hebrews 9:27).) Thomas further testified that he never meant those comments to be taken as threats. (Id.) This testimony is credible, because White's testimony corroborates it. White testified that Thomas said, "[Y]ou never know when you're going to die," virtually every Saturday, and that he almost always connected that comment to repentance and accepting God as one's savior. (White at 2328:25–2330:5, 2248:5–2249:10.) Indeed, Thomas said it so often that White referred to it as Thomas's "mantra." (Id. at 2248:5–2249:10.) Thus, it appears that Thomas made his statements to the escorts about the shortness of life and the randomness of death as part of his religious message and not as threats intending to place the escorts in fear of bodily harm or death.

I do not infer that Thomas had an intent to threaten patients solely from the fact that he said that the escorts would not "be [t]here when [they] le[ft]." I reach this decision in part because there is no credible evidence that Thomas ever spoke or acted with the intent to threaten during his six years protesting outside Choices. Additionally, Thomas's speech outside Choices often includes claims that escorts and Clinic staff do not care about the patients or their children[8] and that the protestors, on the other hand, are there to help.[9] Thomas's statement could be understood

---

[8] (See, e.g., Ex. 102 (showing Thomas standing in front of Choices and stating, "Please ma'am, they don't care about your children. They don't care about children inside of this place. What they care about is the dollars.").)
[9] (See, e.g., Thomas at 2826:14–25 (stating that, when he engages with women, he typically tells them, "Ma'am, you already a mother if you're pregnant. Please, we want to help you. We can help, we can help you to save your child. Whatever you need, we are here, we are willing to assist in any way."); see also, e.g., Garnick at 1611:2–11 (stating that Musco often tells patients, "We care about you and we want to help you"); Ex. 410 (R. George stating, "If you need any help whatsoever we're here to help you in any way that we can").)

to communicate that, once a patient's procedure is over and her bill is paid, the escorts will no longer be concerned with her well-being.

The OAG accuses Thomas of physically obstructing patient and companion access to Choices by "repeatedly position[ing] his body and his signs in front of patients, causing patients to slow down or even stop, as they maneuver around the sign." (OAG Findings ¶¶ 242, 252–55, 261–65, 274–75, 280, 285, 289.) The OAG argues that Thomas further obstructs access by positioning his sign in the middle of the sidewalk, crowding the entrance to the Clinic, and leaning into open car windows. (Id.) Thomas denied this. (Thomas at 2824:22–2826:10, 2841:16–12.) Thomas testified that he never blocked the sidewalk with his sign and that if he moved around with a sign, he did so "just to show it." (Thomas at 2833:3–14.) Thomas also testified that he would move his sign around in attempts to make it visible to approaching patients, despite the escorts' efforts to stand in front of it and block it from view. (Id. at 2836:4–21.) But when a patient gets close to Thomas, he "move[s] out of the path so the patient can move—so the patient can get access to going into Choices [sic]." (Id. at 2836:22–2837:1.) Thomas could not recall standing in a patient's path in a way that made it difficult for her to get by. (Id. at 2837:2–9.)

The OAG attempts to undermine this testimony and establish that Thomas intentionally obstructed access to Choices by citing Clinic Escort Recaps; Garnick's, Greenberg's, Asmus's, and Brady's testimony; and three videos. (OAG Findings ¶¶ 252–55, 261–65, 274–75, 280, 289–90.) Again, the former two categories are not credible enough to support this finding. (Supra F.II.2–7.) The videos do not support it either, because they do not show Thomas obstructing access to the Clinic.

Exhibits 41 and 102 show Thomas standing in the middle of the sidewalk, directly in front of the Clinic entrance, on the mornings of November 19 and June 4, 2016, respectively. (Ex. 41;

Ex. 102; Brady at 313:12–314:6 (establishing that Exhibit 102 took place on June 4, 2016).) Despite Garnick's testimony that Thomas "ma[de] it difficult for the patient to get to the entrance" and that Thomas blocked "easy access into the clinic," (Garnick at 1539:21–1542:6), Exhibit 41 does not show Thomas blocking, delaying, or otherwise obstructing anyone's access to the Clinic. (See Ex. 41.) The eleven-second video shows one patient approaching the Clinic. (Id.) As she approaches, Thomas simply lifts up his sign in an attempt to make it visible to her, and she walks into the Clinic without impediment. (Id.) Garnick's testimony is thus without basis. (See id.) In Exhibit 102, Thomas stands in the same spot on the sidewalk with a sign and a handful of pamphlets. (Ex. 102.) During the course of the two-minute video, Thomas preaches from a stationary position as several escorts repeatedly ask Thomas to step back because he is less than 15 feet from the Clinic entrance. (Id.)[10] Far from showing obstructed patient access to the Clinic, Exhibit 102 does not show even a single patient trying to enter the facility. (See id.)

Exhibit 137, the third video, shows Greenberg speaking to the passenger of a parked car while Thomas and three other protestors stood behind her and attempted to make their voices heard. (Ex. 137.) After Greenberg effectively shepherded the patient from the car to the entrance without impediment from the protestors or anyone else, Thomas stepped to the open car door and leaned down to speak to the driver. (Id.) A minute later, Thomas closed the car door for the driver, and then continued to speak with the driver through the window for another minute and a half before the car drove off without impediment. (Id.)

Again, none of these videos shows Thomas obstructing access to Choices, thus supporting Thomas's testimony that he did not obstruct or otherwise interfere with access to the Clinic.

---

[10] For years, the escorts were under the mistaken impression that FACE, NYSCAA, or NYCCAA imposed a 15-foot buffer zone extending from Choices' door. (See, e.g., Ex. 102; see also infra L.III (discussing the conduct FACE, NYSCAA, and NYCCAA prohibit).)

Finally, the OAG accuses Thomas of following and harassing people outside Choices with the intent to harass, annoy, or alarm. (OAG Findings ¶¶ 266, 276–77, 279, 281–83, 284, 286, 291.) Thomas testified that he approaches patients and appeals to them, "Please, please save your child, your child is precious." (Thomas at 2820:17–2822:15.) He further testified that he does not approach the patients with an intent to badger them, to intimidate them, or to interfere with their access to the Clinic. (Id.) The OAG attempts to establish Thomas's improper conduct and intent with citations to Clinic Escort Recaps; Garnick's, Asmus's, White's, and Brady's testimony; and four videos. (See OAG Findings ¶¶ 266, 276–77, 279, 281–83, 284, 286, 291.) For the reasons stated above, the Clinic Escort Recaps and OAG witness testimony are not reliable and establish neither the alleged conduct nor intent. (Supra F.II.2–3, F.II.5–7.)

The four videos also fail to establish that Thomas followed and harassed anyone outside Choices with the intent to harass, annoy, or alarm. Exhibit 333 shows Thomas following a patient and her escorts down the sidewalk and attempting to persuade the patient not to use the Clinic. (Ex. 333.) As Thomas followed the patient, she turned back and said, "Back up," five times in rapid succession. (Id.) Thomas took a few steps away from the patient in response, thereby giving her more space. (Id.) Exhibit 351 shows Thomas following a patient and her escort to the Clinic door. (Exhibit 351.) Thomas clearly was speaking to or at the patient, but the video captured neither his words, nor those of the patient or escort. (Id.) It is not possible to make out the patient's reaction, because the video was taken from behind Thomas, the patient, and the escort. Exhibit 354 shows Thomas attempting persuade a patient's husband not to use the Clinic. (Ex. 354.) At the start of the video, the husband was stationary, explaining to Thomas that his wife was at the Clinic because she had a miscarriage. (Id.) Thomas attempted to persuade the man not to use the Clinic at all, because it perform abortions. (Id.) The companion said, "Okay," in an exasperated

tone and began walking toward the entrance. (Id.) Thomas continued after him, attempting to persuade him to change his mind. (Id.) Exhibit 99 shows Thomas standing about six feet from an escort, pleading with her to look at a rubber fetus doll and attempting to explain to her why abortion is not acceptable in his view. (Ex. 99.) Although there are voices in the background of the video (including one that says, "Back up"), one cannot make out who said those words to whom. (Id.) Nevertheless, the escort appears to be uninterested in what Thomas had to say, because she turned her back on him and walked a few feet up the sidewalk. (Id.) Thomas followed her for a few feet, but did not get closer to her. (Id.) For the entire thirty-nine-second video—as in the other two videos with sound—Thomas never strayed from his religious speech about sin and accountability. (Id.) Thomas testified that the woman was a newer escort and that he was attempting to persuade her to give up the practice. (Thomas at 2884:13–2886:23.) When viewed in light of the case as a whole, I find that, in Exhibit 99 and in the other three relevant videos, Thomas did not persist in speaking to a patient, companion, or escort for so long or in such a tone or manner that one could infer that Thomas's intent to persuade devolved into an intent to harass, alarm, or annoy.

5. Prisca Joseph

Joseph has been a regular protestor outside Choices since the Church at the Rock protestors started going to Choices in 2012. (Joseph at 2618:3–9, 2619:17–18.) She typically attends the early shift, takes copious notes, and attempts to speak with approaching patients and hand them literature. (Id. at 2620:22–2622:16, 2665:23–2668:6; Ex. 103.) Indeed, Joseph took so many notes outside Choices that the escorts referred to her as "the scribe" before they learned her name. (Brady at 119:3–10.)

The OAG accuses Joseph of "intimidating patients and interfering with their access to the clinic by filming patients seeking to enter Choices" on two occasions. (OAG Findings ¶¶ 297,

299, 301, 318–20.)  At the hearing, Joseph testified that she began filming outside Choices pursuant to Griepp's instructions.  (Joseph at 2643:7–25, 2697:3–2698:14.)  Joseph explained that the protestors began filming because they had "a lot of incidents where the escorts would just surround, surround us ladies, at least those that were giving out literatures, [sic] and they would purposely push us out the way [sic] so, to have something documented, to have it on video just to protect ourselves because it's going to be, when they call the cops, I want to be able to show the cops we didn't do anything wrong."  (Id.)  Joseph further explained that the protestors do not intend to capture the patients, but they are sometimes included incidentally.  (Id.)  She said, "We don't mean to because we don't want to invade anyone privacy, [sic] that's not our goal out on the street, but, however, just to protect our self [sic] for when the escorts call the cops, we want to be able to show, you know, show the cops this is what happened."  (Id.)  I find this explanation credible.

The OAG attempts to establish that Joseph filmed patients outside Choices with the intent to intimidate or interfere with access to Choices by citing White's, Garnick's, and Greenberg's testimony and two videos.  (OAG Findings ¶¶ 297, 299, 301, 318–20.)  For the reasons explained above, I do not find the escorts' testimony reliable.  (Supra F.II.4–6.)  For the reasons explained below, Exhibits 461 and 462 do not support such a finding either.

Exhibit 461 is a seventeen-second video Joseph took shortly before 7:00 a.m. on February 28, 2015.  (Ex. 461.)  It shows the backs of Greenberg and the patient she was accompanying from the main entrance to Choices, which had yet to open, to the entrance on Jamaica Avenue.  (Id.) When the video begins, Richards is audible in the background stating, "Your baby's precious," as Greenberg and the patient made their way out of the small crowd gathered around Choices' locked main entrance.  (Id.)  Joseph quickly stated, "Exactly," and, after a slight pause and a subtle change in tone, "I'm videotaping you."  (Id.)  Joseph then twice began to say something, but made false

36

starts instead, before saying, "We care about you."  (Id.)  Joseph then repeated, "There's no quick fix in life," until Greenberg and the patient walked out of earshot.  (Id.)

Exhibit 461 does not support an inference that Joseph filmed a patient with intent to intimidate or interfere with her access to Choices.  When asked about the video at the preliminary injunction hearing, Greenberg explained that the video began after Greenberg had intervened in an interaction between a patient and multiple protestors—probably Joseph and Richards—and began bringing that patient around to the Jamaica Avenue entrance.  (Greenberg at 1099:12–1100:18.)  Greenberg did not opine on whom Joseph was speaking to when she declared, "I'm videotaping you."  (Id.)  Joseph also explained that she began recording because she was upset that Greenberg had intervened in the interaction between Richards and the patient.  (Joseph at 2698:15–2704:21.)  Joseph further explained that both the comment and the video itself were directed at Greenberg, and that Joseph began recording because she wanted to document how Greenberg was "practically dragging, walking the woman, not even allowing her a chance to even listen to Sharon for a minute or two."  (Id.)  I find that Joseph's comment, "I'm videotaping you," and the camera itself were directed at Greenberg, not the patient.

Exhibit 462 is addressed earlier in the discussion pertaining to Griepp.  (Supra F.III.1.)  That video, recorded by Joseph on May 10, 2014 near the main patient entrance, shows a sidewalk crowded with at least six protestors and eight escorts, four to five of whom surround the patient at the beginning of the video and block Richards from accessing her.  (Ex. 462.)  The video also shows that Griepp was filming the scene on his phone and that a young protestor was filming the scene with a tripod camera set up in the flatbed of a pickup truck parked nearby.  (Id.)  When the patient noticed Joseph filming the approaching group of people, the patient said that she did not want to be filmed, and an escort immediately ran to Joseph and attempted to block her camera.

(Id.)  As this happened, Joseph said, "That's okay," and turned her camera up, taking the patient out of the frame.  (Id.)  The remaining 25 seconds of the video largely captures Joseph's interaction with the escort, which involved the escort telling Joseph not to film patients and Joseph warning the escort that she would be arrested if she touched Joseph.  (Id.)  As the escort walked back up the sidewalk, the background of the video shows the patient walking away from the Clinic entrance on 147th Place.  (Id.)  The evidence fails to establish that Joseph recorded this video with the intent to intimidate the patient or interfere with her access to Choices.

The OAG also accuses Joseph of impliedly threatening Choices employee Esther Priegue by twice recording her license plate number.  (OAG Findings ¶¶ 307, 321.)  Priegue testified that she once saw Joseph write her license plate number on a notepad and that this made Priegue uncomfortable and a "little bit scared because [Priegue] wanted to know why she was writing that down."  (Priegue at 1400:10–1401:18, 1419:25–1422:15.)  Priegue continued, "Was she going to show up at my house now?  I mean I work at a facility where we deal with abortions and protesters.  Taking down information like that, it's very alarming to us."  (Id.)  Priegue also testified that she observed Joseph taking down her license plate number a second time, on security camera footage. (Id.)

This testimony is somewhat questionable.  It is surprising that Priegue would see Joseph recording her license plate number a second time on video, would find that to be "very alarming," and would still fail to pull the footage of the incident.  Additionally, if meant to be a threat, it is hard to understand why Joseph would record Priegue's license plate number a second time out of Priegue's presence.  Finally, Joseph denied recording Priegue's license plate number.  (Joseph at 2727:9–12.)

Despite these misgivings, I will assume that Joseph did record Priegue's license plate number on these two occasions, because Priegue was an otherwise credible witness. I do not find that Joseph took down Priegue's license plate number with the intent that Priegue fear bodily harm or death. There is no evidence that Joseph took down the number in an ostentatious manner that would suggest that she wanted Priegue to see her doing so and was sending her a message. In fact, Priegue was not even in the vicinity of her vehicle on the second occasion. (Priegue at 1400:10–1401:18, 1419:25–1422:15.) Additionally, the record is replete with evidence that Joseph took copious notes when she protested outside Choices, so much so that the escorts referred to her as "the scribe" before they learned her name. (Brady at 119:3–10.)

Next, the OAG accuses Joseph of following and harassing patients with the intent to harass, annoy, or alarm them. (OAG Findings ¶¶ 311–13, 317, 322.) The OAG supports this accusation with Garnick's, Greenberg's, and Asmus's testimony and with one video (Exhibit 135). (OAG Findings ¶¶ 311–13, 317, 322.) Again, this testimony is insufficiently credible to support such a finding. (<u>Supra</u> F.II.4–5, F.II.7.) Nor does Exhibit 135 support it.

Exhibit 135 shows Joseph briefly following a patient or a companion leaving Choices. (Ex. 135.) The video does not capture Joseph's words, but it is clear that Joseph upset the woman, who immediately began arguing with and then physically hitting Joseph. (<u>Id.</u>) Joseph testified that, before the woman entered the Clinic, Musco had attempted to engage her in conversation. (Joseph at 2685:14–2692:17.) Joseph approached, despite her awareness that the woman had refused Musco's overtures, because Joseph thought the woman might be more receptive to Joseph's approach. (<u>Id.</u>) According to Joseph, she asked the woman something to the effect of, "Are you ok?" or "Do you need help?" (<u>Id.</u>) After a few seconds of arguing with Ms. Joseph, the woman started to hit her. (Ex. 135.) Although it is possible that Joseph may not have been as calm and

comforting as she suggested, without additional evidence of what Joseph said to the woman and in what tone of voice, I do not draw the inference that Joseph approached the woman with the intent to harass, annoy, or alarm her, rather than with an intent to engage the woman in conversation and persuade her not to seek an abortion or otherwise support Choices. This finding is based in part on Joseph's long history of protesting outside Choices and the lack of credible evidence of her interacting with anyone outside the Clinic with such an unlawful intent.

6. Osayinwense Okuonghae

Okuonghae is a former congregant of Church at the Rock who, before moving to Texas, protested outside Choices. (Griepp at 2546:22–2547:14.) When he protested at Choices, Okuonghae attempted to approach and speak with patients arriving by car or foot. (See Ex. 58; Ex. 138.) Although Okuonghae no longer lives in New York, he wishes to retain the right to return to Choices when he visits. (Court Colloquy at 2433:8–14.)

The OAG accuses Okuonghae of rendering passage to and from Choices unreasonably difficult on several occasions "by either inhibiting a patient or companion's ability to access or exit the clinic or an escort's capacity to assist a patient in doing so." (OAG Findings ¶¶ 326, 328, 330–34, 337–40.) The OAG supports this argument with Brady's, White's, and Garnick's testimony and with four videos. (Id.) As noted repeatedly, the escorts' testimony is not reliable. (Supra F.II.3, F.II.5–6.)

The OAG's four videos also fail to support its physical-obstruction allegation against Okuonghae. Exhibit 138 shows that, on June 25, 2016, Okuonghae directly approached a patient and her companion in an attempt to speak with the patient and hand her a pamphlet. (Ex. 138.) The patient and companion turned slightly and, without slowing their pace, walked around Okuonghae and on to the Clinic door. (Id.) Okuonghae made no effort whatsoever to prevent the

patient and her companion from walking past him.  (Id.)  Exhibit 23 is a video from the morning of October 15, 2016.  (Ex. 23.)  It shows Brady and another escort accompanying a patient from Jamaica Avenue to the main Clinic entrance on 147th Place.  (Id.)  It also shows Okuonghae and escort Greenberg standing near that main entrance and then approaching the patient and her escorts from that direction.  (Id.)  As they approach, it appears that Greenberg is in the patient's path and Okuonghae is off to the side, reaching out his arm in an attempt to hand her a pamphlet.  (Id.)  Greenberg then moves out of the way as the patient's two escorts step in front of her and motion for Okuonghae to get even further out of the way.  (Id.)  This entire interaction slows the patient's access to Choices by perhaps a second.  (Id.)  Exhibit 39 shows Okuonghae and defendant protestor Musco standing on the sidewalk outside Choices' main entrance on November 19, 2016 and speaking to a patient as she exited the passenger side of her car and took a child out of the back seat.  (Ex. 39.)  The video also shows five escorts standing nearby, and two additional protestors who eventually join the scene.  (Id.; see also supra F.III.2 (discussing Ex. 39).)  After about one minute, the patient took a stroller from the back seat of the car to the end of the sidewalk, where three protestors and two escorts were standing.  (Ex. 39.)  One of the escorts was in the patient's direct path, and immediately moved out of the way.  (Id.)  The patient then put the child in the stroller and walked into the Clinic without impediment as Okuonghae spoke to the patient's companion.  (Id.)  Exhibit 58 shows Okuonghae leaning beside and speaking into an open car window on December 3, 2016.  (Ex. 58.)  The video does not suggest a non-consensual interaction—let alone that Okuonghae obstructed access to or from the Clinic.  (Id.)  Indeed, the fact that the window was open on what appears to be a cold day suggests that the interaction was consensual.  In sum, Exhibits 138, 23, 39, and 58 do not show Okuonghae blocking or otherwise interfering with access to Choices.

The OAG also accuses Okuonghae of following and harassing a patient outside Choices. (OAG Findings ¶¶ 336, 341–43.)   With the exception of Garnick's unreliable testimony, no evidence supports this claim.

7. Anne Kaminsky

Anne Kaminsky is a member of Church at the Rock who regularly protests at Choices. (Garnick at 1452:17–1453:2, 1678:5–10.)

The OAG accuses Kaminsky of threatening Priegue with force by telling her that, if she stopped working at Choices, Kaminsky could take her off a murder mill website.  (OAG Findings ¶¶ 350–51, 360–61.)  Priegue testified that Kaminsky told her this and that the statement alarmed her, because she knew that abortion providers have been targets of violence in the past.  (Priegue at 1401:19–1403:18.)  I find this testimony credible.  No evidence has been offered to  rebut this statement.

The OAG also accuses Kaminsky of physically obstructing patients and escorts and of following and harassing patients outside Choices.  (OAG Findings ¶¶ 347–49, 354–59, 362–64.)  The OAG supports these allegations with only Clinic Escort Recaps and Garnick's, Brady's, and Asmus's testimony.  (Id.)  For the reasons explained above, this evidence is insufficiently credible to support these allegations.  (Supra F.II.2–3, F.II.5, F.II.7.)

It is undisputed that Kaminsky sometimes speaks to patients with whom a different protestor has already spoken.

Finally, the OAG accuses Kaminsky of interfering with the provision of reproductive health care services at Choices on one occasion by falsely telling a patient and her mother that the Clinic was closed when it was open, causing the patient and her mother to turn around and leave. (OAG Findings ¶¶ 252, 265.)  This contention relies on Asmus's testimony, (id.), which has

significant credibility problems in general, (supra F.II.7), and on this point in particular, because Asmus testified that he was within earshot of the statement but failed to correct it, (see Asmus at 1804:13–1807:1). As stated above, it is odd that Asmus allowed the patient and her mother to leave the area based on a mistaken belief that the Clinic was closed. (See id.) Nevertheless, I find that Kaminsky made this statement and that the patient and her mother did leave the area, since no evidence has been offered to rebut it.

8. Brian George

B. George has been a monthly and sometimes weekly protestor outside Choices since 2015. (R. George at 2933:12–2934:12.) The OAG accuses him of (1) threatening force outside Choices by filming patients with the intent to intimidate them or to interfere with their access to Choices and (2) following and harassing patients outside the Clinic. (OAG Findings ¶¶ 373–78, 380.) These accusations rest entirely on the unreliable testimony of Garnick and Asmus testimony. (Id.; supra F.II.5, F.II.7.)

The OAG also accuses B. George of physically obstructing patient access to Choices on three occasions by engaging in a deliberate "slow walk" in front of patients. (OAG Findings ¶¶ 367–72, 379.) This allegation is supported. B. George walked slowly in front of patients approaching the Clinic entrance on those three occasions, and he did so in order to give him and his fellow protestors additional time to speak with the patient. This finding is based upon Musco's testimony and B. George's supplemental declaration in which he admits it. (See Ex. 497 at 17–18, 34–35; Musco at 2790:13–2794:2, 2811:24–2813:7; D.E. # 211-1.)

9. Sharon Richards

Richards has been a regular Church at the Rock protestor outside Choices since 2012. (White at 2263:13–24.)

The OAG accuses Richards of using force against patients and escorts outside Choices by stepping on their heels or bumping their arms. (OAG Findings ¶¶ 384–87, 397–401.) The OAG supports these accusations with Clinic Escort Recaps and Greenberg's, White's, Garnick's, and Brady's testimony. (Id.) I find that Richards stepped on the heel of a patient and, on a separate occasion, on the heel of an escort, because Richards concedes that this happened. (D.E. # 196 ¶ 418.) But, regardless of whether those or any of the other alleged contacts occurred, I do not find that Richards intentionally used force against any of the patients or escorts involved in these interactions, because the evidence the OAG cited in support of these claims are insufficiently credible to establish the circumstances of the contacts or to otherwise establish Richards's unlawful intent. (Supra F.II.2–6.)

The OAG also accuses Richards of "stepping in front of a patient and temporarily blocking her ability to enter the clinic." (OAG Findings ¶¶ 383, 402.) This allegation is supported by video evidence. (Ex. 55.) Accordingly, I find that Richards briefly impeded a patient's access to the main Clinic entrance on the morning of June 10, 2017. (See Ex. 55.)

Stationed near the door, Richards and two nearby escorts spotted the approaching patient at the same time. (See id.) The two escorts established body position on Richards, boxed her out, and created a lane to the door for the approaching patient. (See id.) Richards attempted to dart through that lane to reach the patient, but quickly found herself in the patient's way. (See id.) Richards immediately attempted to get out of the way and reach the patient on the other side of one of the escort, but she found that the patient did the same, causing Richards to be in the patient's way once again. (See id.) The patient then made a hand gesture indicating that she was attempting to reach the Clinic entrance, and Richards responded by quickly moving out of her way and abandoning her attempt to interact with the patient. (See id.) After reviewing Exhibit 55 in light

of the record as a whole, I find that Richards did not intend to impede the patient's access to the Clinic entrance. The obstruction appears to be the accidental result of Richards's attempts to reach the patient in the face of effective blocking by the escorts. In reaching this conclusion, I find it persuasive that, despite six years of protesting outside Choices, this is the only documented evidence that Richards impeded a patient's access to Choices. Indeed, I find no other credible evidence that Richards ever obstructed or otherwise impeded anyone's access to Choices.

Finally, the OAG accuses Richards of following and harassing patients outside Choices with the intent to harass, alarm, or annoy them. (OAG Findings ¶¶ 388–93, 395–96, 403.) For the reasons stated above, the Clinic Escort Recaps and Brady's, Greenberg's, Asmus's, White's, and Garnick's testimony are insufficiently credible to support the allegation. (F.II.2–7.) For the reasons stated below, the two videos the OAG cites in support of the allegation also fail to do so.

The OAG's two videos do not suggest that Richards approached the patients with an intent to harass, annoy, or alarm, as opposed to a genuine intent to persuade the person not to seek abortion services or otherwise support Choices. Exhibit 3 is a video without audio that shows Richards following a patient. (Ex. 3.) Just before Richards comes onscreen, an escort appears to step in front of Richards, presumably forcing her back behind the patient. (Id.) The video also shows Richards attempting to speak with the patient and offer literature. (Id.) It does not capture what Richards or the patient said, but it looks as if the patient ignores Richards's pleas. (Id.) Exhibit 338 is a video that shows Richards walking alongside a patient, her companion, and two escorts. (Ex. 338.) Richards attempted to speak to the patient and hand her literature. (Id.) The video again does not capture what was said by either Richards or the escort and, because the video was taken from behind the group, one cannot make out the patient's reaction. (Id.) I find that these videos do not establish Richards's purported intent to harass, alarm, or annoy.

10. Deborah Ryan

Since the summer of 2014, Ryan has regularly protested outside Choices with other members of Church at the Rock. (Garnick at 1432:14–16, 1688:24–1689:2.) The OAG accuses Ryan of intentionally using force against escorts and of following and harassing patients outside Choices. (OAG Findings ¶¶ 408–10, 414, 417–20.) The OAG supports these allegations with only Clinic Escort Recaps and Brady's and Garnick's testimony, (id.), which have already been explained are insufficiently credible to support such findings of fact, (supra F.II.2–5).

11. Angela Braxton

Braxton is affiliated with Grace Baptist Church and protested at Choices from early 2013 to early 2017. (Nicotra at 3062:8–21, 3064:9–10; Braxton at 3103:11–3104:13.) Although Braxton has not been to Choices in over a year, she has not foreclosed the possibility of resuming her activities outside Choices. (Braxton at 3106:10–18, 3167:1–16.) During her time at Choices, Braxton spent sixty to seventy percent of her time positioned across Jamaica Avenue, where she attempted to speak and hand pamphlets to approaching patients. (Id. at 3110:10–12.) On other occasions, she stationed herself outside the front entrance to Choices on 147th Place. (Id. at 3154:22–3155:1; see also Ex. 7; Ex. 404; Ex. 405.)

The OAG accuses Braxton of threatening escorts, patients, and companions with force by filming them as they approached the Clinic entrance with the intent to intimidate them or to interfere with their access to Choices and by posting certain videos on Facebook. (OAG Findings ¶¶ 442–46, 464–65.) The OAG supports these allegations with Garnick's testimony, Braxton's testimony, three videos taken by Braxton, and non-party protestor Dan Courney's speech and videos. (Id.) This evidence is insufficient to establish that Braxton engaged in this improper conduct. First, Garnick's testimony is insufficiently credible to support such a finding of fact.

(Supra F.II.5.)  Second, Braxton testified at the hearing and credibly denied filming outside Choices or posting pictures or videos taken outside Choices to social media with the intent to intimidate patients or to interfere with their access to Choices.  (Braxton at 3118:6–22.)  Third, Braxton's videos do not suggest that she took them with an improper purpose.  (See Ex. 386 (filming escorts singing and dancing outside the Clinic entrance and criticizing them for making light of a serious situation); Ex. 387 (filming a violent and confrontational patient); Ex. 388 (filming Courney preaching outside Choices); Ex. 561 (filming after an escort purportedly threatened her).)  Finally, there is nothing in Courney's speech or videos that suggests that Braxton had an improper purpose when she filmed outside Choices.  (See Ex. 131; Ex. 132.)  In sum, I find no credible evidence that Braxton filmed outside Choices with an intent to injure, intimidate, or interfere with access to the Clinic.

The OAG also accuses Braxton of physically obstructing, on six occasions, "a patient or companion's ability to access or depart the clinic or an escort's capacity to assist a patient in doing so."  (OAG Findings ¶¶ 434, 433, 439, 449, 466–71.)  Braxton testified that she had not done so, as far as she could recall.  (Braxton at 3170:19–22.)  The OAG supports its allegations with escort testimony, one video that purportedly shows three instances of Braxton's obstructive behavior, and one of Braxton's Facebook posts.  (See OAG Findings ¶¶ 434, 433, 439, 449, 466–71.)  As stated above, the escort testimony insufficiently credible to support the allegation.  (Supra F.II.3–6.)  Exhibit 7, the cited video, does not show, as the OAG argues, that, "on September 3, 2016, Braxton positioned herself near the Choices patient entrance and approached and walked alongside or in front of patients trying to enter the Clinic in order to hand them literature, impeding their access."  (OAG Findings ¶¶ 433, 466–67.)  Exhibit 7 does indeed show Braxton attempting to speak with or hand pamphlets to a handful of approaching patients and companions over the course

of nearly six minutes on the morning of September 3, 2016. (Ex. 6.) But at no moment in the video did Braxton stop, slow, or otherwise delay anyone's access to the Clinic door. (Id.) Exhibit 398, the cited Facebook post, does not establish that Braxton made passage to or from Choices unreasonably difficult. That post explains an incident in which a mother dropped off her daughter outside Choices and, as the mother was pulling away, Braxton approached her, despite Braxton's knowledge that she had already rejected the overtures of different protestors. (Ex. 398.) The Facebook post suggests that the mother had a similarly negative reaction to Braxton's words. (Id.) But it does not suggest that the mother even stopped pulling away to listen to Braxton or to respond to her, let alone that Braxton physically obstructed her ability to drive away from the Clinic. (Id.)

Finally, the OAG argues that Braxton followed and harassed patients and their companions outside Choices with the intent to harass, annoy, or alarm them. (OAG Findings ¶¶ 436, 452, 455, 457, 472–77.) The OAG supports this accusation with Garnick's and Brady's testimony, Braxton's testimony, and one of Braxton's Facebook posts. (Id.) Garnick's and Brady's testimony is insufficiently reliable to support this allegation, (supra F.II.3, F.II.5), and the remaining evidence does not show Braxton's conduct to be actionable.

Although Braxton could not recall following any patient who did not want to speak with her, (Braxton at 3117:16–18), the remaining evidence shows that Braxton did not always heed a patient's or companion's request to be left alone, (see Ex. 396 (Braxton's Facebook post stating: "[Braxton:] Please sir don't murder your child. Protect your family. [Companion:] Shut the f up. [Braxton:] Nope I'm not shutting up. [Companion:] You better. [Braxton:] You will regret it. [Companion:] No I won't. [Braxton:] I'm pleading with you for your child's life. You are a dad and will always be a dad but a dad of a murdered child. [Companion:] Held the woman's arm as he led his child to the slaughter!"); see also Braxton at 3135:11–3136:23 (explaining that Exhibit

48

396 describes both sides of a conversation with a companion outside Choices).) Based on the record as a whole, that Braxton has likely engaged patients and companions outside Choices after they have asked to be left alone is not sufficient, on its own, to establish that she did so with the intent to harass, annoy, or alarm them, as opposed to an intent to persuade the patient not to seek abortion services or otherwise support Choices.

12. Jasmine LaLande

LaLande regularly protested outside Choices from the spring of 2015 to the spring of 2017. (Brady at 28:22–24, 122:24–25, 436:2–8.) Until June 2017, LaLande was affiliated with Grace Baptist Church. (Nicotra at 3064:13–18.)

The OAG accuses LaLande of intentionally using force against patients and escorts outside Choices. (OAG Findings ¶¶ 485–89, 500–02.) The OAG supports this allegation with Clinic Escort Recaps; Brady's and Garnick's testimony; and a video. (Id.) For the reasons described above, the first two categories of evidence are insufficiently credible to support the allegation. (Supra F.II.2–3, F.II.5.) For the reasons described below, the video does not support the allegation either, because it depicts an accidental collision between LaLande and an escort. (Ex. 21.)

Exhibit 21 depicts this incident, which occurred on October 8, 2016. (Id.) According to Garnick's recollection of the event, "[t]he patient had been more hesitant approaching the clinic, and so there was a couple escorts who agreed to walk with the patient and offered that that might make her feel more comfortable." (Garnick at 1753:11–14.) "When they were approaching the clinic, LaLande approached the patient and escorts and repeatedly tried to get in between them to get to the patient." (Id. at 1753:15–17.) When asked what she meant by "in between them," Garnick explained that she remembered that LaLande tried "to move in between the escorts to get to where the patient was walking." (Id. at 1753:18–21.) In doing so, LaLande purportedly collided

with the escorts. (Id.) In fact, the video shows a woman approaching the Clinic from Jamaica Avenue with one escort. (Ex. 21.) As the patient neared the door, LaLande walked toward her and attempted to hand her a pamphlet. (Id.) At the same time, a second escort ran over to the patient and attempted to block LaLande's access. (Id.) LaLande and the second escort reached the patient at roughly the same time and, although the video shows that LaLande's outstretched arm did collide with the second escort's shoulder, it is not clear who initiated contact. (Id.) After this contact, the initial escort appears to have collided with LaLande, who was standing still. (Id.) LaLande then made a quick second attempt to hand the patient a pamphlet around the other side of the second escort, but the patient turned and entered the Clinic. (Id.) There does not appear to have been any contact on the second attempt. (Id.) Exhibit 21 shows accidental contact. Neither LaLande nor the escorts appear to be trying to create a collision. (Id.) Rather, it appears that LaLande was trying to hand the patient a pamphlet and that the escorts were trying to block LaLande's access to the patient. (Id.)

The OAG also accuses LaLande of following and harassing patients outside Choices with the intent to harass, annoy, or alarm them. (OAG Findings ¶¶ 497–99, 503–07.) The OAG supports this accusation with Brady's and Garnick's testimony and with one video. (Id.) This testimony is insufficiently credible to support the allegation, (supra F.II.3, F.II.5), and Exhibit 17 does not support the allegation either. Instead, it shows LaLande attempting to speak with and hand a pamphlet to a patient from the far side of three escorts for about ten seconds and then shows her attempting to do the same to a second patient from the far side of one escort for about 5 seconds. (Ex. 17.) The video has no audio, and neither patient had a visible reaction to LaLande's conduct. (Id.) Nothing in the video suggests that LaLande approached or followed the patients with an intent to harass, annoy, or alarm. (Id.)

13. <u>Scott Fitchett, Jr.</u>

Fitchett first began going to Choices on Saturday mornings in May 2014, after seeing one of Braxton's Facebook posts.  (Fitchett at 3197:1–14.)  The last time he protested at Choices was in February 2017.  (<u>Id.</u> at 3216:3–7.)

When he did protest outside Choices, he did not attempt to hand out pamphlets or engage in sidewalk counseling.  (Fitchett at 3199:1–3200:12, 3221:22–3222:2.)  His sole activity was to preach and hold a sign while standing at the edge of the sidewalk, fifteen feet from the Clinic entrance.  (<u>Id.</u>)  Fitchett testified that, when he preaches, he does so loudly to overcome New York street noise and because "the definition of preaching is proclaiming your voice so you want to proclaim loud enough to be heard."  (<u>Id.</u> at 3181:14–22.)  Fitchett's preaching outside Choices has included statements similar to the following: "You're still killing your child.  You're still murdering your child.  Doesn't matter if you're getting mad; you're still a murderer.  You're still killing your child.  Jesus died on a cross for sins.  And he died, while you're yet, killing your child.  And his blood was shed, while you're yet, willingly, killing your child."  (Ex. 250.)  Fitchett often engaged in this type of speech while holding a sign on a pole that says, "CHRIST DIED FOR SIN."  (Ex. 171 at 13.)  On occasion, Fitchett preaches with a GoPro video camera strapped to his chest and, even less often, Fitchett takes photos with his phone at his preaching locations, during breaks in his preaching.  (Fitchett at 3188:2–21, 3231:20–3236:14.)

The OAG accuses Fitchett threatening patients with force in violation of FACE, NYSCAA, and NYCCAA by calling them murderers and filming or photographing them as they approached the Clinic entrance with the intent to intimidate them or to interfere with their access to Choices as well as by posting certain photos on Facebook.  (OAG Findings ¶¶ 516–29.)  The OAG also accuses Fitchett of violating NYCCAA by knowingly interfering with the provision of

reproductive health care services at Choices "by intimidating and deterring patients from approaching and entering the clinic by placing them in fear of exposure by filming them." (OAG Findings ¶¶ 516–28, 530–31.) But it is undisputed that Fitchett does not call attention to his recording devices, and there is no evidence that Fitchett deterred anyone from entering the Clinic or otherwise interfered with the Clinic's operations. The record is also devoid of evidence that Fitchett recorded videos or took pictures outside Choices with the intent to intimidate patients or interfere with their access to the Clinic as distinguished from the reasons he gave.

Fitchett testified that he sometimes films with a GoPro camera strapped to his chest while preaching, outside Choices and elsewhere, to create a record of his interactions in order to protect himself from violence or from wrongful accusations of improper conduct. (Fitchett at 3231:20–3236:14.) The OAG argues that this testimony is not credible, because Fitchett routinely records over the footage on subsequent days. (OAG Findings ¶ 522 (citing Fitchett at 32:31:20–3234:1).) But Fitchett explained that his purpose in filming was not related to a potential civil lawsuit, which he never foresaw, but related to the potential that someone might call the police. (Fitchett at 32:31:20–3236:14.) In those circumstances, Fitchett could show the police the footage capturing his preaching and any relevant incident. (Id.)

Fitchett also testified that he sometimes, though rarely, takes photos with his phone at his preaching locations, during breaks in his preaching. (Id. at 3188:2–21.) He explained that his reason for posting pictures taken outside Choices on Facebook is "accountability," by which he means giving an account of himself as a believer and one who preaches the gospel. (Id. at 3196:13–22, 3211:11–23, 3239:16–3250:16.) Pursuant to that purpose, Fitchett posts pictures so that his followers know where he is and what he is doing. (Id.) The OAG argues that Fitchett's stated reason for posting on Facebook is not credible, because he does not state his location in the

Facebook post or even post the picture the day he took it. (OAG Findings ¶¶ 521, 525–27.) But Fitchett's explanation is entirely consistent with his Facebook posts, because they convey that he preached the gospel outside an abortion Clinic. Two of the pictures, which Fitchett posted on Facebook without caption in the spring and summer of 2015, capture patients, escorts, and protestors either from behind or from a distance, and appear to be designed only to show that Fitchett is protesting outside an abortion clinic. (Ex. 404; Ex. 466.) Exhibit 405 seems to have a similar purpose. That post is a set of two pictures showing Braxton speaking to a patient outside Choices and is captioned, "Angela Braxton at the abortion clinic pleading for the babies that can't plead for themselves." (Ex. 405.) The caption also includes a Bible verse and "tags" three protestors. (Id.) Finally, Exhibits 465 and 468 appear to corroborate Fitchett's stated purpose, but also to convey a second purpose: sharing with his like-minded Facebook friends what he perceives to be outrageous sin. Exhibits 465 and 468 capture a series of pictures of two young women approaching Choices, flanked by escorts and ignoring other protestors attempts to speak with them. (Ex. 465; Ex. 468.) Fitchett posted the pictures with a caption that (1) says, "At the Abortion clinic pleading for life," and (2) quotes a Bible verse about the evil of shedding innocent blood. (Ex. 465; Ex. 468.) Fitchett's Facebook friends express words of encouragement for those spreading the gospel and shock that one of the young women is smiling. (Ex. 465; Ex. 468.) No effort is made to identify the patients and there is not the slightest suggestion that any harm should come to them.

I find Fitchett's explanations credible, and thus do not find that Fitchett filmed or photographed outside Choices with the intent to intimidate patients or interfere with their access to the Clinic.

## CONCLUSIONS OF LAW

As stated above, the OAG brings claims under FACE, NYSCAA, and NYCCAA. Using essentially identical language, both FACE and NYSCAA provide penalties for those who (1) by force, threat of force, or physical obstruction, (2) intentionally injure, intimidate, or interfere with a person, or attempt to do the same, (3) "because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1); see N.Y. Penal Law § 240.70(1)(a)–(b). NYCCAA prohibits a host of similar activities that prevent access to reproductive health care facilities. N.Y.C. Admin. Code § 8-803(a).

## I.      Standard of Review

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "A party seeking a preliminary injunction must ordinarily establish (1) 'irreparable harm'; (2) 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party';[11] and (3) 'that a preliminary injunction is in the public interest.'" N.Y. ex rel. Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015) (quoting Oneida Nation of N.Y. v. Cuomo, 645 F.3d 154, 164 (2d Cir. 2011)); see also Winter, 555 U.S. at 20.[12]

---

[11] The posture of this preliminary injunction motion is a bit unusual, because the parties have already conducted discovery and have presented extensive live testimony from seventeen witnesses and no party has demanded a jury. In effect, the trial has already been held, (see supra I), and the findings of fact were made based on credibility determinations, (supra F). Accordingly, where the OAG has failed to establish a violation, the OAG is neither likely to succeed on the merits of that claim nor able to establish a sufficiently serious question going to the merits of that claim.

[12] The defendants argue that a heightened standard should apply here, but offer no analysis to support that position. A heightened standard applies "where: (i) an injunction is 'mandatory,' or (ii) the injunction 'will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" Actavis, 787 F.3d at 650 (quoting Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 33–34 (2d Cir. 1995)). Neither criterion applies here. First, an injunction that prevents a defendant from continuing

In general, preliminary injunctive relief is available only if the court finds that "irreparable injury is <u>likely</u> in the absence of an injunction." <u>Winter</u>, 555 U.S. at 22 (emphasis in original). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" <u>Actavis</u>, 787 F.3d at 660. In this case, the OAG argues that irreparable harm may be presumed, because a state entity seeks a statutorily authorized injunction. (<u>See</u> OAG Findings ¶¶ 36–37, 599–600.) But, even under that relaxed standard, the OAG concedes that she must still prove "that there is a reasonable likelihood that the wrong will be repeated." <u>City of New York v. Golden Feather Smoke Shop, Inc.</u>, 597 F.3d 115, 120–21 (2d Cir. 2010) (quoting <u>CFTC v. British Am. Commodity Options Corp.</u>, 560 F.2d 135, 141 (2d Cir. 1977)); (<u>see also</u> D.E. # 212 at 26:1–28:12 (the OAG's concession)).

The moving party bears the burden of establishing its entitlement to a preliminary injunction, <u>e.g.</u>, <u>U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.</u>, 775 F.3d 128, 140 (2d Cir. 2014), and "the burdens at the preliminary injunction stage track the burdens at trial," <u>Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal</u>, 546 U.S. 418, 429 (2006) (citing <u>Ashcroft v. ACLU</u>, 542 U.S. 656 (2004)). Thus, if a plaintiff seeks a preliminary injunction, its burden includes showing jurisdiction, standing, and the constitutionality of the statutes under which it seeks preliminary injunctive relief. <u>See</u> <u>id.</u> With respect to standing, specifically, "[a] plaintiff's burden to demonstrate standing increases over the course of litigation." <u>Cacchillo v. Insmed, Inc.</u>, 638 F.3d 401, 404 (2d Cir. 2011) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)). "When a preliminary injunction is sought, a plaintiff's burden to demonstrate

---

to interfere with a plaintiff's rights is a prohibitory injunction, not a mandatory one. <u>New York ex rel. Spitzer v. Cain</u>, 418 F. Supp. 2d 457, 472–73 (S.D.N.Y. 2006). Second, the issuance of a preliminary injunction prohibiting the defendants from interfering with patients' access to Choices "will not 'make it difficult or impossible to render a meaningful remedy' to the defendants should they prevail on the merits," because "the order can be 'undone' and defendants would be free to resume their protest activities." <u>Id.</u> at 472 n.9 (citing <u>Tom Doherty Assocs.</u>, 60 F.3d at 35). Accordingly, the OAG's motion for preliminary injunction will be assessed under the usual standard.

standing 'will normally be no less than that required on a motion for summary judgment.'" Id. (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 907 n.8 (1990)). Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot "rest on such 'mere allegations,' [as would be appropriate at the pleading stage] but must 'set forth' by affidavit or other evidence 'specific facts.'" Id. (brackets in original) (quoting Lujan v. Defenders of Wildlife, 504 U.S. at 561).

## II. Standing

The OAG brings this action as *parens patriae*. FACE explicitly authorizes state attorneys general to "commence a civil action in the name of such State, as *parens patriae* on behalf of natural persons residing in such State, in any appropriate United States District Court." 18 U.S.C § 248(c)(3)(A).[13] NYSCAA also provides for the OAG's *parens patriae* standing: "[T]he attorney general or district attorney may bring an action in the name of the people of the State of New York to permanently enjoin such violation." N.Y. Civ. Rights Law § 79-m.[14]

---

[13] The defendants argue that this "on behalf of" language means that the OAG must specifically name injured individuals in his complaint. (D.E. # 57-1 at 2–7; D.E. # 75-2 at 4–5.) These "protestations that the Attorney General does not represent an identifiable individual are entirely misguided." Cain, 418 F. Supp. 2d at 470. "[A] state can no more bring suit on behalf of a particular citizen as a personal attorney than it can as an assignee." Id. But, a state can "bring suit as *parens patriae* on behalf of citizens generally," and "[t]his is what FACE in fact authorizes." Id. The antitrust precedents to which the defendants cite are not to the contrary. See In re Coordinated Pretrial Proceedings, 497 F. Supp. 218, 224 (C.D. Cal. 1980) (not saying that a state plaintiff must name injured individuals in its complaint, but rather that the peculiar terms of Section 4C of the Clayton Act require a state plaintiff to show, "in addition to authority to sue as *parens patriae*, that the natural persons in the state sustained (1) injury (2) to their property 'by reason of' a violation of the Sherman Act"); In re Montgomery Cty. Real Estate Antitrust Litig., 452 F. Supp. 54, 59–60 (D. Md. 1978) (holding that the state plaintiff properly invoked *parens patriae* standing to bring suit on behalf of consumer citizens, without addressing whether the complaint specifically named those consumers); New York v. Dairylea Coop., Inc., 570 F. Supp. 1213, 1215–16 (S.D.N.Y. 1983) (dismissing antitrust claims brought on behalf of New York's milk consumers, because the complaint failed to name as defendants the alleged retailer co-conspirators from whom the consumers purchased their allegedly overpriced milk, and because Supreme Court case law prevented recovery against the alleged wholesaler co-conspirators). The OAG need not specifically name injured individuals in his complaint to have standing to bring action under FACE as *parens patriae*.

[14] Both FACE and NYSCAA state that the OAG may bring such an action if it "has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of" FACE or NYSCAA. 18 U.S.C § 248(c)(3)(A); N.Y. Civ. Rights Law § 79-m. Braxton and LaLande focus on the word "injured" in these provisions, arguing that the OAG may bring actions premised only on injury, rather than intimidation or interference. (D.E. # 57-1 at 8; D.E. # 75-2 at 6–7.) But intimidation and interference constitute legal injury in the standing context, which is what the term "injured" means in the public-right-of-action provisions. FACE and NYSCAA authorize the OAG to bring action on behalf of those who are suffering or have suffered legal injury "by conduct constituting violation" of those statutes. 18 U.S.C § 248(c)(3)(A); N.Y. Civ. Rights Law § 79-m. Conduct that violates FACE and NYSCAA includes injuring, intimidating, or interfering. 18 U.S.C. § 248(a)(l); N.Y. Penal

Unlike FACE and NYSCAA, NYCCAA does not appear to contemplate enforcement by the OAG as *parens patriae*. See N.Y.C. Admin. Code §§ 8-804, 8-805.[15] The defendants concede that the OAG would have common law standing to enforce NYCCAA's civil provisions if it were to establish (1) injury to a quasi-sovereign interest, or an interest apart from the interests of particular private parties; (2) injury to a sufficiently substantial segment of its population; and (3) that individuals could not obtain complete relief through a private suit. (D.E. # 173 at 3); see also, e.g., People by Vacco v. Mid Hudson Med. Grp., P.C., 877 F. Supp. 143, 146 (S.D.N.Y. 1995) (holding that the OAG had common law *parens patriae* standing to enforce a statute that did not include a public right of action for state attorneys general). These are the same elements the OAG must show to establish *parens patriae* standing under FACE and NYSCAA. See New York ex rel. Spitzer v. Cain, 418 F. Supp. 2d 457, 469–72 (S.D.N.Y. 2006). The OAG satisfies all three.

1. Quasi-Sovereign Interest, Apart from the Interests of Particular Private Parties

To sue as *parens patriae*, "the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express

_____

Law § 240.70(1)(a)–(b). Here, the OAG has accused the defendants of intimidating and interfering with patients, volunteer escorts, and staff at Choices, thereby causing them harm. (OAG Findings ¶¶ 49–531.)

[15] The defendants argue that the OAG cannot make out its civil causes of action under NYCCAA, because a criminal conviction is a predicate to civil liability. (D.E. # 57-1 at 5; D.E. # 75-2 at 7–8.) But NYCCAA creates civil causes of action "[w]here there has been a violation" of the liability provision of NYCCAA. N.Y.C. Admin. Code § 8-804; see also id. § 8-805 (creating a civil cause of action for the New York City Corporation Counsel "to prevent or cure a violation of" NYCCAA's liability provision). This language does not require a criminal conviction as a necessary predicate to civil liability, and the defendants provide no good reason for this Court to burden every civil claim under NYCCAA with the heightened criminal standard of proof.

In a similar vein, the defendants argue that, because NYSCAA is codified in part in the New York Penal Law, the OAG lacks the authority to enforce NYSCAA and this Court lacks jurisdiction to hear the case. (D.E. # 57-1 at 3–4.) But, as stated above, a provision of the New York Civil Rights Law authorizes the OAG to bring a civil action for injunctive relief if he "has reasonable cause to believe that any person or group of persons is being, has been, or may be injured by conduct constituting a violation of" that criminal provision. N.Y. Civ. Rights Law § 79-m. Accordingly, the OAG has the authority to bring this civil action, and I have jurisdiction to hear it. It does not matter that there is a drafting error in the OAG's Complaint, which only cites the Penal Law provision in the subheader related to the OAG's NYSCAA cause of action, (Compl. at 29), because the first paragraph under that subheader states that the OAG incorporates by reference all preceding paragraphs in the Complaint, (id. ¶ 103), and because paragraph 8 makes clear that the OAG brings his second cause of action under N.Y. Civ. Rights Law § 79-m, (id. ¶ 8). Additionally, the OAG's proposed findings of fact clarify that it seeks a preliminary injunction pursuant to § 79-m. (OAG Findings ¶ 1 n.1.)

a quasi-sovereign interest." Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592, 607 (1982). "[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents." Id.; accord Cain, 418 F. Supp. 2d at 471. "[T]argeted picketing of a hospital or clinic threatens not only the psychological, but also the physical, well-being of the patient held 'captive' by medical circumstance." Madsen v. Women's Health Ctr., 512 U.S. 753, 768 (1994). Accordingly, a state has *parens patriae* standing to protect the ability of its citizens to access reproductive health services. Cain, 418 F. Supp. 2d at 471; see also Hill v. Colorado, 530 U.S. 703, 715 (2000) (noting that the State's interest in protecting the health of its citizens "may justify a special focus on unimpeded access to health care facilities and the avoidance of trauma to patients associated with confrontational protests" (citing Madsen, 512 U.S. at 768)); New York ex rel. Spitzer v. Operation Rescue Nat'l, 273 F.3d 184, 202 (2d Cir. 2001) (affirming FACE injunction in case brought by the OAG and stating that at least four public interests supported the injunction: "(1) ensuring public safety and order; (2) protecting freedom to receive reproductive health services; (3) advancing medical privacy and the well-being of patients seeking care at facilities; and (4) safeguarding private property"); United States v. Vazquez, 145 F.3d 74, 84 (2d Cir. 1998) (noting the propriety of a joint civil action under FACE brought by the United States and the State of Connecticut, as *parens patriae*); New York ex rel. Abrams v. Terry, 45 F.3d 17, 22 (2d Cir. 1995) (affirming the district court's conclusion that subject matter jurisdiction existed in the State's action to enjoin the defendants from interfering with access to reproductive health care clinics).

Here, the OAG accuses the defendants of threatening the health, well-being, and safety of New York residents by impeding patients' ability to receive the reproductive health care services they need and by causing some of these patients—and their children—emotional distress and even

physical injury.  (OAG Findings ¶¶ 93–111.)  Thus, the OAG has standing to sue as *parens patriae*, because it has a quasi-sovereign interest apart from the interests of particular private parties in ensuring that New York's residents receive, without injury or impediment, the health care to which they are legally entitled.  See Cain, 418 F. Supp. 2d at 470–71.

## 2.  Injury to a Substantial Segment of New York's Population

To establish *parens patriae* standing, the State plaintiff also must allege injury to a substantial segment of the State's population.  The Supreme Court has warned, however, that there are no "definitive limits on the proportion of the population of the State that must be adversely affected by the challenged behavior."  Snapp, 458 U.S. at 607.  "Although more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population."  Id.  "One helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers."  Id.

As the district court noted in Cain, "[i]t is not fatal to the [OAG's] *parens patriae* standing" that the Complaint focuses on a single reproductive health care clinic and activities that might have directly impacted only a relatively small number of people.  418 F. Supp. 2d at 471.  As stated above, "the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population."  Snapp, 458 U.S. at 607.  The OAG has alleged that, since the spring of 2012, the defendants have regularly intimidated, threatened, and harassed Choices staff, both current and prospective patients seeking to enter Choices, and their children and companions, as well as the volunteer escorts who guide

and walk patients to the door. (OAG Findings ¶¶ 49–531.) Choices' current and prospective patients are not limited to women seeking abortions; Choices provides services including obstetrics and gynecological services, prenatal care, colposcopy, and cryo-LEEP, and it serves all women in the New York City area. (Joint Pretrial Order at 16; Priegue at 1380:3–8.) In this way, the defendants' consistent protest activity outside Choices "may deprive any number of persons of the opportunity to receive reproductive health services." Cain, 418 F. Supp. 2d at 471. Indeed, the harm caused by the defendants' alleged conduct is so far reaching that New York passed its own version of FACE, N.Y. Penal Law §§ 240.70–240.71; N.Y. Civ. Rights Law § 79–m, thereby indicating that the "alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae*." Snapp, 458 U.S. at 607; Cain, 418 F. Supp. 2d at 471.

### 3. Availability of Complete Relief Through a Private Suit

Finally, *parens patriae* standing is appropriate here, because individuals could not obtain complete relief through a private suit, despite the existence of private rights of action. Few private actors would have the time or resources to engage in the year-long investigation—comprising video surveillance, several undercover operations, and numerous employee and escort interviews, (D.E. # 2-1 at 8)—necessary to identify the named defendants and document their activities.

At the outset, this additional requirement imposes only a "slight burden" on the OAG. New York by Schneiderman v. Utica City Sch. Dist., 177 F. Supp. 3d 739, 48 (N.D.N.Y. 2016); see also People v. Peter & John's Pump House, 914 F. Supp. 809, 811 & n.3 (N.D.N.Y. 1996). "[I]t stands for the simple proposition that *parens patriae* standing is improper where the state is merely a nominal party; i.e., where the state lacks a true quasi-sovereign interest that would be vindicated separate and apart from the interests of private citizens in a lawsuit." Utica City Sch. Dist., 177 F.

Supp. 3d at 748; see also Peter & John's Pump House, 914 F. Supp. at 811 & n.3. That is not the case here.

The defendants attempt to undermine the OAG's standing by pointing to the available private rights of action, the attorney's fees provisions in the relevant statutes, the purported abundance of attorneys in New York willing to provide *pro bono* legal services to uphold abortion rights, Choices' status as a for-profit company, and Choices' owner's personal wealth.[16] Even if such private actions were financially viable, however (and it is not clear that they would be, given the risk that the claims would fail and the time gap between the investment and the potential recovery), private litigants would not have the same incentive to obtain complete and prospective relief for all New Yorkers.

"Private litigants might not achieve the complete relief that the State seeks because they have a greater incentive to compromise requests for injunctive relief in exchange for increased money damages." Peter & John's Pump House, 914 F. Supp. at 813. Although it is true that for-profit businesses like Choices may sometimes have the incentive to obtain complete relief to ensure better access to their clinics, their financial interests will often favor a different approach. This is especially true given the disincentives of litigation, which include the fear of increased scrutiny and aggressive discovery practices. These considerations may carry significant weight in a field that values confidentiality. See Northwestern Mem'l Hosp. v. Ashcroft, 362 F.3d 923, 929 (7th Cir. 2004) (noting that if abortion patient information was released, the provider would likely "lose the confidence of its patients, and persons with sensitive medical conditions may be inclined

---

[16] At oral argument, the defendants also argued that, because the Corporation Counsel may bring a civil action on behalf of the City of New York under NYCCAA, see N.Y.C. Admin. Code § 8-803, the OAG does not have *parens patriae* standing to bring this action under NYCCAA. But the question here is whether individuals could obtain complete relief through private suit. See, e.g., People v. Peter & John's Pump House, Inc., 914 F. Supp. 809, 811–14 & n.3 (N.D.N.Y. 1996); Mid Hudson Med. Grp., 877 F. Supp. at 148–49; New York by Abrams v. Operation Rescue Nat'l, No. 92-CV-4884 (RJW), 1993 U.S. Dist. LEXIS 13982, *4 (S.D.N.Y. Oct. 1, 1993). It is of no moment to the *parens patriae* analysis that another public entity may be able to obtain complete relief through a different public suit.

to turn elsewhere for medical treatment"). Additionally, Choices could be discouraged from bringing a private action and seeing it to judgment based on the possibility of becoming a target for additional protest activity, especially during the pendency of the action. More generally, Choices and other private litigants "might not have the tenacity or fortitude to sue." Peter & John's Pump House, 914 F. Supp. at 813.

Accordingly, "the remote possibility that [a private party like Choices] could obtain relief for [it]self does not preclude the Attorney General from seeking 'complete relief' for all current and future [victims]." Mid Hudson Medical Group, 877 F. Supp. at 149; accord Peter & John's Pump House, 914 F. Supp. at 814. For that reason, district courts in this Circuit have found *parens patriae* standing appropriate even where private actors had already filed actions regarding the same conduct addressed by the public suit. See Utica City Sch. Dist., 177 F. Supp. 3d at 749–50 (separate public and private actions); Support Ministries for Persons with AIDS, Inc. v. Vill. of Waterford, N.Y., 799 F. Supp. 272, 278–79 (N.D.N.Y. 1992) (combined public and private actions).

In sum, "the interests of the State and private individuals are not coextensive." Peter & John's Pump House, 914 F. Supp. at 813. Unlike many private actors, "[t]he State has both the interest and resources necessary to prevent these unlawful practices and to protect all of New York's citizens from such unlawful activities," both now and in the future. New York by Abrams v. Operation Rescue Nat'l, No. 92-CV-4884 (RJW), 1993 U.S. Dist. LEXIS 13982, *5 (S.D.N.Y. Oct. 1, 1993). The OAG has carried its "slight burden" of showing that individuals could not obtain complete relief through private suit. Utica City Sch. Dist., 177 F. Supp. 3d at 748; see also Peter & John's Pump House, 914 F. Supp. at 811 & n.3.[17]

---

[17] To the extent that the defendants' standing arguments have not been addressed above, they are rejected as untethered to any relevant standing case law. (See D.E. # 80 at 1–6.)

## III.    First Amendment Challenge

The defendants argue that FACE is an unconstitutional content-based restriction on speech. The Second Circuit's decision in <u>United States v. Weslin</u>, 156 F.3d 292, 295 (2d Cir. 1998), forecloses this argument.[18]

In <u>Weslin</u>, the Second Circuit held that Congress had the power to enact FACE under the Commerce Clause, that FACE was constitutional under the First Amendment, and that the defendants in that case had the requisite intent to be found guilty under FACE. <u>Id.</u> at 295–97. The Second Circuit found that "FACE is not a viewpoint- or content-based regulation" because, "[b]oth by its language and its application, FACE seeks to govern all people who obstruct the provision of reproductive health services. And it does so regardless of whether the obstruction is or is not motivated by opposition to abortion. Thus, 'pro-choice' protestors as well as 'pro-life' protestors come within the terms of the statute." <u>Id.</u> at 296. "It is irrelevant whether, in practice, most of those prosecuted under FACE are anti-abortion protestors," because "First Amendment law does not recognize disparate impact claims." <u>Id.</u> at 297.

The Second Circuit also found that "FACE, which in any case is viewpoint-neutral, does not govern speech as such but, instead, is concerned with conduct that frequently has expressive components." <u>Id.</u> To determine FACE's constitutionality, then, the court did not apply strict scrutiny, but rather the less exacting First Amendment test established in <u>United States v. O'Brien</u>, 391 U.S. 367, 377 (1968). That test requires that (i) the regulation must serve an important or substantial governmental interest; (ii) the interest must be unrelated to the suppression of expression; and (iii) the incidental restriction of First Amendment freedoms must be narrowly

---

[18] The defendants' constitutional analysis focuses on FACE. (<u>See</u> D.E. # 80 at 6–14.) But they also challenge NYSCAA and NYCCAA on the same grounds. (D.E. # 80 at 6 n.4.) Accordingly, I focus my analysis on FACE, but reject the defendants' three constitutional challenges on the same grounds.

tailored to that interest.  Id.  The Second Circuit held that the government's interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services are, in combination, sufficient to support FACE.  Weslin, 156 F.3d at 297–98 (internal quotations omitted).  It then held that those interests are unrelated to the suppression of free speech, and that "FACE is narrowly tailored."  Id. at 298.

This Court is bound to follow this controlling "precedent until it is overruled by a higher court or until Supreme Court precedent renders it untenable."  United States v. Emmenegger, 329 F. Supp. 2d 416, 436 (S.D.N.Y. 2004); accord Unicorn Bulk Traders Ltd. v. Fortune Mar. Enters., Inc., No. 08-CV-9710 (PGG), 2009 WL 125751, at *2 (S.D.N.Y. Jan. 20, 2009).  The defendants argue that the Supreme Court's opinions in McCullen v. Coakley, 134 S. Ct. 2518, 2531 (2014), and Reed v. Town of Gilbert, Arizona, 135 S. Ct. 2218 (2015), undermine the Second Circuit's decision in Weslin to such a degree that this Court should reject its holding.  (D.E. # 80 at 6–14.)  There is no merit to this claim.

In McCullen, anti-abortion advocates challenged a Massachusetts statute making it a crime to knowingly stand on a public way or sidewalk within 35 feet of an entrance or driveway to any place, other than a hospital, where abortions are performed.  134 S. Ct. at 2525.  The Supreme Court first held that the Massachusetts statute was "neither content nor viewpoint based and therefore need not be analyzed under strict scrutiny."  Id. at 2530–34.  The Court nonetheless held the statute unconstitutional, because the 35-foot "buffer zones burden[ed] substantially more speech than necessary to achieve the Commonwealth's asserted interests."  Id. at 2537.  In the McCullen opinion, the Supreme Court observed that FACE is tailored more narrowly to the relevant interests than the Massachusetts statute was.  See id. at 2537–38.  Thus, the Supreme

Court's holding that the Massachusetts statute was both content neutral and unconstitutional does not affect the Second Circuit's holding that FACE is both content neutral and constitutional. Id.

In Reed, a pastor, seeking to advertise the time and location of his Sunday church services challenged the constitutionality of a local code governing the manner in which people could display outdoor signs. 135 S. Ct. at 2224. That code identified various categories of signs based on the type of information they conveyed and subjected each category to different restrictions. Id. For example, "Ideological Sign[s]"—which included any "sign communicating a message or ideas for noncommercial purposes," subject to certain exceptions—could be up to 20 square feet in area and could be placed in all zoning districts without time limits. Id. "Temporary Directional Signs Relating to a Qualifying Event"—which included any "Temporary Sign intended to direct pedestrians, motorists, and other passersby to a 'qualifying event'"—could be no larger than six square feet. Id. at 2225. The Supreme Court held that the code was "content based on its face," because the different restrictions in the code "depend entirely on the communicative content of the sign." Id. at 2227. The Court further held that this and other content-based regulations could not avoid strict scrutiny based on a benign underlying legislative motive or a content-neutral justification for the law. Id. at 2227–28. It noted: "[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral." Id. Accordingly, the Court applied strict scrutiny and held the code unconstitutional. Id. at 2231–32. This holding does not affect the Second Circuit's refusal to subject FACE to strict scrutiny in Weslin, because the Second Circuit reached that decision based on its holding that FACE is content neutral on its face—not on any finding that FACE was enacted with benign motives or supported with innocuous justifications. See 156 F.3d at 296–97.

In sum, this Court concludes that <u>Weslin</u> is a controlling precedent that neither the Second Circuit nor the Supreme Court has overruled or undermined.[19]

## IV.     Specific Conclusions of Law

FACE and NYSCAA provide penalties for those who (1) by "force," "threat of force," or "physical obstruction," (2) "intentionally injure[], intimidate[,] or interfere[]" with a person, or attempt to do the same, (3) because that person was or is "obtaining or providing reproductive health services."  18 U.S.C. § 248(a)(1); N.Y. Penal Law § 240.70(1)(a)–(b).  Because the two statutes prohibit the same conduct with very similar wording, courts analyze them together.  <u>See Cain</u>, 418 F. Supp. 2d at 482 ("The terms of the Clinic Access Act are essentially identical to FACE, and all conduct constituting a violation of FACE will also constitute a violation of the Clinic Access Act."); <u>New York ex rel. Spitzer v. Kraeger</u>, 160 F. Supp. 2d 360, 372 (N.D.N.Y. 2001) ("Since the language of the Clinic Access Act is almost identical to FACE, the standards for proving a violation of the Clinic Access Act [are] the same as those for proving a violation of FACE.").  The OAG asserts force, threat-of-force, and physical-obstruction claims under both statutes.

NYCCAA covers similar conduct.  It provides that "[i]t shall be unlawful for any person (1) to knowingly physically obstruct or block another person from entering into or exiting from the premises of a reproductive health care facility by physically striking, shoving, restraining, grabbing, or otherwise subjecting a person to unwanted physical contact, or attempting to do the same; (2) to knowingly obstruct or block the premises of a reproductive health care facility, so as to impede access to or from the facility, or attempt to do the same; (3) to follow and harass another

---

[19] To the extent that the defendants argue that FACE is unconstitutional because the OAG's attempts to enforce it stem from an improper purpose, (D.E. # 80 at 14), they misunderstand the law.  Allegations of selective enforcement or other official viewpoint discrimination do "not go to the validity of the Act."  <u>McCullen</u>, 134 S. Ct. at 2534.

person within 15 feet of the premises of a reproductive health care facility; (4) to engage in a course of conduct or repeatedly commit acts within 15 feet of the premises of a reproductive health care facility when such behavior places another person in reasonable fear of physical harm, or attempt to do the same; (5) to physically damage a reproductive health care facility so as to interfere with its operation, or attempt to do the same; or (6) to knowingly interfere with the operation of a reproductive health care facility, or attempt to do the same, by activities including, but not limited to, interfering with, or attempting to interfere with (i) medical procedures being performed at such facility or (ii) the delivery of goods to such facility." N.Y.C. Admin. Code § 8-803(a). The OAG asserts claims under each subsection except subsection (5). (See Compl; OAG Findings.)

    1. <u>Force</u>

FACE and NYSCAA prohibit the use of "force" with the requisite intent, but neither statute defines the term. <u>See</u> 18 U.S.C.A. § 248(e); N.Y. Penal Law § 240.70(3). "When words in a statute are not otherwise defined, it is fundamental that they 'will be interpreted as taking their ordinary, contemporary, common meaning.'" <u>Morse v. Republican Party of Va.</u>, 517 U.S. 186, 254 (1996) (quoting <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979)); <u>see also</u> <u>Majewski v. Broadalbin-Perth Cent. Sch. Dist.</u>, 91 N.Y.2d 577, 583 (1998) ("As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof."); <u>United States v. Dinwiddie</u>, 76 F.3d 913, 924 (8th Cir. 1996) (rejecting a vagueness challenge to FACE because force is a "readily understandable term[] that [is] used in everyday speech"). Accordingly, the term "force," as used in FACE and NYSCAA, is "broadly defined as 'power, violence, or pressure directed against a person or thing.'" <u>Cain</u>, 418 F. Supp. 2d at 473 (citing <u>Dickson v. Ashcroft</u>, 346 F.3d 44, 50 (2d Cir. 2003)). "It is not limited to 'violent or assaultive' force, and there is no exception

for fleeting or *de minimis* contact (assuming, of course, that the fleeting use of force was intentional)." Id. (internal citation omitted) (quoting Dickson, 346 F.3d at 50). "Acts such as hitting, pushing, shoving, kicking, and knocking over an escort have been found to constitute force within the meaning of the statute." Kraeger, 160 F. Supp. 2d at 372 (citing Dinwiddie, 76 F.3d at 926).

In addition to its conduct requirement, FACE and NYSCAA include two intent requirements. Cain, 418 F. Supp. 2d at 474 (citing Sharpe v. Conole, 386 F.3d 482 (2d Cir. 2004)). First, the defendant must act with the "intent to injure, intimidate, or interfere." Sharpe, 386 F.3d at 484. Under FACE and NYSCAA, the term "interfere with" means "to restrict a person's freedom of movement," and the term "intimidate" means "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." 18 U.S.C. § 248(e)(2)–(3); N.Y. Penal Law § 240.70(3)(b)–(d). The term "injure" is not defined, and thus has its ordinary meaning. See, e.g., Morse, 517 U.S. at 254; Majewski, 91 N.Y.2d at 583. Second, FACE and NYSCAA require that the defendant "act because the interfered-with person was seeking, obtaining, or providing, or had obtained or provided, or might obtain or provide, reproductive health services." Sharpe, 386 F.3d at 484 (emphasis in original). This provision extends FACE's and NYSCAA's protections to "escorts who are assisting patients and staff in obtaining access to the clinic," in addition to the patients and clinic staff themselves. United States v. Scott, 958 F. Supp. 761, 774 (D. Conn. 1997) (citing S. Rep. No. 103–117, at 26 and United States v. Hill, 893 F. Supp. 1034, 1038–39 (N.D. Fla. 1994)), aff'd, 145 F.3d 74 (2d Cir. 1998).

To assess the OAG's claims, it is helpful to review case law in this Circuit addressing the force element. In Scott, the district court found FACE violations based on evidence that a defendant pushed and kicked clinic escorts and staff on numerous occasions. 958 F. Supp. at 769–

70, 775. In finding the FACE violations, the court highlighted evidence that, on one occasion, the defendant knocked over an escort and yelled, "That's what happens when you get in my way!" Id. at 775. With respect to a different defendant, the district court rejected a claimed FACE violation. Id. at 772. In reaching this holding, the court explained that "[t]he testimony of the plaintiffs' witnesses indicated that Vazquez extended her arm to offer literature to clients, and on occasion her arm passed in front of an escort who was walking alongside the client." Id. The court held that neither this conduct nor the defendant's underlying intent could support a FACE violation. Id.

In Cain, the district court distinguished between incidents in which the defendants purposefully pushed into escorts and incidents in which the defendants inadvertently stumbled into the escorts. 418 F. Supp. 2d at 474. First, the district court found FACE and NYSCAA violations when a defendant "came up to an escort volunteering at the Center, pressed his body into the escort, and pushed the escort when the escort told him to move away." Id. During this incident, the defendant yelled, "how can you do what you do?" and "we're not going to take this anymore." Id. at 466. Second, the district court found FACE and NYSCAA violations when a different defendant pushed into an escort as she was opening the door for a patient. Id. at 474. In finding a violation, the court emphasized that the defendant "acted purposefully to make a point in the aftermath of a yelling match between a patient and the defendant." Id.; see also id. at 464 ("On November 6, a yelling match erupted when a patient asked Cain to leave her alone. After the police had responded to the scene and left, Cain deliberately pushed into an escort as she was opening the door for a patient. Then he stepped back and walked away.").

The district court in Cain declined to grant preliminary injunctive relief based on the "several incidents in which the defendants have bumped into escorts or patients while following them to the Center door," because there was insufficient evidence that the defendants did this with

intent to injure, intimidate, or interfere. Id. at 474. The evidence showed that bumping was commonplace outside the reproductive health center, suggesting that the defendants' practice of following at close proximity greatly increased the likelihood of unwanted physical contact. Id. Indeed, the court attributed this bumping to "the defendants' practice of crowding patients and following on their heels." Id. The court held that, "while such contact may be inappropriate, it is not illegal under FACE if it is not motivated by an intent to restrict freedom of movement or place another in reasonable apprehension of bodily harm." Id. The court found that the plaintiffs had not shown that the defendants bumped escorts and patients with this intent. Id.

The district court in Cain also found no violations of FACE and NYSCAA by one defendant, even though the evidence clearly established that he assaulted escorts and a passerby, because the plaintiffs failed to show that the defendant satisfied the statutes' second intent requirement. Id. at 475. On those occasions, the defendant assaulted the escorts and the passerby because they struck or attempted to move his anti-abortion signs. Id. The court held that the plaintiffs could not show that the defendant was acting against the victims because they were obtaining or providing reproductive health services or helping to do the same. Id. On the contrary, "the evidence show[ed] that he acted to protect his property, which he felt was threatened in each instance." Id. "These uses of force might well have been assaults, but they were not violations of FACE." Id.

In Kraeger, the district court found that one defendant violated FACE and NYSCAA by pushing a Planned Parenthood employee and by following an escort so closely that he stepped on the escort's heels three times in one day. Kraeger, 160 F. Supp. 2d 360 at 375. With respect to the latter incident, the court emphasized that (1) the defendant stepped on the escorts heels "not once, but three times," (2) this caused the escort to fear that the defendant would harm him, and

(3) the court found this use of force to be intentional.  Id. at 366, 375.  The court also found that another defendant used force when she "accosted, yelled at, pushed, and bumped into [a patient] while following her to her car." Id. at 375.

Here, the OAG accuses R. George, Thomas, Richards, Ryan, and LaLande of using force against escorts and patients on dozens of occasions.  (OAG Findings ¶¶ 182–84, 214–15, 256–60, 287, 384–87, 397–401, 408–10, 417–18, 485–89, 500–02.)  Yet, the OAG supports these claims almost exclusively with Clinic Escort Recaps and OAG witness testimony, (see id.), which are insufficiently reliable to support the accusations, (supra F.II.2–7, F.III.2, F.III.4, F.III.9–10, F.III.12).  Indeed, the OAG cites only one video in support of its force claims, despite its access to almost six years of Choices' video surveillance, one year of OAG video surveillance, and several videos taken by escorts and OAG investigators.  (See OAG Findings ¶¶ 182–84, 214–15, 256–60, 287, 384–87, 397–401, 408–10, 417–18, 485–89, 500–02.)

As previously explained, that video shows a collision between LaLande and an escort on the morning of October 8, 2016, but it is not clear who initiated contact: LaLande or the escort.  (Ex. 21; supra F.III.12.)  In either case, this video shows a quintessential incidental contact, because neither LaLande nor the escorts appear to be trying to create a collision.  (See id.)  Rather, it appears that LaLande was trying to hand the patient a pamphlet while the escorts tried to block her access to the patient.  (Id.)  In Cain, the district court held that similar conduct did not violate FACE or NYSCAA, because it did not appear to be done with the intent to injure, intimidate, or interfere.  418 F. Supp. 2d at 474.  The same is true here.

It is doubtless true that this type of incidental bumping has occurred more than once over the six years that the defendants have been protesting outside Choices, especially given the number of protestors and escorts crowding the sidewalk every Saturday morning.  This contact is

regrettable. However, the testimony regarding the intent behind, frequency of, and context of the contacts is not sufficiently credible to establish the defendants' unlawful intent either directly or circumstantially.[20] (Supra F.II.2–7, F.III.2, F.III.4, F.III.9–10, F.III.12.)[21] To the contrary, the record as a whole suggests that the defendants have endeavored to toe the line between lawful and unlawful conduct. Thus, the OAG has not shown that any defendant has used force in violation of FACE or NYSCAA.[22]

## 2. Threats of Force

FACE and NYSCAA also prohibit "threat[s] of force," 18 U.S.C. § 248(a)(1); N.Y. Penal Law § 240.70(1)(a)–(b), and NYCCAA prohibits conduct within 15 feet of a reproductive health care facility that "places another person in reasonable fear of physical harm" or attempts to do the same, N.Y.C. Admin. Code § 8-803(a)(4). Only those statements proscribable as threats under the First Amendment give rise to liability under FACE. See Operation Rescue Nat'l, 273 F.3d at 196.

---

[20] The July 2, 2016 incident involving R. George is not an exception. The OAG mischaracterizes R. George's testimony when it asserts that he "admitted to initiating contact with the escort." (OAG Findings ¶¶ 182–84, 214–15 (citing R. George at 2943:14–2944:9).) Instead, R. George explained that an escort put his hands on R. George's chest, and R. George responded by swatting the escort's hands away. (R. George at 2943:14–2944:9.) R. George later apologized for his reaction, because he knew that "in [his] heart there was some anger" when he swatted the escort's hands away. (Id.) That testimony does not admit to initiating contact, but rather to responding to contact in kind. This incident does not amount to a force violation on R. George's part, because he used force against the escort out of anger at being touched, not because the escort was helping Choices provide reproductive health services. See Cain, 418 F. Supp. 2d at 475 (holding that one of the defendants did not violate FACE or NYSCAA when he assaulted escorts and a passerby out of anger at their attempts to move or damage his anti-abortion signs).

[21] For example, there is testimony that two of the protestors stepped on the shoes of patients and escorts on two occasions each. (OAG Findings ¶¶ 386–87, 398, 408–09, 417.) Even if these contacts occurred, there is insufficient credible evidence to establish that they were purposeful and not accidental. (See id.; supra F.II.2–6.)

[22] I also reject the OAG's attempt to establish physical-obstruction violations of FACE, NYSCAA, and NYCCAA based on the defendants' purported uses of force. (See, e.g., OAG Findings ¶¶ 214, 215 n.7, 287 & n.8, 397, 417 & n.9, 500 & n.10.) As stated above, the only credible evidence the OAG has cited in support of its force claims is Exhibit 21. Exhibit 21 shows an accidental collision between LaLande and an escort. (Supra F.II.12.) Thus, the OAG cannot establish that LaLande had the intent necessary to violate either (1) the physical-obstruction portions of FACE and NYSCAA, which have the same intent requirements as the force portions, see 18 U.S.C. § 248(a)(1); N.Y. Penal Law § 240.70(1)(a)–(b), or (2) the physical obstruction provisions of NYCCAA, which prohibit knowing or attempted obstruction or blocking, N.Y.C. Admin. Code § 8-803(a)(1)–(2). Additionally, there is no evidence that, when R. George intentionally swatted away an escort's hands, the escort involved in that incident was attempting to enter or exit the premises of a reproductive health care facility or that R. George otherwise obstructed or blocked him. N.Y.C. Admin. Code § 8-803(a)(1).

District courts in this Circuit have extended this interpretation to NYSCAA, see Cain, 418 F. Supp. 2d at 476, 482–83, and the OAG argues that NYCCAA's "prohibition on conduct that places another person in reasonable fear of physical harm mirrors the federal and state prohibition on threats." (OAG Findings ¶ 26.) Accordingly, the OAG does not argue that NYCCAA's reasonable-fear-of-harm provision spans more broadly than FACE's and NYSCAA's threat-of-force provisions.

Under First Amendment precedent, courts distinguish "true threats" from protected speech. In Virginia v. Black, 538 U.S. 343 (2003), the Supreme Court defined true threats to "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Id. at 359–60. The Supreme Court further explained that "[t]he speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." Id. (internal quotation marks and brackets omitted). The Supreme Court concluded, "Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death." Id.

While noting without deciding the possibility that Black added a requirement that a defendant must have subjectively intended that his comments be understood as a threat, the Second Circuit continues to hold that "[t]his Circuit's test for whether conduct amounts to a true threat 'is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury.'" United States v. Turner,

720 F.3d 411, 420 & n.4 (2d Cir. 2013) (brackets in original) (quoting United States v. Davila, 461 F.3d 298, 305 (2d Cir. 2006)).[23]

Before its decision in Turner, the Second Circuit had consistently applied the standard set out in United States v. Kelner, 534 F.2d 1020 (2d Cir. 1976), as the one courts should apply to "determin[e] whether a statement qualifies as a threat for First Amendment purposes." Operation Rescue Nat'l, 273 F.3d at 196 (quoting and applying Kelner in a FACE case); see also United States v. Francis, 164 F.3d 120, 123 (2d Cir. 1999) (quoting and applying Kelner's standard in a non-FACE case); United States v. Malik, 16 F.3d 45, 51 (2d Cir. 1994) (same). That standard requires district courts to ask whether "the threat on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened, as to convey a gravity of purpose and imminent prospect of execution . . . ." Id. at 1027. In Turner, the Second Circuit disclaimed an interpretation of Kelner that would require that all four factors be met before a statement is found to be a true threat. It did not suggest that those factors are irrelevant to the true-threats analysis. Turner, 720 F.3d at 423–24.

In the FACE context, several district courts opinions have provided guidance as to appropriate considerations in analyzing whether a statement is a true threat. Those cases emphasize that the true-threats analysis is highly contextual. E.g., Scott, 958 F. Supp. at 774. Among the "[r]elevant context to consider are the national climate of violence at reproductive health care clinics, and assaults on physicians and clinic workers in the area or elsewhere in the nation." Kraeger, 160 F. Supp. 2d at 373 (citing Dinwiddie, 76 F.3d at 925). "Other relevant

---

[23] This subjective intent requirement may be limited to criminal statutes, like 18 U.S.C. § 875. See Elonis v. United States, 135 S. Ct. 2001, 2012 (2015) ("The jury was instructed that the Government need prove only that a reasonable person would regard Elonis's communications as threats, and that was error. Federal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state."). That possibility does not affect this Court's holdings that the defendants have not made true threats, because none of these holdings is premised solely on the defendant's lack of subjective intent to threaten.

factors are whether the statement was uttered directly to the victim, the reaction of the victim and other listeners, whether the threat was conditional, and whether the similar statements were made to the victim in the past." Id. (citing Dinwiddie, 76 F.3d at 925).

Here, the OAG argues that various defendants made true threats when they made certain statements to escorts and patients; when they filmed patients as they approached the Clinic; and when one protestor took down a Clinic staffer's license plate number. For the reasons set forth below, these statements and actions do not constitute true threats.

i.    *Defendant Protestors Thomas's and R. George's Statements to Escorts*

The OAG argues that several statements made outside Choices by Thomas and R. George constitute true threats in violation of FACE, NYSCAA, and NYCCAA. (OAG Findings ¶¶ 189, 216–19, 267–70, 278, 288.) In particular, the OAG points to the following statements:

- Thomas's statement to Greenberg, "You're going to kick the bucket soon, Marylou," (Greenberg at 1073:10–1075:8);

- Thomas's statement to Greenberg, "You never know when you're going to die," expressed soon after a shooting at a Planned Parenthood in Colorado Springs, (id.);

- Thomas's statements to escorts, also shortly after the shooting at the Colorado Springs Planned Parenthood, that "they could die at any moment"; that they "never know when death may come"; and that "they could die from being shot by a bullet while on the sidewalk," (Garnick at 1550:21–1553:18); and

- Thomas's statement to Greenberg, on the day an unknown man pulled a knife on another unknown person across the street from Choices, "That could be you one day. Someone could pull a knife on you," (Asmus at 1789:10–1790:13).

- R. George's statement to Brady that "the people who went to work on 9/11 didn't know what was going to happen that day, you never know when you're going to die." (Brady at 205:15–207:2.)

Taken out of the context of the day-to-day interactions of escorts and protestors, these statements sound alarming. But, as the cases make plain, context is crucial to the analysis of whether a statement is an actionable true threat shielded from the protections of the First Amendment. See, e.g., Scott, 958 F. Supp. at 774; Kraeger, 160 F. Supp. 2d at 373.

Thomas and R. George regularly preached about the fragility of life and the need to repent and accept God as one's savior. The escorts were well aware of this. White testified that Thomas has said, "[Y]ou never know when you're going to die," virtually every Saturday, and that he almost always connected that comment to repentance and accepting God as one's savior. (White at 2328:25–2330:5.) Indeed, Thomas says it so often that White referred to it as Thomas's "mantra." (Id. at 2248:5–2249:10.) Similarly, Brady testified that R. George "talks about death a lot when he preaches" and that, after he made his comment referring to 9/11, "he talked about repenting." (Brady at 205:15–207:2.) All of the above statements are consistent with this theme.

After years sharing the sidewalk with Thomas and R. George, the escorts were familiar both with the context of their speech and with the protestors themselves, and were not genuinely fearful of them or intimidated by their words. For example, Exhibit BL 152c is a video Brady took and posted on "Facebook Live." (Ex. BL 152c.) In that video, Brady records herself and the sidewalk scene. (Id.) For the duration of the video, she is quite close to R. George as he preaches. (Id.) She refers to his preaching, and tries to capture it for her audience, and makes light of it. (Id.) R. George is within earshot of all of Brady's statements, including: "He's fun. I'm sure he'd

be great at parties." (Id.)  These are neither the actions nor the observations of someone who found R. George threatening.

Although the OAG points to other cases in which similar statements were found to be true threats, those statements were made in vastly different contexts.  The OAG emphasizes that the district court in Kraeger found that the following statement by a protestor to a clinic staffer was a true threat: "You need to repent because you never know how long you have."  160 F. Supp. 2d at 375.  But the circumstances were far more ominous.  In Kraeger, the protestor made that statement while following the staffer after a community event about teen pregnancy and, when the staffer asked the defendant if her statement was intended as a threat, the protestor merely repeated the same statement.  Id. at 367.  The court found that, based on this second statement, the staffer feared for her physical safety.  Id.  Here, Thomas and R. George made all of their statements outside the Clinic consistent with their preaching and never suggested that their comments were meant as threats.

The OAG places particular emphasis on Thomas's statement, after the shooting at the Planned Parenthood in Colorado Springs, that "they could die at any moment; that they never know when death may come; and that they could die from being shot by a bullet while on the sidewalk outside of the clinic" and cites for support of its position that this was a true threat the district court decision in Scott.  In Scott, the court concluded that the defendant's statement, "A bullet could come your way today," was part of a threatening course of conduct not present in this case.  Scott, 958 F. Supp. at 769.  That defendant in Scott also obstructed access to the clinic many times; pushed and kicked escorts, patients, and clinic staff on a dozen occasions; was arrested outside of the clinic on fourteen occasions; expressed his belief that the murder of a doctor who performed abortions was justified; stated, as a doctor walked past, "[t]he doctor should be executed"; and

stated, to a clinic employee, "You're young.  But just because you're young does not mean your life won't be taken early," frightening the employee so much that she applied for a gun permit and took lessons on the use of a gun.  <u>Scott</u>, 958 F. Supp. at 767–70.  The paramount consideration is the expected effect on the listener.  <u>See</u> <u>Turner</u>, 720 F.3d at 420.  Here, Garnick conceded that the escorts who heard this statement wondered "whether to take that as a serious threat and whether it was necessary to call the police but also concerned that it was vague and often, when they fill out a complaint, they want more specific threats."  (Garnick at 1550:12–1553:1.)

In sum, applying this Circuit's objective test, an ordinary, reasonable escort familiar with the preaching and other conduct of Thomas and R. George outside Choices—as Greenberg, Garnick, and Brady were—would not interpret their messages about repentance and the shortness of life as threats.  <u>See</u> <u>Turner</u>, 720 F.3d at 420.

   *ii.*  *Defendant Protestor Anne Kaminsky's Statement to a Clinic Staffer*

The OAG argues that Kaminsky made a true threat when she told Clinic staffer Esther Priegue that, if she stopped working at Choices, Kaminsky would take her off a murder mill website.  (OAG Findings ¶¶ 350–51, 360–61 (citing Priegue at 1401:19–1403:11).)  Priegue testified that she understood the murder mill website to be a list of abortion providers so protestors know who they are and can attack them in one form or another.  (Priegue at 1401:19–1403:22, 1422:24–1425:4.)

The Supreme Court has indicated that, while "the speaker need not actually intend to carry out the threat" for it to qualify as such for First Amendment purposes, the recipient's fear must stem "from the possibility that the threatened violence will occur."  <u>Black</u>, 538 U.S. at 359–60.  Kaminsky's statement neither suggested that she was engaged in a plan to harm Priegue nor

indicated "unequivocal immediacy or express intention."  Operation Rescue Nat'l, 273 F.3d at 196–97 (citing Kelner, 534 F.2d at 1027).

A statement's effect on the listener is an important and sometimes decisive factor to consider when determining whether a protestor has made a true threat.  See Operation Rescue Nat'l, 273 F.3d at 196 n.5 (holding that a protestor's statement, "You won't be laughing when the bomb goes off," expressed to a group of clinic workers, was not a true threat, because the workers waited two weeks before reporting the comment to the police).  Although Priegue claimed to be alarmed, she neither called the police nor made an attempt to find out if such a website existed. (Priegue at 1401:19–1403:22, 1422:24–1425:4.)  Her colleague could not find such a website.  (Id.) Priegue's only response was to cease wearing her name tag until she entered the Clinic.  (Id.)

The Second Circuit has indicated that courts should not find that a defendant made a true threat if the statement informs a person merely that "he or she is in danger from a third party." Operation Rescue Nat'l, 273 F.3d at 196.  At best, Kaminsky's statement about the murder mill suggests that some user of the murder mill website might engage in violence against Priegue at some unspecified time.  (See Priegue at 1401:19–1403:18.)

Accordingly, the statement is not a true threat, because an ordinary, reasonable recipient familiar with the context of Kaminsky's statement about the murder mill website would not have interpreted it as a threat of injury.

### iii.    Protestor Defendant R. George's Statement to an Undefined Patient

The OAG argues that R. George made a threat of force to a patient approaching Choices as well.  (OAG Findings ¶¶ 189, 216–19.)  Garnick testified that, as a patient approached the Clinic, R. George once screamed about how "women were being assaulted when they leave this clinic." (Garnick at 1483:24–1487:3.)   Garnick explained that she found this statement to be "very

threatening, because [she] was not aware of any assault." (Id.)  Garnick elaborated on her view that the implication to a patient that she might be assaulted as she left the Clinic would be very scary.  (Id.)  The defendants argue that this statement is at best ambiguous.  (D.E. # 196 ¶ 302.)  It is important to note that the OAG bears the burden of proving that this statement was a true threat.  See, e.g., Windstream Commc'ns, 775 F.3d at 140.  In this connection, it is problematic that the OAG has not introduced the patient's testimony or any other evidence regarding the patient's reaction to this statement.  Instead, the OAG only cited Garnick's view on how the patient may have interpreted that statement based upon her own frame of reference.  The Second Circuit has emphasized that a statement's effect on the listener is an important and sometimes decisive factor to consider when determining whether a protestor has made a true threat.  See Operation Rescue Nat'l, 273 F.3d at 196 n.5.  Here, there is no evidence of the patient's response to this statement.  Garnick apparently believed the threat of assault to come from the protestors because she was not aware of anyone being subject to a random assault in the area.  There is no evidence or even claim that the patient had similar knowledge such that she would interpret the statement as a threat from the protestors as opposed to a statement that the area surrounding Choices was dangerous.  Even if the patient had reacted with alarm, one could not "be sure that the recipient [wa]s fearful of the execution of the threat by the speaker (or the speaker's co-conspirators)."  Operation Rescue Nat'l, 273 F.3d at 196 (emphasis in original) (citing Malik, 16 F.3d at 49).  "[G]enerally, a person who informs someone that he or she is in danger from a third party has not made a threat, even if the statement produces fear."  Id.  That is the case here, because R. George's statement does not suggest that he or his fellow protestors were involved in any such assaults.  For these reasons, this statement is not a true threat.

The OAG also argues that Thomas made threats of force to patients approaching Choices. (OAG Findings ¶¶ 267–70, 278, 288.)  Garnick testified that, as patients approached the Clinic, Thomas sometimes got within inches of them and told "them not to murder their baby," "not to go into the clinic," and that the escorts "won't be here when you leave."  (Garnick at 1537:15–1538:18.)  Garnick added that "patients can often find [these statements] intimidating" and "scary."  (Id.)  "[T]here's some implication that having escorts there kept them safe and, if they weren't there, . . . they could be at risk of harm."  (Id.)  Garnick further testified that this has led some patients to ask her "what type of risk are they at, what might happen to them if [the escorts] are not there, sort of to me showing some sort of fear that harm could come to them."  (Id.)

When Thomas testified, he denied ever making any threats to patients.  (Thomas at 2829:21–24.)  Neither side questioned him about this alleged statement.  (See id.)  It is worthy of note that, on the videos introduced into evidence, when Thomas preaches, he never does so in a threatening tone.  Rather, he implores patients not to kill their babies and notes that Choices does not care about babies; they just want money.  (See, e.g., Ex. 102.)  There is nothing about his demeanor that suggests that he is a threat to the patients themselves.

Although this statement in a hostile setting could raise concerns, there is no reason to believe that he ever changed his demeanor.  There was no patient testimony, and even Garnick spoke in equivocal terms: "some implication," "some sort of fear."  (Garnick at 1537:15–1538:18.) The implication that violence was threatened, let alone that the unspecified violence would occur, is too attenuated to support a holding that a reasonable patient would have interpreted it as a threat of force.  Where courts have found implied threats, the implication of violence by the speaker was more concrete, and the surrounding circumstances reinforced that implication.  In Cain, for

example, the district court found that the defendant made an implicit threat when he told an escort, "Stay out of [my] way. This is your last warning." Cain, 418 F. Supp. 2d at 464–66, 476. Part of the context that led the court to find this to be a true threat was the fact that the defendant screamed this statement from very close to the escort while pointing a finger in her face. Id. The statement's implication of violence was also strengthened by the court's findings that the defendant had previously "deliberately pushed into an escort" and "threatened an escort that he would 'knock [her] in the head.'" Id. (brackets in original). Thomas's statement offers a far less concrete implication of violence than did the defendant's in Cain, and the context of the statement does not strengthen that implication. Unlike the defendant in Cain, Thomas did not scream the statement, did not make a gesture indicating a violent intent (like putting his finger in the patient's face), and did not have a history of using force and threatening force, much less such a history that would be known to the recipient of the threat.

In sum, Thomas's statement does not rise to the level of "a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." Black, 538 U.S. at 359–60. Finally, to the extent that Black requires that the speaker have the subjective intent to communicate a threat, 538 U.S. at 359–60, as set forth in the findings of face, (see supra F.III4), that proof is lacking here.

> v.    *Thomas's Statement that the Clinic Will Be Shut Down*

The OAG argues that one final statement by Thomas constitutes a true threat: his statement "that the clinic will be shut down." (Garnick at 1553:20–1556:14.) Garnick speculated that Thomas could have been referring to a bombing, but she admitted that she did not know what he meant. (Id.) Thus, by her own admission, this was hardly a concrete threat.

Thomas's comment did not suggest that he or anyone he knew had plans to shut the Clinic down, and there is no evidence that the escorts reacted with alarm. (See Garnick at 1553:20–1556:14.) Far from exhibiting the "immediacy and unequivocal nature of a true threat," Cain, 418 F. Supp. at 477, Thomas's comment did not state how, why, or when the Clinic would be shut down. (See Garnick at 1553:20–1556:14.) Indeed, the comment neither suggests that Thomas would be involved in shutting the Clinic down, nor that violent or otherwise illegitimate means would lead to its closure rather than loss of business or changes in the law. (See id.)[24]

  *vi.*  *Filming Outside Choices*

The OAG argues that Griepp, R. George, Joseph, B. George, Braxton, and Fitchett made threats of force on many occasions by filming or photographing patients, companions, and escorts outside Choices. (OAG Findings ¶¶ 146–42, 158–59, 219, 293, 297, 299, 301, 318–20, 373–74, 378, 444–46, 464–65, 516–20, 529.) The argument is that "filming can be used to intimidate women and prevent them from accessing health care." (Id. ¶ 16.) While that could be true, the relevant statutes do not ban intimidation or intended intimidation alone. What they ban is intimidation by use of force, threat of force, or physical obstruction. There is no claim that filming constitutes force or physical obstruction. The claim is that the defendants threaten force when they film outside Choices. But there has been no showing that the defendants suggested to the patients, companions, or escorts that they filmed that the videos or photographs would be provided to those who intended them harm. Nor was that ever done.

---

[24] The facts here are a far cry from those in United States v. Lindgren. 883 F. Supp. 1321 (D.N.D. 1995). There, protestors had blockaded an abortion clinic with disabled cars. Id. at 1326. When a police officer told the defendant to move back, he became agitated and "said there might be a bomb in one of the cars, and there might be someone in the area with a remote detonator. Several times he shouted 'boom!' and threw his hands in the air." Id. The defendant was arrested and later found to have made a true threat based on these comments, even though no bomb was found. Id. at 1326–27.

In any event, the OAG also fails to carry its burden because it has not shown that any defendant filmed with the requisite intent to injure, intimidate, or interfere. (<u>Supra</u> F.III.1–2, F.III.5, F.III.8, F.III.11, F.III.13); <u>see also</u> <u>Kraeger</u>, 160 F. Supp. 2d at 369, 379 n.10 (refusing to find FACE violations based on the evidence that, on several occasions, two of the defendants "used a video camera to record their activities as well as patients and staff entering and leaving the clinic," because even though the defendants knew that the clinic had surveillance video cameras, the defendants were entitled "to gather clear footage on their own camera to capture any incidents").[25] The OAG claims that protestors "deliberately and conspicuously filmed patients and, when asked to stop, instead of assuring patients that their motives [we]re benign, that they would not post them, instead they move around to get a better view of the patient." (D.E. # 215 at 3345:17–3346:4.) This statement is unsupported. There is no credible evidence that the defendants ever informed patients that they were being filmed or targeted their videos specifically on patients, as distinguished from interactions between protestors and patients or escorts. (<u>See</u> <u>supra</u> F.III.1 (discussing Exhibits 327 and 462); <u>supra</u> F.III.2 (discussing Exhibit 410); <u>supra</u> F.III.5 (discussing Exhibits 461 and 462); F.III.11 (discussing Exhibits 386, 387, 388, and 561);

---

[25] The OAG's pre-FACE precedent is not to the contrary. <u>See, e.g.</u>, <u>ProChoice Network v. Project Rescue W. N.Y.</u>, 799 F. Supp. 1417 (W.D.N.Y. 1992), <u>aff'd in part, rev'd in part sub nom.</u>, <u>Pro-Choice Network v. Schenck</u>, 67 F.3d 359 (2d Cir. 1994), <u>aff'd as modified sub nom.</u>, <u>Pro-Choice Network of W. N.Y. v. Schenck</u>, 67 F.3d 377 (2d Cir. 1995), <u>aff'd in part, rev'd in part</u>, 519 U.S. 357 (1997) (collectively, "<u>Schenck</u>"). In <u>Schenck</u>, for example, the district court concluded that an injunction preventing protestors from filming patients outside abortion facilities was warranted on the facts before it (though it declined to enter one because there was "no clear precedent for such an injunction"). 799 F. Supp. at 1439. It reached that conclusion over the defendants' objection that the purpose of their filming outside the abortion center was to record the protestors' activity against unfounded harassment charges, because "the evidence adduced at the hearings clearly indicates that, instead of using cameras for defensive purposes, defendants employ them as offensive weapons to intimidate patients seeking abortions." <u>Id.</u> at 1425. The court reached this decision in part based on the video evidence, which showed that the protestors "almost always focus[ed] on the patient and the patient escorts" and that the protestors were "often not even on the screen." <u>Id.</u> at 1426. That is not the case here. Furthermore, because the district court in <u>Schenck</u> did not enjoin filming, the considerable subsequent appellate proceedings never addressed the issue.

F.III.13 (discussing Exhibits 404, 405, 465, 466, and 468).)[26]  Moreover, I credit the defendants' benign explanations for their filming.

<em>vii.    Recording License Plate Numbers</em>

The OAG argues that Defendant Joseph violated FACE, NYSCAA, and NYCCAA on at least two occasions by recording Clinic staffer Priegue's license plate number.  (OAG Findings ¶¶ 293, 307, 321.)  Priegue testified that she saw Joseph write her license plate number on a notepad and that this made Priegue uncomfortable and a "little bit scared because [Priegue] wanted to know why she was writing that down.  Was she going to show up at my house now?  I mean I work at a facility where we deal with abortions and protesters.  Taking down information like that, it's very alarming to us."  (Priegue at 1400:10–1401:18, 1419:25–1422:15.)  Priegue also saw Joseph take down her license plate number a second time on security camera footage.  (Id.)  Although Joseph denied taking down Priegue's license plate number, I will assume that she did so for the purposes of this motion.  (Supra F.III.5.)

In certain circumstances, taking down license plate numbers could qualify as true threats. Again, context is important.  In Cain, the district court found that the defendant made a true threat in violation of FACE and NYSCAA when he made "a point of being seen inspecting the license plate on an escort's car."  418 F. Supp. 2d at 464, 476–77.  In reaching this holding, the district court stressed that the defendant made "a show" of noting the license plate number.  Id.  The defendant in Cain had also used force against an escort and had explicitly threatened escorts on a

---

[26] The OAG advances one additional argument against Fitchett that it does not advance against any of the other defendants who have filmed outside Choices.  The OAG argues that Fitchett "has interfered with the provision of reproductive health services, in violation of the NYC Clinic Access Act, by intimidating and deterring patients from approaching and entering the clinic by placing them in fear of exposure by filming them."  (OAG Findings ¶¶ 516–28, 530–31.)  The OAG cites no evidence that Fitchett's filming ever deterred any patient from approaching and entering the Clinic or otherwise interfered with their access to Choices.  (Supra F.III.13.)  The OAG also has not established that Fitchett attempted to interfered with the provision of reproductive health services by filming, because the OAG has cited no evidence that he ever filmed or photographed outside Choices with the requisite intent to interfere.  (Id.)

number of occasions described above, stating, among other things, that he was "going to 'bash [an escort's] fucking head in'" and that "she 'better not go home alone' because he had '[his] eyes on [her].'"  Id. at 466, 474, 476 (second brackets in original).  Based upon this evidence, the court held that, "[i]n the context of an overtly hostile, and often physical, confrontation, when a person makes a show of noting the license plate of a car, a car owner would reasonably interpret the gesture as intended to communicate an intent to track the owner down and harm her."  Id.

Unlike the defendant in Cain, Joseph did not attempt to make "a show" of taking down the license plate number.  In fact, Priegue was not even in the vicinity of her vehicle on the second occasion Joseph appeared to take down her license plate number; Priegue saw Joseph take down her license plate number in security footage.  (Priegue at 1400:10–1401:18, 1419:25–1422:15.)  Also unlike the defendant in Cain, Joseph had no history of using force or threatening force outside Choices.  Instead, Joseph had an extensive history of publicly taking notes.  Indeed, Joseph took so many notes outside Choices that the escorts referred to her as "the scribe" before they learned her name.  (Brady at 119:3–10.)  In these circumstances, an ordinary, reasonable person familiar with this context would not interpret Joseph's effort to take down Priegue's license plate number as a threat of force.  See Turner, 720 F.3d at 420.  The OAG has failed to establish that Joseph recorded Priegue's license plate number with the intent to place Priegue in fear of bodily harm or death.  (Supra F.III.5.)

3.  Physical Obstruction

FACE and NYSCAA provide penalties for those who, with the "intent to injure, intimidate, or interfere," physically obstruct those "seeking, obtaining, or providing . . . reproductive health services."  Sharpe, 386 F.3d at 484; see also 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d).  The statutes define "physical obstruction" as "rendering impassable ingress to or egress from a

86

facility that provides reproductive health services . . . or rendering passage to or from such a facility . . . unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d). The OAG argues that NYCCAA's "prohibition on obstruction of a clinic mirrors the federal and state prohibition on physical obstruction." (OAG Findings ¶ 26); see also N.Y.C. Admin. Code § 8-803(a)(2). Accordingly, the OAG does not argue that NYCCAA's obstruction provision spans more broadly than FACE's or NYSCAA's.

To assess the OAG's claims, it is helpful to review this Circuit's case law addressing the physical-obstruction element. In Operation Rescue National, the Second Circuit held that a defendant intentionally obstructed access to the reproductive health clinic by "using her body to slow moving cars and pushing literature and pamphlets through car windows." 273 F.3d at 195. The court explained that "[o]ne tactic she employ[ed] to slow access to the PPR parking lot involve[d] dropping an item on the ground and then retrieving it in slow motion." Id. Another was to "block[] patients inside their automobiles by standing up close to the car doors." Id. The court then reprimanded the district court for characterizing legitimate protest activities (approaching patients, addressing them in angry tones, and even yelling at them) as illegal interference with clinic access by grouping it together with illegal conduct (blocking driveways and car doors). Id. The court also rejected the concept of "constructive obstruction" as "uncertain" and "slippery." Id.

In Cain, the district court found that protestors intentionally obstructed access to a reproductive health center by "stand[ing] near car doors so patients could not leave their cars" and by "corner[ing]" a patient "against a wall as she approached the Center and began to yell at her." 418 F. Supp. 2d at 464–66, 480. The district court also found FACE and NYSCAA violations when one of the protestors stepped directly in front of an approaching patient who rejected his

materials and then matched the patient's lateral movements, thereby preventing her from stepping around him and continuing on to the center.  Id. at 465, 480.  Finally, the district court found FACE and NYSCAA violations when a protestor physically blocked the clinic door by "standing directly in front of the Center door and refusing to move until a security guard approache[d]."  Id. at 466, 480.

In Kraeger, the district court found FACE and NYSCAA violations based on the defendants' practice of "crowd[ing] patients, walk[ing] very closely to them, and step[ping] in their way, making it very difficult for patients to maneuver around them."  160 F. Supp. 2d at 376.  The court also found violations when several protestors would band together to form a "U-shape[d]" blockade in front of the clinic steps and would refuse to move to allow patients or pedestrians to pass by.  Id. at 370, 376.  The district court also noted that the protestors would "pace the entire length of the narrow clinic sidewalk while holding large signs, making it difficult for people to walk on the sidewalk."  Id. at 370, 376.  The court made a similar finding with respect to the protestors' practice of walking in circles with large signs directly in front of the clinic steps and "mov[ing] closer together and walk[ing] 'tighter' together" when someone would exit the clinic and attempt to get by them.  Id.  The court found that this "ma[de] it more difficult for patients to get through them."  Id.  Finally, the district court noted that the defendants would "not yield space on the sidewalk to anyone."  Id.  The court found that the protestors made it so difficult for people to walk on the sidewalk that the police would escort elderly people a block out of their way "because they d[id] not want to walk by the defendants" and that pedestrians would "sometimes walk past the clinic in the street because there is no room on the sidewalk."  Id.

In Scott, the district court distinguished two defendants.  958 F. Supp. at 768, 775–76.  One "regularly obstruct[ed] free ingress to, and egress from, [the clinic] by stepping in front of escorts[

and] using his sign to prevent escorts from walking past him." Id. The other did not obstruct access to the clinic, because that defendant "never stopped the forward progress of an individual seeking reproductive services at [the clinic]." Id. at 772. The district court also found that one defendant obstructed access in violation of FACE by "often st[anding] so close to cars that patients were unable to open their car doors," but that the other defendant "did not obstruct a client from getting out of a taxi" on a given occasion, because "[a]ny obstruction of the car door was caused by the presence of numerous individuals who crowded the curbside." Id. at 772, 776.

To the extent that the OAG suggests that these cases stand for the proposition that a defendant can obstruct access to a clinic without blockading the entrances or making it unreasonably difficult for someone to access the clinic, (OAG Findings ¶ 20),[27] I disagree. As long as a protestor does not blockade a clinic entrance or exit, he or she is free to stand or pace with a sign unless and until he or she interferes with another person's passage to or from the facility. At that point, the protestor must yield space for the other person to pass. See Cain, 418 F. Supp. 2d at 464, 466, 480; Kraeger, 160 F. Supp. 2d at 370–71, 376; Scott, 958 F. Supp. at 768, 775–76. The Second Circuit explicitly held that, under FACE, a protestor may also approach patients, follow them closely, and even yell at them, because making their approach to the Clinic "unpleasant" or "emotionally difficult" does not make passage to or from the facility "unreasonably difficult or hazardous." Operation Rescue Nat'l, 273 F.3d at 195–96. To find that a defendant physically obstructed access to a reproductive health center in violation of FACE and NYSCAA, the court must find that there was "an actual obstruction." Cain, 418 F. Supp. 2d at 480 (citing Operation Rescue Nat'l, 273 F.3d at 195).

---

[27] In United States v. Mahoney, the D.C. Circuit found that the defendants' blockading of two out of the three entrances to a clinic—leaving only the "back alley" entrance unobstructed—rendered ingress to or egress from the clinic "unreasonably difficult" under the circumstances. 247 F.3d 279, 281–84 (D.C. Cir. 2001).

The OAG argues that most of the defendants in this case have physically obstructed patient, companion, and escort access to Choices. A careful review of the video, photo, and testimonial evidence presented at the preliminary injunction hearing and reveals that only B. George illegally obstructed access to Choices.

i.       *B. George's Slow Walk*

B. George did engage in a purposeful "slow walk" in front of patients on February 11, 2017, February 25, 2017, and June 3, 2017—and that he did so to delay the patients' access to Choices and thereby provide more time for protestors to speak with the patients and hand them literature. (Supra F.III.8.) On these three occasions, B. George violated FACE, NYSCAA, and NYCCAA by physically obstructing patient access to Choices with the intent to interfere with their access to Choices because they were obtaining reproductive health services. See, e.g., Operation Rescue Nat'l, 273 F.3d at 195 (holding that a defendant physically obstructed in violation of FACE by slowing access to the clinic's parking lot by "dropping an item on the ground and then retrieving it in slow motion"); Kraeger, 160 F. Supp. 2d at 370 ("Mrs. Kraeger, Sheri, and Vicki Jo stand in the driveway and walk extremely slowly across the driveway when cars attempt to pull into and out of the driveway, causing delay for patients and staff entering and leaving the driveway.").

Nevertheless, the OAG's motion for a preliminary injunction against B. George is denied. It is not reasonably likely that B. George will engage in his "slow walk" outside Choices again. The fact that B. George crossed the line is problematic, of course. But the evidence proffered at the preliminary injunction hearing shows that B. George slow walked only a few times over a few months in 2017, ceasing the conduct before the OAG filed this action.[28] Subsequent to the hearing,

---

[28] The OAG argues that B. George's voluntary cessation of his illegal conduct does not put preliminary injunctive relief out of reach. (OAG Findings ¶ 39.) But the OAG supports her voluntary-cessation argument with cases addressing the issue of mootness. (See id.) "[W]hether a case should be dismissed on mootness grounds is a materially distinct inquiry from a determination as to whether a plaintiff has demonstrated irreparable harm." Ferring

B. George submitted a supplemental declaration swearing under oath that he engaged in the slow walk on only a handful of occasions, that he stopped doing so when Griepp learned of the practice and told him to discontinue it, and that he "will not engage in that behavior again." (D.E. # 211-1.)[29]  Accordingly, irreparable harm is not "actual and imminent." Actavis, 787 F.3d at 660.  Nor is there "a reasonable likelihood that the wrong will be repeated," Golden Feather Smoke Shop, 597 F.3d at 120–21.

<em>ii.    Defendants' Interactions with Patients Arriving in Cars</em>

The OAG argues that R. George, Musco, Thomas, Okuonghae, Kaminsky, and Braxton obstructed access to Choices by those arriving by car.  (OAG Findings ¶¶ 199–200, 220, 222–23, 236, 238–39, 248, 274–75, 285, 290, 330–33, 339–40, 354–55, 362, 449, 466, 470–71.)  At the outset, much of the cited conduct—and all of the cited videos, (supra F.III.2, F.III.6 (discussing Exhibit 39); supra F.III.3 (discussing Exhibits 49B and 105); supra F.III.4 (discussing Exhibit 137); supra F.III.6 (discussing Exhibit 58))—does not violate or show violations of FACE or NYSCAA, even as characterized by the OAG.  The OAG complains that the defendants would crowd car doors, lean into open car windows, thrust pamphlets into them as they attempted to speak with the car's occupants, and slow a person's departure from the Clinic merely by engaging them in conversation.  (See OAG Findings ¶¶ 449, 470 (discussing Exhibit 398); supra F.III.11 (discussing Exhibit 398).)  This conduct is not illegal unless it actually interferes with an individual's ingress to or egress from the Clinic.  Cain, 418 F. Supp. 2d at 480 ("There must be an actual obstruction." (citing Operation Rescue Nat'l, 273 F.3d at 195)).  Courts in the Second

---

Pharms., Inc. v. Watson Pharms., Inc., 765 F.3d 205, 219 (3d Cir. 2014).  Indeed, "[w]hen a district court contemplates imposing an injunction based in part on a past history of illegal behavior by protestors, it should be vigilant to ensure that the current protests threaten to maintain whatever coercive influence resulted from the original illegal conduct." Operation Rescue Nat'l, 273 F.3d at 200 (citing Milk Wagon Drivers Union of Chi. v. Meadowmoor Dairies, Inc., 312 U.S. 287, 296 (1941)).  The defendants do not argue that the case is moot; they argue merely that the OAG cannot show the likelihood of irreparable injury needed to support a preliminary injunction.

[29] The OAG did not object to the defendants' belated submission of this supplemental declaration.

Circuit have found illegal obstruction under FACE and NYSCAA only when the defendants stood so close to the car door that the occupant could not open it or used their bodies to slow moving cars and give the protestor additional time to reach the approaching patient.  See Operation Rescue Nat'l, 273 F.3d at 195; Cain, 418 F. Supp. 2d at 465–66, 480; Scott, 958 F. Supp. at 772, 776.  A protestor would also violate FACE, NYSCAA, and NYCCAA by preventing a driver from leaving a clinic after dropping off a patient.  (See 18 U.S.C.A. § 248(e) (stating that physical obstruction means rendering impassable or unreasonably difficult or hazardous the "ingress to or egress from a facility that provides reproductive health services" (emphasis added)); N.Y. Penal Law § 240.70(3) (same); N.Y.C. Admin. Code § 8-803(a)(2) (making it unlawful "to impede access to or from the facility" (emphasis added)).)  The OAG has not only failed to provide credible evidence that the defendants have engaged in any of this obstructive conduct, (see supra F.II.2–7, F.III.2–4, F.III.6–7, F.III.11), it has largely failed to accuse them of doing so.

### iii.    Defendants' Interactions with Patients Walking to the Clinic

The OAG argues that Griepp, R. George, Musco, Thomas, Okuonghae, Kaminsky, Richards, and Braxton physically obstructed patients, companions, or escorts approaching the Clinic on foot.  (OAG Findings ¶¶ 157, 160–61, 164, 175–76, 180, 199–200, 220–23, 229–30, 232, 247, 252–55, 261–65, 280, 285, 289–90, 326, 328, 337–38, 347–49, 362, 383, 402, 433–34, 439, 466–71.)  In support of this argument, the OAG cites Clinic Escort Recaps, OAG witness testimony, one photograph, and eight videos.  (See id. (citing Exhibits 7, 23, 31, 41, 55, 102, 119, 138, and 307).)  As stated above, the Clinic Escort Recaps and OAG witness testimony are insufficiently credible to support these allegations; the photo and five of the videos fail to show any obstruction or interference by the protestors; and the remaining three videos show accidental obstruction.  (Supra F.II.2–7, F.III.1–4, F.III.6–7, F.III.9, F.III.11.)

The photo and videos that do not show obstruction or interference by the protestors are Exhibits 7, 23, 41, 102, 119, and 307. The OAG claims that Exhibit 7 shows Braxton rendering passage to Choices unreasonably difficult three times on the morning of September 3, 2016. (OAG Findings ¶¶ 433, 466–67.) That video shows Braxton attempting to speak with or hand pamphlets to a handful of approaching patients and companions over the course of nearly six minutes. (See Ex. 7.) It does not show Braxton stopping, slowing, or otherwise delaying anyone's access to the Clinic door, much less making access unreasonably difficult. (See id.; supra F.III.11) The OAG also argues that Thomas used his sign to physically obstruct access to Choices. (OAG Findings ¶¶ 252–55, 289.) Yet, the two videos it relies upon in support of this allegation show no such thing. (See Ex. 41; Ex. 102.) Those videos show Thomas standing in the middle of the sidewalk and attempting to make his sign visible and his voice audible to anyone approaching the Clinic. (Supra F.III.4.) They do not show Thomas obstructing access to the Clinic. (Id.) The OAG makes similar allegations against Musco, (OAG Findings ¶¶ 229, 230, 247), but the sole photograph it cites in support of the allegations do not show any patients approaching the Clinic, let alone any blocking by Musco, (see Ex. 119; supra F.III.3). Finally, the OAG claims that R. George obstructed a patient in Exhibit 307, (OAG Findings ¶¶ 180, 221), and that Okuonghae obstructed a patient in Exhibit 23, (OAG Findings ¶¶ 326, 338). Those videos show escorts briefly and accidentally stepping in front of patients' paths to the Clinic on the mornings of March 25, 2015 and October 15, 2016. (Ex. 307; Ex. 23; supra F.III.2, F.III.6). Exhibits 7, 23, 41, 102, 119, and 307 do not show any defendant physically obstructing access to Choices in violation of FACE, NYSCAA, or NYCCAA.

Unlike the photograph and the videos discussed above, Exhibit 55 shows a protestor—Richards—briefly impeding patient access to Choices on the morning of June 10, 2017. (Ex. 55.)

But it does not show her doing so with the requisite intent. (<u>Supra</u> F.III.9.) Instead, the momentary obstruction shown in Exhibit 55 was the result of Richards's attempts to reach an approaching patient in the face of effective blocking by the escorts. (<u>Id.</u>) That can establish neither the intentional obstruction prohibited by FACE and NYSCAA nor the knowing obstruction prohibited by NYCCAA.

Neither does Exhibit 31 establish a physical obstruction violation. (Ex. 31.) As explained above, that video shows that, on the morning of October 29, 2016, R. George attempted to make his sign visible to an approaching patient by repeatedly moving it in response to two escorts' persistent attempts to block it from view. (Ex. 31; <u>supra</u> F.III.2.) R. George impeded neither the escorts' access to the approaching patient nor the patient's access to the Clinic. (Ex. 31; <u>supra</u> F.III.2.)

Finally, Exhibit 138 shows that, on June 25, 2016, Okuonghae approached a patient head on and attempted to provide her a pamphlet. (Ex. 138; <u>supra</u> F.III.6.) Because Okuonghae was directly in the patient's path, the patient, her companion, and her escorts deviated slightly from their path to get around Okuonghae, without changing their pace. (<u>Id.</u>) As the group stepped around him, Okuonghae made no effort to interfere with their progress toward the Clinic. (<u>Id.</u>) This conduct is easily distinguishable from the conduct that has been found to violate FACE and NYSCAA. <u>Compare</u> (Ex. 138), <u>with</u> <u>Cain</u>, 418 F. Supp. 2d at 466, 480 (holding that a defendant violated FACE and NYSCAA by stepping directly in front of an approaching patient who rejected his materials and then matching her lateral movements, thereby preventing her from stepping around him and continuing to the center), <u>Kraeger</u>, 160 F. Supp. 2d at 376 (holding that the defendants violated FACE and NYSCAA by stepping in the patients' way and "making it very difficult for patients to maneuver around them"), <u>and</u> <u>Scott</u>, 958 F. Supp. at 768, 775–76 (holding

that one of the defendants "regularly obstruct[ed] free ingress to, and egress from, [the clinic] by stepping in front of escorts[ and] using his sign to prevent escorts from walking past him").  Indeed, when refusing to find that a defendant physically obstructed a patient on a given occasion, the district court in Kraeger specifically emphasized that the patient "did not encounter any significant or unreasonable delay in leaving the clinic."  160 F. Supp. 2d at 371.  The same is true here.  By causing the patient to walk around him, Okuonghae delayed the patient's access to the Clinic by one second, at most.  (See Ex. 138.)  He did not make access to the Clinic "unreasonably difficult or hazardous."  18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d).  Accordingly, Okuonghae did not violate FACE, NYSCAA, or NYCCAA in the scene depicted in Exhibit 138.

    4.  Follow-and-Harass

    NYCCAA makes it unlawful to "follow and harass another person within 15 feet of the premises of a reproductive health care facility."  N.Y.C. Admin. Code § 8-803(a)(3).  The OAG argues that "90 percent" of the protestors' purportedly unlawful conduct outside Choices violates this follow-and-harass provision.  (D.E. # 185 at 52:13–53:4.)  Specifically, the OAG argues that R. George, Musco, Thomas, Joseph, Okuonghae, Kaminsky, B. George, Richards, Ryan, Braxton, and LaLande violated NYCCAA's follow-and-harass provision by their interactions with patients or their companions as they approached the Clinic entrance.  (OAG Findings ¶¶ 203–04, 209–10, 212, 222–25, 240–46, 249, 266, 276–77, 279, 281–84, 286, 291, 311–13, 317, 336, 341–43, 356–59, 363–64, 375–77, 380, 388–93, 395–96, 403, 414, 419–20, 436, 452, 455, 472–77, 497–99, 503–07.)

    The defendants first attack the City statute as unconstitutionally vague and overbroad because it does not define the term "harass."  (See, e.g., D.E. # 57-1 at 18–20; D.E. # 75-2 at 20–24.)  In response to these arguments, the OAG—and the New York City Council, appearing in this

action as *amicus curiae*—have argued that the term takes its definition from the New York Penal Law's criminal harassment statutes.  (OAG Findings ¶¶ 28–33, 589 (citing N.Y. Penal Law §§ 240.25, 240.26); D.E. # 215 at 3346:5–3347:2; D.E. # 185 at 65:20–67:18.)  The OAG premises this argument on the statute's legislative history, which explains that "[t]he word 'harass' has its ordinary meaning [in NYCCAA] just as it does when used in the crime of 'harassment' in the State Penal Law."  (D.E. # 127-10 at 1); see also, e.g., Forsham v. Harris, 445 U.S. 169, 182–84 (1980) (determining the meaning of the undefined term "agency records," as used in the federal Freedom of Information Act, by reference to the use of the term "record" in other federal statutes, in part by reference to legislative history); Hernandez v. Barrios-Paoli, 93 N.Y.2d 781, 789 (1999) (using a committee report to glean the New York City Council's intent when passing a particular local law).

Under the OAG's interpretation of the follow-and-harass provision, a person violates it when, within fifteen feet of the premises of a reproductive health care facility, he or she follows another person and, with intent to harass, annoy, or alarm that other person, engages in a course of conduct or repeatedly commits acts that alarm or seriously annoy the other person and that serve no legitimate purpose.  (D.E. # 215 at 3346:5–3347:2 (focusing its follow-and-harass arguments on the New York Penal Law provision that prohibits "an individual with intent to harass, annoy, or alarm another person [from] . . . repeatedly commit[ting] acts which alarm or seriously annoy another person and which serve no legitimate purpose"); D.E. # 212 at 23:9–24:20 (conceding that, under the OAG's interpretation of the follow-and-harass provision, a person only violates it if he or she does the prohibited conduct with the intent to harass, annoy, or alarm).)[30]

---

[30] The New York Penal Law actually includes five definitions of harass, but three of them would render other portions of NYCCAA meaningless.  (Compare N.Y. Penal Law §§ 240.25, 240.26, with N.Y.C. Admin. Code § 8-803.  In New York, "[a] construction that would render a provision superfluous is to be avoided."  Majewski v. Broadalbin-Perth Cent. Sch. Dist., 91 N.Y.2d 577, 587 (1998) (citing Matter of OnBank & Trust Co., 90 N.Y.2d 725, 731 (1997)); see also Morton Bldgs. v. Chu, 510 N.Y.S.2d 320, 321 (3d Dep't) ("The rules of statutory construction require that every part of a statute must have a meaning."), aff'd sub nom., Morton Bldgs, Inc. v. Chu, 70 N.Y.2d 725 (1987).  Recognizing this, the OAG has "focus[ed] on the prohibition on repeatedly commit[ing] acts which alarm or

At oral argument, the OAG contended, despite the clear language of the Second Degree Harassment statute, that the follow-and-harass provision's imported intent requirement—the intent to harass, annoy, or alarm the victim—asks only that the defendant intend to commit the harassing conduct. (D.E. # 212 at 23:9–25:25.) The OAG made this argument in reliance on People v. Stuart, 100 N.Y.2d 412 (2003), a decision by the New York Court of Appeals that addressed a criminal stalking statute. But that statute lacked any similar intent requirement. See id. at 414. The stalking statute required only that the defendant engage in "an intentional course of conduct with no legitimate purpose in which the offender targets a particular person" and that the conduct be "likely to place the victim in reasonable fear of material harm, or cause the victim mental or emotional harm." 100 N.Y.2d at 414 (paraphrasing N.Y. Penal Law § 120.45). The intent element here is not just an intent to commit the annoying or alarming conduct, but the intent to annoy or alarm.

It is not necessary to resolve the thorny constitutional issues raised concerning NYCCAA. Accepting the OAG's position that the term "harass" in the City statute draws its definition from the Second Degree Harassment statute, I find that the OAG has failed to establish that any defendant violated this provision.

It is undisputed that the defendants in this action sometimes continue to engage patients, companions, or escorts after being told they have no interest in their message. Griepp testified that, when a patient directly tells him that she does not want to hear what he has to say, he "make[s]

---

seriously annoy such other person and which se[rve] no legitimate purpose." (D.E. # 215 at 3346:5–3347:2.) Nevertheless, the OAG has suggested that the term harass could mean "strik[ing], shov[ing], kick[ing] or otherwise subject[ing] such other person to physical contact, or attempt[ing] or threaten[ing] to do the same," or "repeatedly committing acts which places such other person in reasonable fear of physical injury." (See id.) But the OAG has proffered insufficient evidence that any defendant has engaged in such conduct outside of Choices. (Supra L.III.1, L.III.2.) The OAG has not made the same suggestion about the possibility that "harass" could legitimately mean to "follow[] a person in or about a public place." N.Y. Penal Law §§ 240.25, 240.26(2). Even if it had, I would reject that definition, because it would rob the "follow" portion of the follow-and-harass provision of all meaning. See Majewski, 91 N.Y.2d at 587; Morton Bldgs., 510 N.Y.S.2d at 321.

an assessment on whether or not [he] can adjust and maybe go to a different—different topic or something else like that at that point. [He doesn't] necessarily stop." (Griepp at 2531:7–14.) R. George testified that he does not ask patients their permission before speaking with them and that, if the patient remains silent, he continues to walk alongside her and attempt to speak with her until she reaches the Clinic entrance. (R. George at 3000:5–3005:12.) R. George also continues to engage patients if they have refused his literature. (Id.) Typically, R. George stops talking to the patient if she asks him to leave her alone, though he will sometimes make "a closing remark about what could happen on the other side of those doors." (Id.) Musco testified that, when a person tells her that he or she does not want to hear from Musco, she will make a last offer of literature and a last appeal: "We can help you, if you are going in for an abortion, we—please don't hurt your baby, we can help you." (Musco at 2764:12–18; 2769:24–2770:1, 2771:4–11, 2783:9–2784:2.)

Similarly, Griepp, R. George, Joseph, and Musco all testified that the Church at the Rock protestors will often "tag team" patients, such that one protestor will cease his or her attempt to speak with the patient after being asked to stop, but another protestor will then attempt to engage with same patient. (Griepp at 2572:1–11; R. George at 3005:13–3008:9; Joseph at 2690:2–15; Musco at 2736:20–2737:5, 2764:12–2765:14, 2781:11–2782:4.) Sometimes the second pass happens seconds later; sometimes it happens minutes later. (Griepp at 2572:1–11; R. George at 3005:13–3008:9; Joseph at 2690:2–15; Musco at 2736:20–2737:5, 2764:12–2765:14, 2781:11–2782:4.) Sometimes the second protestor makes a conscious effort to engage with a patient that has rebuffed a different protestor, as Joseph did in Exhibit 135; sometimes the second protestor is not aware that another protestor has interacted with a given patient. (Griepp at 2572:1–11; R.

George at 3005:13–3008:9; Joseph at 2690:2–15; Musco at 2736:20–2737:5, 2764:12–2765:14, 2781:11–2782:4.)

Sidewalk counseling has been recognized as a legitimate First Amendment exercise. McCullen, 134 S. Ct. at 2528–30. On the other hand, ignoring a request to be left alone is a relevant factor in determining the nature of the speaker's intent. I am troubled by the defendants' suggestion that a request to be left alone is immaterial. It is not. See, e.g., Hill, 530 U.S. at 716–18 (noting that the Supreme Court has "repeatedly recognized the interests of unwilling listeners in situations where the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure" (internal quotations omitted)). Nonetheless, it is not dispositive. I decline to establish a bright-line rule that continuing to try and persuade someone for a short time after a single rebuff establishes an intent to harass, annoy, or alarm or otherwise vitiates a legitimate purpose.

When determining whether a given defendant's conduct evinces such an unlawful intent on a given occasion, it is necessary to consider the quantity and quality of requests to be left alone, the invasion of personal space, and the speaker's volume and tone, as well as the content of the defendant's speech.

The credible evidence in this case is limited to defendants' admissions, videos, and photographs. (Supra F.II.) The videos rarely captured the content of the interactions between protestors and patients, companions, or escorts. (See supra F.III.) In fact, the video evidence is of such limited value in establishing follow-and-harass violations that the OAG cites none in support of its claims against R. George, Okuonghae, Kaminsky, B. George, Ryan, or Braxton. (See OAG Findings ¶¶ 203–04, 209–10, 212, 222–25, 240–46, 249, 266, 276–77, 279, 281–84, 286, 291,

311–13, 317, 336, 341–43, 356–59, 363–64, 375–77, 380, 388–93, 395–96, 403, 414, 419–20, 436, 452, 455, 472–77, 497–99, 503–07.)

Moreover, several of the videos the OAG does cite are of little utility, because there is no audio. (See F.III.4 (discussing Exhibit 351); F.III.9 (discussing Exhibits 3 and 338); F.III.12 (discussing Exhibit 17).) It cannot be inferred that the patients asked to be left alone in these interactions, let alone that the defendants engaged the patients with the intent to harass, annoy, or alarm.

The videos with audio do not support an unlawful intent. In Exhibit 333, for example, Thomas took a few steps away from the patient in response to her requests that he "[b]ack up." (Ex. 333; supra F.III.4.) In Exhibit 354, the companion Thomas attempted to persuade not to support Choices never asked to be left alone; he only said, "Okay," in an exasperated tone. (Ex. 354; supra F.III.4.) Even after saying that, the companion stopped to speak to Thomas for a second time. (Ex. 354.) Then Thomas followed him for a few more steps before the companion entered the Clinic. (Id.) Nothing about these interactions establish an intent by Thomas to harass, annoy, or alarm. (F.III.4.)

Other videos reflect conduct that arguably comes closer to crossing the line. Exhibit 135, for example, captures a woman's violent reaction to Joseph's overtures. (Ex. 135.) This video is problematic, because Joseph testified that she was aware that Musco had already approached the woman and been rebuffed and because of the woman's reaction. (F.III.5 (discussing Exhibit 135).) Nonetheless there is insufficient evidence about what Joseph said to the woman and in what tone of voice to allow an inference that Joseph approached the woman with the intent to harass, annoy, or alarm her, rather than with an intent to engage the woman in conversation and persuade her not to seek an abortion or otherwise support Choices. (Id.) This finding is based in part on Joseph's

long history of protesting outside Choices and the lack of credible evidence of her interacting with anyone outside the Clinic with such an unlawful intent. (Id.)

Exhibit 99 also presents a closer case, because Thomas was aware that the escort to whom he was talking exhibited body language suggesting that she was not interested in what he had to say. (F.II.4 (discussing Exhibit 99).) But the video does not show Thomas talking to the escort for so long, in such a tone, or in such a manner that it can be can inferred that he did so with the intent to harass, annoy, or alarm. (Id.)

In sum, the OAG has introduced evidence that the protestors sometimes continued attempting to engage with a person who asked to be left alone and that the protestors sometimes attempted to engage people who were not receptive to a different protestor's overtures. Although such conduct can be circumstantial evidence of an intent to harass, annoy, or alarm, it does not establish that intent here. The interactions on the sidewalk outside Choices were generally quite short, and there is no credible evidence that any protestor disregarded repeated requests to be left alone over an extended period or changed his or her tone or message in response to requests to be left alone in a way that suggested an intent to harass, annoy, or alarm. The OAG has failed to show that any defendant had the intent to harass, annoy, or alarm a patient, companion, or escort; thus, it has failed to show that any defendant has violated NYCCAA, as interpreted by the OAG.[31]

---

[31] The OAG also attempts to establish its follow-and-harass claims against Musco and Braxton without establishing that they followed the patient or companion during the relevant incident. With respect to Musco, Exhibit 452 is the only video the OAG cites in support of her follow-and-harass claim. (See OAG Findings ¶¶ 240–46, 249.) That video, taken by Thomas, shows Musco standing in one place outside Choices, attempting to persuade a woman not to go into Choices as the woman yells over her. (Ex. 452.) When the woman walks away toward the Clinic entrance, Musco does not follow her, though she does yell, "You won't even talk to me!" (Id.) With respect to Braxton, the OAG cites a Facebook post by Braxton, which describes both sides of a conversation with a companion at Choices: "Please sir don't murder your child. Protect your family. Shut the f up. Nope I'm not shutting up. You better. You will regret it. No I won't. I'm pleading with you for your child's life. You are a dad and will always be a dad but a dad of a murdered child. Held the woman's arm as he led his child to the slaughter!" (Ex. 396; see also Braxton at 3135:11–3136:23.) Even if either of these incidents could establish an intent to harass, annoy, or alarm, they could not establish a follow-and-harass violation, because they do not establish that either Musco or Braxton followed the person she was purportedly harassing.

A word of caution—this decision should not embolden the defendants to engage in more aggressive conduct. In a few instances noted, several of the defendants' actions came close to crossing the line from activity protected by the First Amendment to conduct prohibited by NYCCAA. Engaging in concerted activity that suggests an intent to annoy rather than to persuade not only violates the law, but also would seem to be contrary to defendants' stated objectives. Voluntarily discontinuing the practice of speaking to patients who have affirmatively asked to be left alone not only would evidence the defendants' good will, but also would lessen the likelihood of future litigation directed toward their protest activities.

    5.   <u>Interference with the Operation of a Reproductive Health Care Facility</u>

Under NYCCAA, it is unlawful for any person "to knowingly interfere with the operation of a reproductive health care facility, or attempt to do the same, by activities including, but not limited to, interfering with, or attempting to interfere with (i) medical procedures being performed at such facility or (ii) the delivery of goods to such facility." N.Y.C. Admin. Code § 8-803(a)(6). The OAG argues that Musco and Kaminsky interfered with the provision of reproductive health care services at Choices, on one occasion each, by telling an approaching patient and her mother that the Clinic was closed when it was open, causing the patient and her mother to turn around and leave. (OAG Findings ¶¶ 235, 250, 352, 365.) Assuming the statements were made and that they rise to the level of "interfer[ing] with the operation of a reproductive health care facility," N.Y.C. Admin. Code § 8-803(a)(6), I still deny the OAG's motion for a preliminary injunction against Musco and Kaminsky, because I do not find it reasonably likely that they will engage in this conduct again. In reaching this holding, I weigh heavily the fact that, despite years of protest activity, Musco and Kaminsky made such statements only once each. (<u>See</u> Asmus at 1804:13– 1807:1.) Based on my review of the record as a whole, I do not find it likely that either Musco or

Kaminsky, having been warned about the impropriety of such statements, will tell another patient that the Clinic is closed when it is open. Thus, the OAG has failed to establish either that irreparable harm is "actual and imminent," Actavis, 787 F.3d at 660, or "that there is a reasonable likelihood that the wrong will be repeated," Golden Feather Smoke Shop, 597 F.3d at 120–21.

## CONCLUSION

For the foregoing reasons, the OAG's motion for a preliminary injunction is denied.


SO ORDERED.

Dated: July 20, 2018
      Brooklyn, New York

Carol Bagley Amon
United States District Judge